Case No. 23-991

# United States Court of Appeals
# for the Ninth Circuit

United States of America,

        Plaintiff/Appellant,

v.

Gregory Pheasant,

        Defendant/Appellee.

D.C. No. 3:21-cr-24

Appeal from the United States District Court
for the District of Nevada

## Appellant Gregory Pheasant's
## Answering Brief

Rene L. Valladares
Federal Public Defender
*Rohit Rajan
*Ellesse Henderson
Assistant Federal Public Defenders
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
Rohit_Rajan@fd.org
Ellesse_Henderson@fd.org

*Counsel for Appellee Gregory Pheasant

# Table of Contents

Table of Contents.................................................................................i

Table of Authorities .......................................................................iii

Jurisdictional Statement.................................................................1

Detention Status..............................................................................1

Issues Presented ..............................................................................1

Relevant Constitutional Provisions, Statutes, and Sentencing
    Guidelines ....................................................................................1

Statement of the Case .....................................................................1

I.     Congress delegates to the BLM authority to create criminal
       regulations on public land.......................................................1

II.    BLM rangers stop and cite Pheasant under authority granted
       by this regulatory scheme. ......................................................4

III.   The district court dismisses the charges against Pheasant. ...........6

IV.   The government appeals. .................................................................9

Summary of the Argument .....................................................................10

Argument ................................................................................................11

I.     The district court correctly dismissed the charges under the
       nondelegation doctrine..................................................................11

    A.    Standard of review ....................................................................12

    B.    Congress provided no intelligible principle for the BLM. ..........12

    C.    The delegation here fails to provide the more specific
         guidance required in the criminal context...................................17

1.    Differences between criminal and civil consequences are well-established. ....................................................................18

2.    Compelling justifications exist for treating the criminal context differently. ..................................................................20

    a)   The nondelegation justifications are stronger in the criminal context. ................................................................21

        (1)   Separation of powers............................................................21

        (2)   Liberty ................................................................................24

        (3)   Accountability ...................................................................26

        (4)   Notice.................................................................................27

    b)   The rationales for delegations are weaker in the criminal context. ................................................................29

    D.   The government's arguments are unpersuasive..........................31

    1.    Neighboring statutes do not render Congress's delegation to the BLM constitutional. .....................................32

    2.    Greater delegations of authority require more guidance from Congress, not less. ..........................................36

    3.    Cases upholding statutes under the nondelegation doctrine are readily distinguishable. .....................................37

II.   The government cannot recharge Counts One and Two. ..............44

Conclusion...............................................................................................47

Certificate of Compliance

Certificate of Service

ii

# Table of Authorities

**Federal Constitutional Provisions**                                      **Page(s)**

U.S. Const. art. I ................................................................. 11, 22

**Federal Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ................................................ *passim*

*Abramski v. United States,*
    573 U.S. 169 (2014) ....................................................... 24

*Am. Power & Light Co. v. Sec. & Exch. Comm'n,*
    329 U.S. 90 (1946) ......................................................... 36

*Bank Markazi v. Peterson,*
    578 U.S. 212 (2016) ....................................................... 22

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ............................................... 29, 37

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ....................................................... 25

*Clearfield Tr. Co. v. United States,*
    318 U.S. 363 (1943) ....................................................... 23

*Dep't of Transp. v. Ass'n of Am. Railroads,*
    575 U.S. 43 (2015) ......................................................... 25

*Fahey v. Mallonee,*
    332 U.S. 245 (1947) ....................................................... 19

*Fed. Power Comm'n v. Hope Nat. Gas Co.,*
    320 U.S. 591 (1944) ....................................................... 38

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ....................................................... 26

*Ginzburg v. United States,*
    383 U.S. 463 (1966) ....................................................... 31

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ............................................................ *passim*

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ...................................................... 25, 26

*In re Cellular 101, Inc.*
  539 F.3d 1150 (9th Cir. 2008) ......................................... 45

*In re Kollock*
  165 U.S. 526 (1897) ........................................................ 19

*In re Nat'l Sec. Agency Telecomm. Recs. Litig.,*
  671 F.3d 881 (9th Cir. 2011) ........................................... 41

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
  448 U.S. 607 (1980) ........................................................ 30

*Jarkesy v. Sec. & Exch. Comm'n,*
  34 F.4th 446 (5th Cir. 2022) ........................................... 12, 14, 16, 44

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) .................................................... 29

*Landgraf v. USI Film Prod.,*
  511 U.S. 244 (1994) ........................................................ 22

*Lindquist v. City of Pasadena Texas,*
  669 F.3d 225 (5th Cir. 2012) ........................................... 45, 46

*Liparota v. United States,*
  471 U.S. 419 (1985) ........................................................ 24

*Loving v. United States,*
  517 U.S. 748 (1996) ........................................................ 20, 30

*Macheca Transp. Co. v. Philadelphia Indem. Ins.,*
  737 F.3d 1188 (8th Cir. 2013) ......................................... 45, 46

*Marshall Field & Co. v. Clark,*
  143 U.S. 649 (1892) ........................................................ 21

*Martin v. Occupational Safety & Health Rev. Comm'n,*
  499 U.S. 144 (1991) ........................................................ 29

*Med. Ctr. Pharm. v. Holder*,
    634 F.3d 830 (5th Cir.2011) ............................................................. 45

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................ 11, 12, 18, 30, 38

*Munoz v. Imperial County*,
    667 F.2d 811 (9th Cir. 1982) ........................................................... 44

*National Broad. Co. v. United States*,
    319 U.S. 190–26 (1943) ................................................................... 40

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) .................................................................. 11, 26

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ......................................................................... 15

*Papachristou v. Jacksonville*,
    405 U.S. 156 (1972) .................................................................. 27, 28

*Paul v. United States*,
    140 S. Ct. 342 (2019) ....................................................................... 20

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ......................................................... 47

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) .................................................................. 23, 27

*Skretvedt v. E.I. DuPont De Nemours*,
    372 F.3d 193 (3d Cir. 2004) ............................................................ 45

*Smith v. Goguen*,
    415 U.S. 566 (1974) ......................................................................... 23

*States v. Cassiagnol*,
    420 F.2d 868 (4th Cir. 1970) ........................................................... 42

*Touby v. United States*,
    500 U.S. 160 (1991) .............................................................. 17, 19, 40

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ............................................................ 17

*United States v. Apel,*
   571 U.S. 359 (2014) ......................................................... 24

*United States v. Arch Trading Co.,*
   987 F.2d 1087 (4th Cir. 1993) ......................................... 17

*United States v. Bass,*
   404 U.S. 336 (1971) ................................................... 24, 29

*United States v. Brown,*
   381 U.S. 437 (1965) ......................................................... 22

*United States v. Brown,*
   552 F.2d 817 (8th Cir. 1977) ......................................... 38

*United States v. Chi Tong Kuok,*
   671 F.3d 931 (9th Cir. 2012) ..................................... 40, 41

*United States v. Crisp,*
   820 F.3d 910 (7th Cir. 2016) ......................................... 45

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ......................................................... 41

*United States v. Dhafir,*
   461 F.3d 211 (2d Cir. 2006) ........................................... 17

*United States v. Eaton,*
   144 U.S. 677 (1892) ......................................................... 19

*United States v. Emens,*
   565 F.2d 1142 (9th Cir. 1978) ......................................... 9

*United States v. Grimaud,*
   220 U.S. 506 (1911) ................................................... 19, 40

*United States v. Hudson,*
   11 U.S. 32 (1812) ............................................................. 19

*United States v. Jingles,*
   702 F.3d 494 (9th Cir. 2012) ......................................... 46

*United States v. Jones,*
   608 F.2d 386 (9th Cir. 1979) ........................................... 9

*United States v. Kozminski,*
    487 U.S. 931 (1988) ..................................................... 30

*United States v. Melgar-Diaz,*
    2 F.4th 1263 (9th Cir. 2021) ............................. 12, 37, 41, 42

*United States v. Moriello,*
    980 F.3d 924 (4th Cir. 2020) ........................................ 43

*United States v. Motamedi,* No. 20-10364,
    2022 WL 101951 (9th Cir. Jan. 11, 2022) ......................... 17

*United States v. Nagra,*
    147 F.3d 875 (9th Cir. 1998) ........................................ 44

*United States v. Nichols,*
    784 F.3d 666 (10th Cir. 2015) ........................ 17, 18, 20, 25

*United States v. Radmall,*
    340 F.3d 798 (9th Cir. 2003) ........................................ 46

*United States v. Robel,*
    389 U.S. 258 (1967) ..................................................... 25

*United States v. Whitlow,*
    740 F.3d 433 (7th Cir. 2014) ........................................ 45

*United States v. Wiltberger,*
    18 U.S. 76 (1820) ....................................................... 23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ..................................................... 28

*Weaver v. Graham,*
    450 U.S. 24 (1981) ................................................. 22, 28

*Whitman v. Am. Trucking Associations,*
    531 U.S. 457–76 (2001) ............................... 36, 37, 39, 43

*Yakus v. United States,*
    321 U.S. 414–27 (1944) ............................................... 40

## Federal Statutes

15 U.S.C. § 701 ................................................................ 35

18 U.S.C. § 111 ............................................................. 6, 7

18 U.S.C. § 994 ............................................................... 39

18 U.S.C. § 3231 .............................................................. 1

18 U.S.C. § 3553 ......................................................... 38, 39

18 U.S.C. § 3731 .............................................................. 1

22 U.S.C. § 2778 ............................................................. 41

28 U.S.C. § 991 .............................................................. 39

43 U.S.C. § 1701 ......................................................... 33, 34

43 U.S.C. § 1702 ......................................................... 32, 33

43 U.S.C. § 1712 ............................................................. 33

43 U.S.C. § 1732 ......................................................... 32, 33

43 U.S.C. § 1733 ........................................................ *passim*

43 U.S.C. § 1761 ............................................................. 33

## Federal Regulations

36 C.F.R. § 242.6 ............................................................ 15

36 C.F.R. § 242.7 ............................................................ 15

36 C.F.R. § 242.8 ............................................................ 15

43 C.F.R. § 3715.8-1 .......................................................... 4

43 C.F.R. § 4140.1 ........................................................... 15

43 C.F.R. § 4770.1 ........................................................... 14

43 C.F.R. § 6302.20 ...................................................... 14, 15

43 C.F.R. § 8341.1 .......................................................... 3, 6

43 C.F.R. § 8365.1-2 ............................................................... 3, 15

43 C.F.R. § 8365.1-3 ................................................................... 3

43 C.F.R. § 8365.1-4 ........................................................... 6, 7, 15

43 C.F.R. § 8365.1-6 ................................................................... 4

43 C.F.R. § 8365.2-5 .................................................................. 14

43 C.F.R. § 9264.7 ..................................................................... 4

43 C.F.R. § 9268.3 ..................................................................... 4

65 Fed. Reg. 54544-01 ............................................................ 4, 5

65 Fed. Reg. 69781-03 ............................................................... 4

73 Fed. Reg. 39027-02 ............................................................... 4

79 Fed. Reg. 9267-01 ................................................................. 4

## Other Sources

*About Us*,
    U.S. General Services Administration ............................................... 42

*BLM Nevada*,
    Bureau of Land Mgmt., U.S. Dep't of the Interior ....................... 2, 13

*BLM Nevada History*,
    Bureau of Land Mgmt., U.S. Dep't of the Interior ............................. 2

F. Andrew Hessick & Carissa Byrne Hessick, *Nondelegation and Criminal Law*,
    107 Va. L. Rev. 281 (2021) ......................................................... 26, 27

*GSA Properties*,
    U.S. General Services Administration ............................................... 43

James Skillen, *The Nation's Largest Landlord: The Bureau of Land Management in the American West* (2009) ........................................... 1, 2

ix

Josh Bowers, *Legal Guilt, Normative Innocence, and the Equitable Decision Not to Prosecute*,

    110 Colum. L. Rev. 1655 (2010) .................................................. 26, 27

*Nevada Public Room*,

    Bureau of Land Mgmt., U.S. Dep't of the Interior ......................... 2, 3

Steve Timko, *BLM Considering Safety and Environmental Rules for Moon Rocks*,

    KOLO ..................................................................................... 5

*The Bureau of Land Management approves Hungry Valley Off-highway Vehicle Area Public Health and Safety Improvements*,

    Bureau of Land Mgmt., U.S. Dep't of the Interior ............................. 5

*What We Manage*,

    Bureau of Land Mgmt., U.S. Dep't of the Interior ........................... 13

## Jurisdictional Statement

The district court had jurisdiction in this criminal case under 18 U.S.C. § 3231. This Court has jurisdiction of the government's appeal under 18 U.S.C. § 3731.

## Detention Status

Gregory Pheasant is out of custody. ER-237.

## Issues Presented

I.     Whether 43 U.S.C. § 1733, which provides broad, open-ended criminal authority to the Bureau of Land Management (BLM), violates the nondelegation doctrine.

II.    Whether the government can recharge Counts One and Two even though it did not appeal the district court's independent legal basis for dismissing those two counts.

## Relevant Constitutional Provisions, Statutes, and Sentencing Guidelines

All applicable materials are contained in the government's addendum to its opening brief. *See* Cir. R. 28-2.7.

## Statement of the Case

### I.    Congress delegates to the BLM authority to create criminal regulations on public land.

Apart from the entire federal government, the BLM is the nation's largest landlord. James Skillen, *The Nation's Largest Landlord: The*

1

*Bureau of Land Management in the American West* 1–3 (2009). In Nevada, the BLM manages nearly two-thirds of public land.[1] The agency controls 48 million acres, with land in each of the state's sixteen counties:



---

[1] Some BLM sources list "67% of Nevada" under BLM control, *see* U.S. Dep't of the Interior, Bureau of Land Mgmt., *BLM Nevada*, https://www.blm.gov/nevada (last visited Apr. 19, 2024), while other sources claim the BLM manages "63 percent of the state," *see* U.S. Dep't of the Interior, Bureau of Land Mgmt., *BLM Nevada History*, https://www.blm.gov/about/history/history-by-region/nevada (last visited Apr. 19, 2024).

2

U.S. Dep't of Interior, Bureau of Land Mgmt., *Nevada Public Room*,

https://www.blm.gov/media/public-room/nevada (last visited Apr. 19,

2024).

On this land, the BLM enjoys almost unfettered discretion to

create its own laws—including its own crimes. The Secretary of the

Interior (who administers the BLM) may issue any "regulations

necessary to implement the provisions of [the Federal Land Policy and

Management Act of 1976 (FLPMA)] with respect to the management,

use, and protection of the public lands." 43 U.S.C. § 1733(a). Penalties

accompany any violation. Violations of these regulations can result in

prison terms up to one year, thousand-dollar fines, or both. *Id.*

The BLM has seized on the nearly limitless mandate in

Section 1733(a) to enact a range of criminal regulations. Its rules

govern everything from how long individuals may camp at a particular

spot, 43 C.F.R. § 8365.1-2(a); to what kind of seatbelts individuals must

wear, *id.* § 8365.1-3(b)(1); to whether saddle horses have the right-of-

way over off-road vehicles, *id.* § 8341.1(g). The breadth of this authority

is apparent even with only the regulations that carry criminal

penalties. The BLM has, for example, criminalized outdated vehicle

3

registration, *id.* § 9268.3(a)(iv); horse adoption, *id.* § 9264.7(a)(2); noisiness, *id.* § 9268.3(a)(3)(ii); and making false statements to BLM officials, *id.* § 3715.8-1.

Besides those generally applicable regulations, the BLM has given its own state directors discretionary authority to issue "supplementary rules" for their respective jurisdictions. *Id.* § 8365.1-6. The scope of these supplementary rules is similarly unlimited. Nevada's BLM director has, for instance, used this authority to limit where firearms may be used, 79 Fed. Reg. 9267-01(4)(a) (Feb. 14, 2014); 65 Fed. Reg. 69781-03, § (4)(e) (Nov. 20, 2000); regulate where rocks may be picked up, 73 Fed. Reg. 39027-02, § 1(2) (July 8, 2008); and specify agricultural practices on any BLM-managed land in the state, 65 Fed. Reg. 54544-01(a)(1) (Sept. 8, 2000).

## II. BLM rangers stop and cite Pheasant under authority granted by this regulatory scheme.

Over Memorial Day weekend in 2021, Pheasant was detained by BLM rangers while riding a dirt bike on public land in Moon Rocks, a popular destination for off-road enthusiasts in Nevada. Historically, BLM administered the area with a light hand. But, citing concerns

4

about increasing popularity, the BLM implemented a new management and enforcement plan in April 2021. *See* Lisa Ross, *The Bureau of Land Management approves Hungry Valley Off-highway Vehicle Area Public Health and Safety Improvements* (Apr. 15, 2021), https://www.blm.gov/ press-release/bureau-land-management-approves-hungry-valley- highway-vehicle-area-public-health-and (last visited Apr. 19, 2024). Among other measures, that plan pledged to "target specific public health and safety and resource concerns" and to increase regulatory oversight of those who frequented the area. *Id.*; *see* Steve Timko, *BLM Considering Safety and Environmental Rules for Moon Rocks*, KOLO (Dec. 27, 2020), https://www.kolotv.com/2020/12/27/blm-considering- safety-and-environmental-rules-for-moon-rocks/ (last visited Apr. 19, 2024).

On May 28, 2021, shortly after the new BLM plan was approved, two BLM rangers, Michael Yost and Garrett Sarcinella, observed a group of riders without rear taillights a little over an hour after sunset. ER-186–88, 190–91. Yost described one of the riders, who allegedly yelled profanities, as "wearing a neon green color shirt, black and white helmet with red stripes on his pants." ER-187. After stopping the group,

5

the same rider allegedly "twisted his throttle rapidly," causing the bike's rear wheel to "break traction" and "spray[] [Sarcinella's] face with rocks and dirt." ER-190–91. The rider left. ER-191.

About five minutes later, Yost detained Pheasant, believing him to be the same rider as earlier. ER-187. Yost "stuck [his] baton" in the spokes of Pheasant's bike "so he could not again flee from the area." ER-187. Yost eventually cited Pheasant for driving an off-road vehicle without a taillight (Count Three), in violation of 43 C.F.R. § 8341.1(f)(5), (h). ER-186. The government later obtained an indictment for assault on a federal officer (Count One), in violation of 18 U.S.C. § 111(a)(1), (b), along with the taillight charge and another citation for resisting issuance of citation or arrest (Count Two), in violation of 43 C.F.R. § 8365.1-4(a)(4). ER-221–22.

## III. The district court dismisses the charges against Pheasant.

The district court dismissed the indictment on three grounds. ER-3–26.

First, the court held that Counts Two and Three, the regulatory charges, were invalid because they relied on an unconstitutional

6

delegation of legislative authority. ER-11–21. Section 1733(a) lacks an intelligible principle. ER-13–17. No statutory language limited the delegation. ER-13–17. Almost all conduct on federal land involves its management, use, or protection. ER-14–16. And the Secretary of Interior has promulgated regulations on topics ranging "from housing policies, to traffic laws, to firearm regulations, to mining rules, to agriculture certifications." ER-14–15 (citations and footnotes omitted); ER-16 & n.9 (citing other regulations). Because the BLM manages nearly two-thirds of Nevada, the delegation's breadth was striking. ER-16. And the court echoed concerns with giving the Executive "'the power to write his own criminal code' on the public lands." ER-16–17 (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Gorsuch, J., dissenting)).

Second, the court found that BLM rangers lacked the law enforcement authority necessary to stop and cite Pheasant. ER-19–25. Both Counts One and Two required proof that BLM rangers were performing official duties. ER-24 (citing 18 U.S.C. § 111(a)(1), (b), and 43 C.F.R. § 8365.1-4(a)(4)). The court could not find a single regulation providing BLM rangers with "law enforcement responsibilities," even

7

though the Secretary of Interior can provide that authority. ER-21–23 (quoting 43 U.S.C. § 1733(c)(2)). Although other federal statutes directly give law enforcement authority to agency officers, no such statute exists for BLM rangers. ER-22–24 (collecting statutes). Nor does Nevada law provide this authority to these rangers. ER-24. Because BLM rangers could not stop and arrest Pheasant, the government could not prove the official duties element for these two counts. ER-24–25.

And third, the district court dismissed Counts One and Two because the indictment did not adequately inform Pheasant of the charges against him. ER-9–11. The indictment "failed to include any facts or circumstances to inform Pheasant" of the charged conduct for Counts One and Two. ER-10. The assault allegations identified no weapon used or any bodily injury inflicted—an essential element. ER-10. And the allegations for resisting issuance of a citation merely "restate[d] the regulatory language." ER-10. These pleading deficiencies required dismissal. ER-9–11.

Because these bases required dismissal of all three counts, the district court denied Pheasant's suppression motion as moot. ER-25. The court also did not decide whether the "creat[ion] of risk" language

8

in § 8365.1-4(a)(4) rendered the regulation unconstitutionally vague and overbroad. ER-63–65, 172–176.

## IV. The government appeals.

The government appealed,[2] but in its opening brief, it challenged only the district court's nondelegation basis for dismissing Count Three. *See generally* OB; *see also* OB-10–11 n.4. The government did not appeal the court's alternative bases for dismissing Counts One and Two. *See* OB-10–11 & n.4, 25.

| Count | District Court Basis for Dismissal | Government's Argument on Appeal |
|---|---|---|
| Count One (assault) | Specificity | |
| | Authority to Detain | |
| Count Two (resisted issuance of citation) | Specificity | |
| | Authority to detain | |
| | Nondelegation | |
| Count Three (taillight) | Nondelegation | X |

---

[2] The government complains it was deprived of the opportunity to file supplemental briefing on the law enforcement authority issue and to respond to Pheasant's reply. OB-6–7. Yet the government never sought reconsideration to alert the district court of any authority it missed. *See United States v. Jones*, 608 F.2d 386, 390 (9th Cir. 1979) (explaining that motions for reconsideration can be used to notice "error[s] of fact or law" (quoting *United States v. Emens*, 565 F.2d 1142, 1144 (9th Cir. 1978)).

## Summary of the Argument

Congress has given the BLM virtually unchecked power to create—and then enforce—its own criminal code. In doing so, Congress provided no intelligible principle to guide BLM decision-making; the agency can enact any criminal laws it thinks are "necessary" for the "management, use, and protection of the public lands." 43 U.S.C. § 1733(a).

This delegation of legislative power is unconstitutional. By omitting an intelligible principle, Congress has allowed the BLM, at its discretion, to create a limitless series of regulations. These problems are compounded by BLM's ability to create *criminal* offenses, carrying a potential punishment of a year in jail, a thousand-dollar fine, or both. Such an open-ended delegation of criminal authority permits unchecked intrusions on individual liberty and deprives defendants of fair notice. And in Nevada, this means the Executive can create and then prosecute criminal offenses for most of the state, elevating the BLM to the level of the state legislature, governor, and state police.

10

## Argument

### I. The district court correctly dismissed the charges under the nondelegation doctrine.

The nondelegation doctrine preserves the separation of powers. The Constitution provides three "limited and divided" branches of government. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring). Under Article I, section 1 of the Constitution, "[a]ll legislative Powers . . . shall be vested in a Congress of the United States." Because this provision gives exclusive legislative power to Congress, "Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989). Instead, Congress can only seek "the assistance of its coordinate Branches." *Id.* at 372. The line between unconstitutional delegation and constitutional assistance depends on whether Congress has provided an "intelligible principle" to the agency. *Id.* If Congress has not provided such a principle, the statute—along with any regulations promulgated under it—is unconstitutional. *Id.*; *see, e.g.*, *Jarkesy v. Sec. & Exch.*

11

*Comm'n*, 34 F.4th 446, 459–63 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023),[3] *and cert. denied*, 143 S. Ct. 2690 (2023).

Here, Congress delegated legislative power to the Secretary of the Interior and the BLM—the power to create criminal sanctions for private actions on BLM land. 43 U.S.C. § 1733(a). Because Congress provided no intelligible principle for that delegation, the district court correctly dismissed counts two and three.

### A.    Standard of review

This Court reviews de novo whether a statute violates the nondelegation doctrine. *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266 (9th Cir. 2021).

### B.    Congress provided no intelligible principle for the BLM.

As the district court correctly held, Congress failed to provide the requisite guidance curbing executive discretion. ER-11–21. The delegation to create criminal offenses on BLM land appears in Section 1733(a) of the FLPMA. In that section, Congress delegated to the

---

[3] The Supreme Court heard argument in *Jarkesy* on November 29, 2023.

Secretary of the Interior the authority to "issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property located thereon." 43 U.S.C. § 1733(a). This statute gives the Secretary, through BLM officials, essentially unlimited authority to enact criminal prohibitions within its territory—which comprises 10% of the nation's land and about two-thirds of the state. *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., *What We Manage*, https://www.blm.gov/about/what-we-manage (last visited Apr. 19, 2024) ("The BLM manages one in every 10 acres of land in the United States, and approximately 30 percent of the Nation's minerals."); U.S. Dep't of the Interior, Bureau of Land Mgmt., *BLM Nevada*, https://www.blm.gov/nevada (last visited Apr. 19, 2024) ("67% of Nevada—48 million acres belong to the American people.").

Starting with the statute's plain text, Section 1733(a) authorizes virtually any sort of regulation, including criminal prohibitions, as any activity performed on BLM land would relate to the "use" of those "public lands." 43 U.S.C. § 1733(a). The agency determines what is "necessary." *Id.* The agency then writes whatever regulations—

13

including criminal offenses—it believes accomplishes the statute's ends. And the agency ultimately enforces those same regulations on BLM property. Nothing in the statute cabins the agency's discretion in any meaningful way. Indeed, it is hard to imagine a regulation that would not fall under this broad umbrella. And so, by its terms, the statute vests the BLM with the general power to write its own criminal code for the territory it controls, violating the nondelegation doctrine. *See Jarkesy*, 34 F.4th at 462 ("If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution.").

In practice, the BLM has used that grant of authority to enact a wide-ranging system of regulations, including its own housing policies, traffic laws, firearms regulations, mining rules, agricultural certifications, and—most critically here—criminal code. Under the regulations, the public is prohibited from participating in "competitive use," including "foot races," 43 C.F.R. § 6302.20(i); "harassing" a wild horse or burro, *id.* § 4770.1(a); "bringing an animal, except a Seeing Eye or Hearing Ear dog, to a swimming area," *id.* § 8365.2-5(b); making "unreasonable noise," *id.* § 8365.1-4(a)(1); or camping "longer than the

14

period of time permitted by the authorizing officer," *id.* § 8365.1-2(a).
Even more regulations dictate hunting and fishing in Alaska, *id.*
§ 242.6–242.8; behavior while grazing livestock on BLM land, *id.*
§ 4140.1; and activities while camping in BLM wilderness, *id.* § 6302.20.
These are just a few examples of the numerous criminal regulations
enacted under Section 1733(a). And these regulations have a significant
effect in Nevada, where the BLM manages nearly two-thirds of the
land. *See supra*, p. 2.

The statute, in fact, provides less of an "intelligible principle" than
those previously held unconstitutional. In *A.L.A. Schechter Poultry
Corp. v. United States*, 295 U.S. 495, 541 (1935), for example, the
Supreme Court struck down a statute allowing the Executive to set
rules for "fair competition" between businesses. Even though the
statute included some limiting language, the Court concluded it lacked
adequate standards and gave "virtually unfettered" discretion to the
Executive. *Id.* at 542.

The Supreme Court reached a similar conclusion in *Panama
Refining Co. v. Ryan*, 293 U.S. 388, 415 (1935). There, the Supreme
Court concluded that Section 9(c) of the National Industrial Recovery

15

Act—which allowed the Executive to set limits on oil transportation between states—violated the nondelegation doctrine. *Id.* Although the statute narrowly focused on one segment of the national economy, the Court held it invalid, as it "establish[ed] no cr[i]terion to govern the President's course." *Id.* at 406, 415.

The Fifth Circuit recently relied on these two cases to conclude that Congress unconstitutionally delegated its authority to the Securities and Exchange Commission. *Jarkesy*, 34 F.4th at 459–63. The court acknowledged that the Supreme Court has not struck down a statute on nondelegation grounds in the past 80 years. *Id.* at 462. But this observation was best explained by lack of opportunity, not doctrinal invalidity, as the Court had not "considered the issue when Congress offered *no guidance* whatsoever." *Id.* at 462. The last time the Court faced such a case, in *Panama Refining*, it found an unconstitutional delegation. *Id.* That case is, of course, still good law. *Id.* Thus, the Fifth Circuit concluded, so too is the nondelegation doctrine. *Id.*

16

### C.   The delegation here fails to provide the more specific guidance required in the criminal context.

Courts question "whether more specific guidance is in fact required" for "regulations that contemplate criminal sanctions." *Touby v. United States*, 500 U.S. 160, 166 (1991). Although *Touby* left that question unanswered, several courts have assumed a stricter nondelegation principle arises with criminal delegations.[4] *See, e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 575–77 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 216–17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093–94 (4th Cir. 1993). These courts require meaningful "constraining factors" that "explicitly define[] and circumscribe[]" the agency's authority. *Amirnazmi*, 645 F.3d at 575 (quoting *Arch Trading Co.*, 987 F.2d at 1092–94). And now-Justice Gorsuch proposed a more-detailed test: "(1) Congress must set forth a clear and generally applicable rule . . . "that (2) hinges on a factual determination by the Executive . . . and (3) the statute provides criteria the Executive must employ when making its finding[.]" *United*

---

[4] This Court has not taken a position. *See, e.g.*, *United States v. Motamedi*, No. 20-10364, 2022 WL 101951, at *2 (9th Cir. Jan. 11, 2022) (declining to decide the question).

*States v. Nichols*, 784 F.3d 666, 673 (10th Cir. 2015) (Gorsuch, J., dissenting from denial of rehearing en banc).

This Court should adopt similarly exacting review. A stricter nondelegation principle for criminal delegations is longstanding. And the justifications against delegations are weightier with criminal consequences.

### 1.   Differences between criminal and civil consequences are well-established.

The Framers recognized with "criminal subjects," Congress should "leave as little as possible to the discretion of those who are to apply and to execute the law." James Madison, *The Report of 1800*, in 14 The Papers of James Madison 266, 307, 324 (Robert A. Rutland et al. eds., 1983). They "worried that placing the power to legislate, prosecute, and jail in the hands of the Executive would invite the sort of tyranny they experienced at the hands of a whimsical king." *Nichols*, 784 F.3d at 670 (Gorsuch, J., dissenting from denial of rehearing en banc). This concern supplemented their "central judgment" that "the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta*, 488 U.S. at 380.

18

This judgment about the dangers associated with criminal consequences persisted. Early on, courts stressed that the power to define crimes and fix punishments belongs only to Congress. *United States v. Hudson*, 11 U.S. 32, 34 (1812). If Congress failed to define "fully and completely" the offense, no one could be held accountable. *In re Kollock*, 165 U.S. 526, 533 (1897); *see also United States v. Eaton*, 144 U.S. 677, 688 (1892) ("[S]ufficient statutory authority should exist for declaring any act or omission a criminal offense."). To be valid, punishment must be "imposed by the act itself." *United States v. Grimaud*, 220 U.S. 506, 523 (1911). Indeed, *Panama Refining* and *Schechter Poultry*—the seminal cases sustaining nondelegation challenges—"emphasized" that they addressed "delegation of a power to make federal crimes of acts that never had been such before." *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947).

The Supreme Court in *Touby* avoided deciding the need for more specific criminal guidance. 500 U.S. at 166. Yet some Justices thought that "the severe impact of criminal laws on individual liberty" made challenges to such administrative standards "a constitutional necessity." *Touby*, 500 U.S. at 170 (Marshall, J., concurring). The

19

Supreme Court, only a few years later, repeated this concern, explaining that Congress, when "delegating authority to define crimes" must "supply the notice to defendants the Constitution requires." *Loving v. United States*, 517 U.S. 748, 768 (1996) (cleaned up). Several Justices have recently re-expressed these concerns, citing dangers with "weighty criminal penalties." *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting); *see also id.* at 2130–31 (Alito, J., concurring) (expressing similar concerns); *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting the denial of certiorari) (remarking that Justice Gorsuch's "thoughtful *Gundy* opinion" warranted "further consideration").

These historically unique concerns with criminal lawmaking require a stricter intelligible principle requirement here.

### 2. Compelling justifications exist for treating the criminal context differently.

"It's easy enough to see why a stricter rule would apply in the criminal arena." *Nichols*, 784 F.3d at 672 (Gorsuch, J., dissenting from denial of rehearing en banc). Criminal consequences more strongly

implicate the concerns motivating the nondelegation doctrine. And the rationales for delegations are weaker.

### a) The nondelegation justifications are stronger in the criminal context.

At least four justifications support the nondelegation doctrine—the separation of powers, liberty, accountability, and notice. All four support more stringent requirements for criminal delegations.

### (1) Separation of powers

As explained, the Constitution exclusively vests Congress with legislative authority. *See supra*, p. 11. To support the "integrity and maintenance" of the separation of powers, it is "vital" that "congress cannot delegate legislative power." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).

The separation of powers has been of historic import with criminal lawmaking. The framers worried about inviting "the tyranny of the majority that follows when lawmaking and law enforcement responsibilities are united in the same hands." *Gundy*, 139 S. Ct. at 2144–45 & n.88 (Gorsuch, J., dissenting) (citing The Federalist No. 47, at 302 (Madison)). Allowing "the nation's chief prosecutor the power to

21

write his own criminal code" is simply "delegation running riot." *Id.* at

2148 & n.107 (quoting *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J.,

concurring)).

These separation-of-powers concerns specific to the criminal

context are reflected with other constitutional provisions. Although

Congress may constitutionally single out parties to a civil suit, *see Bank*

*Markazi v. Peterson*, 578 U.S. 212, 233 (2016), the Bill of Attainder

Clause prohibits Congress from singling out persons for criminal

punishment, U.S. Const. art. I, § 9, cl. 3. This clause is "an

implementation of the separation of powers, a general safeguard

against legislative exercise of the judicial function, or more simply—

trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965).

Similarly, Congress may impose retroactive civil liability,

*see Landgraf v. USI Film Prod.*, 511 U.S. 244, 267–70 (1994), but the Ex

Post Facto Clause forbids the enactment of retrospective criminal

punishment, U.S. Const. art. I, § 9, cl. 3. This clause, too, "upholds the

separation of powers by confining the legislature to penal decisions with

prospective effect and the judiciary and executive to applications of

existing penal law." *Weaver v. Graham*, 450 U.S. 24, 29 n.10 (1981).

22

Other constitutional doctrines warrant a prohibition on the delegation of criminal lawmaking power. The void-for-vagueness doctrine prohibits vague criminal statutes, in part, to prevent legislatures from "abdicat[ing] their responsibilities for setting the standards of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). "In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality).

The prohibition on federal courts from creating criminal common law mimics these concerns. Federal courts sometimes can create civil common law. *See, e.g.*, *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943). But such authority is absent in the criminal context under the "plain principle that the power of punishment is vested in the legislative, not in the judicial department." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). "It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *Id.*

Lastly, rules of statutory interpretation support a nondelegation principle specific to criminal law. The Supreme Court has refused to

23

provide *Chevron* deference for criminal statutes, because Congress—not the Executive—must define criminal laws. *See Abramski v. United States*, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe."); *United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."). And the rule of lenity, which applies only to criminal statutes, strikes "the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985). It "embodies the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." *United States v. Bass*, 404 U.S. 336, 348 (1971).

These various rules, which safeguard the separation of powers, support a criminal-specific nondelegation rule that should apply here.

### (2)   Liberty

The framers worried that "[a]n 'excess of law-making'" was "one of 'the diseases to which our governments are most liable.'" *Gundy*, 139 S. Ct. at 2134 & n.23 (Gorsuch, J., dissenting) (quoting The Federalist No. 62, at 378 (J. Madison)). To guard against this problem, they adopted

24

"checks and balances" as "the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). The nondelegation doctrine serves this constitutional design. "The principle that Congress cannot delegate away its vested powers exists to protect liberty" that would otherwise be restricted through lawmaking. *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring).

Anxieties about intrusions on liberty are at their zenith with criminal consequences. "The criminal conviction and sentence represent the ultimate intrusions on personal liberty and carry with them the stigma of the community's collective condemnation—something quite different than holding someone liable for a money judgment because he turns out to be the lowest cost avoider." *Nichols*, 784 F.3d at 672–73 (Gorsuch, J., dissenting from denial of rehearing en banc). Thus, "[t]he area of permissible indefiniteness in delegations" should narrow "if the regulation invokes criminal sanctions." *United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring). Other protections acknowledge the harms of criminal sanctions. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 556–58 (2004) (Scalia, J., dissenting) (cataloguing the

procedural requirements in the criminal context); *supra*, pp. 22–24. And a particular concern is the Executive's "exclusive power to enforce criminal laws," a danger missing with civil enforcement. F. Andrew Hessick & Carissa Byrne Hessick, *Nondelegation and Criminal Law*, 107 Va. L. Rev. 281, 307–08 (2021).

### (3)   Accountability

"The nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 124 (Gorsuch, J., concurring). In that respect, the doctrine minimizes the temptation of lawmakers "to delegate power to agencies to reduce the degree to which they will be held accountable for unpopular actions." *Id.* (cleaned up). "The diffusion of power," courts have warned, "carries with it a diffusion of accountability." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010).

The dilution of accountability is worrisome in this context. Even with misdemeanors, "prosecutors enjoy almost unbridled equitable discretion" in making "critical determinations of normative blameworthiness." Josh Bowers, *Legal Guilt, Normative Innocence, and*

26

*the Equitable Decision Not to Prosecute*, 110 Colum. L. Rev. 1655, 1659 (2010). This broad, unchecked authority exacerbates other accountability concerns. "Criminal laws provide a powerful tool to codify prejudices or impose unwarranted burdens on certain segments of the public." Hessick & Hessick, *supra*, at 313. *Gundy*, after all, involved individuals convicted of sex offenses—"one of the most disfavored groups in our society." 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Criminal laws also may be used to "stamp out opposition" or to benefit its enforcers, requiring electoral accountability "to combat these potential abuses." Hessick & Hessick, *supra*, at 313.

### (4)   Notice

"Restricting the task of legislating to one branch characterized by difficult and deliberative processes was also designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules." *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting). This justification mirrors one for the void-for-vagueness doctrine, which insists "that ordinary people have 'fair notice' of the conduct a statute proscribes." *Dimaya*, 584 U.S. at 156 (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972)). If "Congress,

27

rather than the executive," fails to "define what conduct is sanctionable and what is not," the risk of "arbitrary or discriminatory law enforcement" increases. *Id.*

Fair notice is especially important with criminal laws. The ex post facto prohibition, which applies only to criminal statutes, exists "to assure legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver*, 450 U.S. at 28–29. Relatedly, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). There is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99.

Because the justifications for the nondelegation doctrine are weightier with criminal statutes, this Court should require more specificity here.

### b) The rationales for delegations are weaker in the criminal context.

Two oft-cited justifications for delegations reference agency expertise and workability. Those reasons are absent with criminal delegations.

Starting with expertise, delegations are sometimes justified because "complex or changing circumstances call[] upon the agency's unique expertise and policymaking prerogatives." *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991). But this justification cannot exist in the abstract. The absence of "substantive expertise" casts doubt on the agency's authority. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring) (similar).

With criminal rules, administrative expertise is absent. "[C]riminal punishment usually represents the moral condemnation of the community," so "legislatures" must "define criminal activity." *Bass*, 404 U.S. at 348. Because democratic accountability is the primary consideration in criminal lawmaking, input from Congress—"the branch most capable of responsive and deliberative lawmaking"—matters, not

29

an agency. *Loving*, 517 U.S. at 757–58. This principle explains why courts have consistently described crime creation as an "inherently legislative task." *United States v. Kozminski*, 487 U.S. 931, 949 (1988).

As for workability, some defenses of delegation have remarked that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Gundy*, 139 S. Ct. at 2130 (quoting *Mistretta*, 488 U.S. at 372). This justification relies on the inevitability that "some judgments must be left to the officers executing the law." *Id.* (cleaned up).

This observation does not justify completely open-ended delegations. Rather than allowing agencies to provide details, these delegations allow Congress to avoid choices so politically divisive "that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring); *see also Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting) (explaining how Congress can "pass[] the potato" through delegation when it cannot "achieve the consensus necessary to resolve the hard problems"). With Section 1733, Congress has allowed the BLM to make

30

difficult decisions about competing environmental and economic concerns. *See infra*, p. 34. Not only does the agency make those policy judgments, but it does so while wielding the "awesome and dangerous power[]" to impose criminal punishment. *Ginzburg v. United States*, 383 U.S. 463, 477 (1966) (Black, J., dissenting).

In short, the history and justifications behind the nondelegation doctrine require a more stringent standard for criminal statutes. The delegation here fails this stricter benchmark. Section 1733 contains no constraining factors or criteria that limit the BLM's authority. *See supra*, pp. 12–16.

### D.    The government's arguments are unpersuasive.

The government makes several challenges to the district court's reasoning. OB-14–25. The government points to other parts of the FLPMA, insisting they provide adequate guidance to executive officials. OB-17–18. The government contends that the BLM's immense scope "places Congress's grant of authority to the Secretary on *firmer* footing." OB-23–24. And the government relies on cases rejecting challenges to other statutes on nondelegation grounds. OB-14–16, 19–24. The government is wrong, and each case it cites is distinguishable.

31

### 1.   Neighboring statutes do not render Congress's delegation to the BLM constitutional.

The government relies on five other sections of the FLPMA in arguing that, read together, the statute provides adequate guidance to the BLM. OB-17–18 (citing 43 U.S.C. §§ 1701, 1702, 1712, 1732, 1761). None of these sections supports the government's argument.

Starting with Section 1732, the government makes an argument missing from its pleadings below—that this section constrains the BLM's discretion by directing that the agency "manage the public lands under principles of multiple use and sustained yield" and "prevent unnecessary or undue degradation of the lands." OB-17 (quoting 43 U.S.C. § 1732(a), (b)). The government has not explained how this language would have constrained the creation of the relevant criminal regulations here. Indeed, this section is entirely separate from criminal enforcement, which is addressed in Section 1733. By directing the Department of Interior to consider multiple use, sustained yield, and the unnecessary or undue degradation of public land, Congress was addressing management of the land to "best meet the present and future needs of the American people," 43 U.S.C. § 1702(c), not how to

32

handle criminal violations on that land. Pheasant is not challenging the BLM's authority to enact civil regulations, only criminal. Because Section 1732 concerns only the former, it is inapplicable.

The definitions in Section 1702 do not save the delegation. *See* OB-17. Section 1702 does not define any of the broad terms in the delegating statute for criminal regulations. *Compare* 43 U.S.C. § 1702, *with id.* § 1733(a). It includes no definition for "necessary." *Id.* § 1702. Nor "management, use, and protection." *Id.* Instead, it provides definitions relevant only to other parts of the statutory scheme, including "wilderness," "eleven contiguous Western States," "grazing permit and lease," and "Secretary." *Id.*

Nor do Sections 1712 or 1761 save the delegation. OB-17–18. As the government recognizes, both provisions "refine and direct the BLM's implementation of Section 1732(a)," OB-18 (cleaned up)—not Section 1733. Section 1712 concerns land use plans. 43 U.S.C. § 1712. And Section 1761 concerns rights-of-way. *Id.* § 1761. Again, neither addresses BLM's ability to legislate *criminal* offenses on BLM land.

Finally, Section 1701's policy declarations do not render the delegation constitutional. The government focuses on only three of the

33

declarations. OB-18 (citing 43 U.S.C. § 1701(a)(7)–(8), (12)). Those three declarations provide several general goals: developing public land through "multiple use and sustained yield"; protecting "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values"; preserving and protecting lands "in their natural condition"; providing food and habitat for fish and wildlife; providing outdoor recreation; and maintaining "domestic sources of minerals, food, timber, and fiber." 43 U.S.C. § 1701(a)(7)–(8), (12). Like Section 1733(a), the declarations are so broad as to permit virtually any regulation. And the ten additional declarations expand the BLM's discretion more, providing broad—and, at times, contradictory—goals like protecting the environment, maintaining federal ownership, designating lands for specific purposes, and disposing of land in a uniform manner. *Id.* § 1701(a)(1), (4), (10)–(11). It is again difficult to think of a regulation that does not satisfy at least one of these goals.

These policy declarations are substantially broader than the policy declarations the Supreme Court rejected in *Schechter Poultry*. The statute at issue there was enacted to address a "national emergency" of "widespread unemployment and disorganization of industry" and

34

provided a series of goals related to interstate commerce. *Schechter Poultry*, 295 U.S. at 531 n.9, 534–36 (quoting 15 U.S.C. § 701). Those policy goals included: (1) "removing obstructions to the free flow of interstate commerce"; (2) "inducing and maintaining united action of labor and management under adequate governmental sanctions and supervision"; (3) "eliminating unfair competitive practices"; and (4) "increasing the consumption of industrial and agricultural products." *Id.* (cleaned up). Despite these specific goals, the Supreme Court reasoned that the statute's "general aims" still left "the discretion of the President in approving or prescribing codes . . . virtually unfettered." *Id.* at 541–42; *see id.* at 538 (criticizing the statute for providing a "wide field of legislative possibilities"). The policies were so broad that the Executive could do whatever it thought "beneficial" in "dealing with the vast array of commercial and industrial activities throughout the country." *Id.* at 539. And that, the Court held, rendered the statute an unconstitutional delegation of legislative power. *Id.* at 542.

The statute here is worse. It is not limited to economic conditions. *Contra id.* at 521–23. It is not designed to address a specific emergency. *Contra id.* And its vague terms have no established meeting or limit.

35

*Contra Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90,

104–05 (1946). Instead, it is a broad grant of legislative authority,

cabined only by the geographic reach of the BLM—10% of the country's

land, 30% of its minerals, and nearly two-thirds of Nevada. Such

"general aims" give the BLM "virtually unfettered" discretion to do

whatever it thinks is "beneficial" for the lands it manages. *Schechter*

*Poultry*, 295 U.S. at 539, 542. Just as in *Schechter Poultry*, the

delegation here is unconstitutional.

### 2. Greater delegations of authority require more guidance from Congress, not less.

The government next challenges the district court's consideration

of BLM's footprint in Nevada. OB-23–24. According to the government,

the scope of BLM's authority supports a broad delegation from

Congress. OB-23–24. The Supreme Court has explicitly rejected this

argument.

In *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472–76

(2001), the Supreme Court considered whether the Clean Air Act

unconstitutionally delegated legislative power to the EPA. Although the

Court ultimately rejected the challenge to the statute, it also explained

36

the relevance of "the scope of the power congressionally conferred." *Id.*
at 475. "While Congress need not provide any direction to the EPA
regarding the manner in which it is to define 'country elevators,' . . . it
must provide substantial guidance on setting air standards that affect
the entire national economy." *Id.*; *see also Melgar-Diaz*, 2 F.4th at 1267–
68 (same); *Biden v. Nebraska*, 143 S. Ct. at 2377 (Barrett, J.,
concurring) ("[T]he Court overprotects the nondelegation principle by
increasing the cost of delegating authority to agencies—namely, by
requiring Congress to speak unequivocally in order to grant them
significant rule-making power."). Thus, here, while Congress need not
specify how the BLM regulates narrow issues on public land, it must
provide greater guidance when the BLM is regulating all crimes on that
land.

**3.   Cases upholding statutes under the
nondelegation doctrine are readily
distinguishable.**

The government cites cases that, in its view, are analogous to
Pheasant's, upholding statutes in the face of nondelegation challenges.
*See* OB-14–16, 19–24. But none of these cases address a delegation like
the one here.

37

The government first cites Supreme Court cases rejecting nondelegation challenges.[5] For example, the government relies on *Mistretta*, 488 U.S. at 374–77, where the Supreme Court upheld Congress's delegation to the United States Sentencing Commission to create the Sentencing Guidelines. But in doing so Congress provided considerable guidance. Congress "charged the Commission" with three overarching goals: (1) assure the specified purposes of sentencing were met[6]; (2) provide "certainty and fairness" by "avoiding unwarranted sentencing disparities" and "maintaining sufficient flexibility to permit individualized sentences"; and (3) "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the

---

[5] The government also cites two cases that do not address the nondelegation doctrine, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 611 (1944) (considering the legality of rate fixed under regulation), and *United States v. Brown*, 552 F.2d 817, 822–23 & n.8 (8th Cir. 1977) (addressing the Property Clause). OB-14, 20–21.

[6] The purposes of sentencing, as specified by Congress, are: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

38

criminal justice process." *Id.* at 374 (quoting 28 U.S.C. § 991(b)(1)). Congress additionally "prescribed the specific tool—the guidelines system—for the Commission to use in regulating sentencing." *Id.* at 374–75. Congress specified the maximum Guidelines range. *Id.* at 375; *see id.* at 376–77. And Congress provided several factors, including aggravating and mitigating circumstances, to guide the Commission's discretion in creating the Guidelines. *Id.* at 375–77 (citing 18 U.S.C. § 994(c)(1)–(7), (d)(1)–(11)). "In other words, although Congress granted the Commission substantial discretion in formulating guidelines, in actuality it legislated a full hierarchy of punishment . . . and stipulated the most important offense and offender characteristics to place defendants within those categories." *Id.* at 377.

The Supreme Court has approved similar delegations to agencies. In *Gundy*, 139 S. Ct. at 2123–30, the Supreme Court upheld a provision of the Sex Offender Registration and Notification Act, reasoning that the statute delegated only questions of feasibility to the Attorney General. In *Whitman*, 531 U.S. at 475–76 (cleaned up), the Supreme Court ruled it unnecessary for Congress to "provide a determinate criterion for saying how much of the regulated harm is too much." In

*Touby*, 500 U.S. at 165–67, the Supreme Court upheld the Attorney

General's ability to temporarily schedule a drug, considering abuse

potential, lack of safe and accepted medical use, and risk to public

health. In *National Broadcasting Company v. United States*, 319 U.S.

190, 214, 225–26 (1943), the Supreme Court upheld a section of the

Communications Act allowing the agency to perform specific, delineated

tasks "as public convenience, interest, or necessity requires." In *Yakus*

*v. United States*, 321 U.S. 414, 423–27 (1944), the Supreme Court

upheld the Emergency Price Control Act, as "Congress has stated the

legislative objective, has prescribed the method of achieving that

objective—maximum price fixing—and has laid down standards to

guide the administrative determination of both the occasions for the

exercise of the price-fixing power, and the particular prices to be

established." And in *Grimaud*, 220 U.S. at 507–09, 517–22, the

Supreme Court upheld a delegation to the Executive to create

regulations for land reserved by the President, to protect that land

"from destruction."

    This Court, too, has upheld statutes with similar guidance. In

*United States v. Chi Tong Kuok*, 671 F.3d 931, 938–39 (9th Cir. 2012),

this Court rejected a challenge to the Arms Export Control Act, which

delegates authority to the President to "designate those items which

shall be considered as defense articles and defense services" for

purposes of the "United States Munitions List." 22 U.S.C. § 2778(a)(1).

"Although the defining principle for 'articles' and 'services' has not been

set forth with particularly, it is intelligible[.]" *Chi Tong Kuok*, 671 F.3d

at 939. And Congress provided more guidance by "prefac[ing] the

delegation to the President by referring to its shared interest in the

'furtherance of world peace and the security and foreign policy of the

United States.'" *Id.* (quoting 22 U.S.C. § 2778(a)(1)); *see also United*

*States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 321–22 (1936). *In re*

*National Security Agency Telecommunications Records Litigation*, 671

F.3d 881, 896 (9th Cir. 2011) rejected a challenge to a statute that "set[]

out five statutory categories . . . that delineate[d] and circumscribe[d]

the Attorney General's certification discretion." And in *Melgar-Diaz*, 2

F.4th at 1267–69, this Court upheld a grant of discretion to

immigration officials to designate the "time and place" for entry into the

United States. "Considering the text" of the statute "in context and in

light of the statutory purpose, this Court ruled it "obvious" that

41

Congress did "not cast immigration officials completely adrift when they
designate times and places of entry." *Id.* at 1268–69. And this Court
distinguished "narrow, interstitial delegations of authority" from broad
delegations, concluding that it was proper for agencies to "determine
the times and places of lawful entry." *Id.* at 1267–68.

The remaining case—*United States v. Cassiagnol*, 420 F.2d 868,
876 (4th Cir. 1970)—considered a statute that delegated to the General
Services Administration (GSA) the ability to criminalize certain conduct
on its property. But for two reasons, *Cassiagnol* is distinguishable.
First, the GSA's role is substantially different from the BLM's given the
different type of land use at issue. The GSA manages government
property, used in large part by government employees. *Id.* at 876; *see*
U.S. General Services Administration, *About Us*, https://www.gsa.gov/
about-us/mission-and-background/background (last visited Apr. 19,
2024). The BLM, in contrast, manages land used by the public. Thus,
the words "management, use, and maintenance" have different
meanings. As applied to government buildings, they limit the GSA's
discretion; for example, the agency could not, under the guise of
managing a federal courthouse, prohibit livestock grazing. But, as

42

applied to public lands, the words lack the same limiting principle.
Second, the BLM manages a tenth of the land in the United States,
while the GSA manages a fraction of that number. In total, the GSA
manages 371 million square feet of space, slightly less than 8,517 acres.
*See* U.S. General Services Administration, *GSA Properties*,
https://www.gsa.gov/real-estate/gsa-properties (last visited Apr. 19,
2024). In Nevada alone, the BLM manages over five-and-a-half-
thousand times that figure: 48 million acres—over 2 trillion square feet
of space. *See supra*, p. 2. The vast difference in the amount and type of
land each executive agency regulates makes an intelligible principle all
the more critical. *See Whitman*, 531 U.S. at 472–76; *see also United
States v. Moriello*, 980 F.3d 924 (4th Cir. 2020) (upholding successor of
statute addressed in *Cassiagnol*).

In each case, Congress narrowly defined the area in which
executive agencies will regulate. Here, in contrast, Congress has
provided no guidance to the BLM, and the BLM, in turn, has created
various criminal regulations covering nearly two-thirds of Nevada. "If
the intelligible principle standard means anything, it must mean that a
total absence of guidance is impermissible under the Constitution."

43

*Jarkesy*, 34 F.4th at 462. Without that guidance here, the delegation to the BLM was unconstitutional under the nondelegation doctrine.

## II.  The government cannot recharge Counts One and Two.

If this Court finds no violation of the nondelegation doctrine, it should vacate the district court's dismissal only on Count Three. For Counts One and Two, the district court independently concluded that Congress has not provided BLM rangers with law enforcement powers. ER-21–24. The government cannot recharge these counts on remand for redetermination of that issue. *See* OB-10–11 n.4. It has forfeited any further consideration of the enforcement authority issue by failing to raise the issue on appeal.

"When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter." *United States v. Nagra*, 147 F.3d 875, 882 (9th Cir. 1998); *see also Munoz v. Imperial County*, 667 F.2d 811, 817 (9th Cir. 1982) (courts "need not and do not consider a new contention that could have been but was not raised on the prior appeal"). Allowing parties to raise issues piecemeal "undermines the integrity of the judicial system, wastes judicial resources, and imposes substantial costs upon the litigants."

44

*In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (cleaned up).

This principle limits the scope of relief. "Generally, 'an issue that could have been raised on appeal but was not is waived and, therefore, not remanded.'" *United States v. Crisp*, 820 F.3d 910, 912 (7th Cir. 2016) (quoting *United States v. Whitlow*, 740 F.3d 433, 438 (7th Cir. 2014)). Such an issue is "not before" the appellate court and thus "a fortiori" cannot "be remanded to the district court." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 203 (3d Cir. 2004) (cleaned up). Under this principle, courts "have consistently rejected such attempts to litigate on remand issues that were not raised in a party's prior appeal and that were not explicitly or implicitly remanded for further proceedings."[7] *Id.*; *see also Macheca Transp. Co. v. Philadelphia Indem. Ins.,* 737 F.3d 1188, 1196 & n.6 (8th Cir. 2013) (collecting cases from the

---

[7] Regardless of whether this principle derives from law-of-the-case or waiver doctrine, the result is the same. *See Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 239 (5th Cir. 2012) (distinguishing between the two). Either way, "procedural efficiency" demands that "an issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand." *Id.* (quoting *Med. Ctr. Pharm. v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011)).

First, Third, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits reaching similar conclusions).

This Court's decision in *United States v. Radmall*, 340 F.3d 798 (9th Cir. 2003), is instructive. Radmall had prevailed in a prior appeal on a challenge to one of three counts of conviction. *Id.* at 799–800. On remand, and in a subsequent appeal, he raised new challenges to the other two counts. *Id.* at 801–02. In rejecting those arguments, this Court stressed that Radmall could not "use the serendipitous fact of reversal" to "refashion his defaulted claims" on those counts. *Id.* at 802. Parties are "not entitled to hold issues back for a string of appeals." *Id.*

The government's position here invites piecemeal litigation of dispositive issues. It has claimed it will determine later "whether to appeal" the enforcement authority ruling. OB-10–11 n.4. The government has identified no reason why this issue could not have been raised on this appeal. The district court "decided explicitly" that BLM rangers lack enforcement authority. *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (cleaned up); ER-21–25. Proceedings on remand would "not produce any substantially different" result, as the court made a purely legal determination. *Lindquist*, 669 F.3d at 240; ER-21–

46

25. It is irrelevant that the district court had alternative bases for dismissing these counts. An appellant must address all bases for dismissal on appeal. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010) ("[T]he failure of a party in its opening brief to challenge an alternate ground for a district court's ruling *given by the district court* waives that challenge."), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018).

For these reasons, any error in finding a violation of the nondelegation doctrine would require relief only on Count Three.

## Conclusion

This Court should affirm.

Dated: April 19, 2024.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Rohit Rajan*
Rohit Rajan
Assistant Federal Public Defender

*/s/ Ellesse Henderson*
Ellesse Henderson
Assistant Federal Public Defender

47

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-991

I am the attorney or self-represented party.

**This brief contains** | 8,652 | **words,** including | 84 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ◉ complies with the word limit of Cir. R. 32-1.

- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

- ○ complies with the length limit designated by court order dated [          ].

- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Rohit Rajan | **Date** | April 19, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

| **9th Cir. Case Number(s)** | 23-991 |
|---|---|

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Gregory W. Pheasant
> 3405 Brave Lane
> Reno, NV 89506

**Description of Document(s)** *(required for all documents)*:

> Appellant Gregory Pheasant's Answering Brief

| **Signature** | /s/ Rohit Rajan | **Date** | Apr 19, 2024 |
|---|---|---|---|

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 15**                                                                 *Rev. 12/01/2018*