No. 23-991

# In the United States Court of Appeals for the Ninth Circuit

———————————

UNITED STATES OF AMERICA,

*Plaintiff- Appellant*,

v.

GREGORY PHEASANT,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Nevada
District Court No. 3:21-cr-24
Hon. Robert C. Jones

———————————

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE**

———————————

Kara M. Rollins
John J. Vecchione
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
kara.rollins@ncla.legal

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

The New Civil Liberties Alliance has no parent corporation. No publicly held corporation owns any of the stock of the New Civil Liberties Alliance.

Date:  April 26, 2024

/s/ Kara M. Rollins
Kara M. Rollins
New Civil Liberties Alliance
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
kara.rollins@ncla.legal

*Counsel for* Amicus Curiae

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF AMICUS CURIAE ..................................................................1

INTRODUCTION .................................................................................2

ARGUMENT ......................................................................................3

    I.    CONGRESS MAY NOT DIVEST POWER THE CONSTITUTION VESTS IN IT  3

        A.    The Constitution Forbids All Legislative Delegation ................3

        B.    Transferring Legislative Power Undermines Self-Government .6

    II.    DETERMINING WHAT ACTIONS ARE CRIMINAL IS STRICTLY AND EXCLUSIVELY A LEGISLATIVE POWER ...................................................10

CONCLUSION ...................................................................................15

CERTIFICATE OF COMPLIANCE .............................................................16

CERTIFICATE OF SERVICE ...................................................................17

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)............................................................11

*Bond v. United States*,
   564 U.S. 211 (2011)..............................................................6

*City of Arlington v. FCC*,
   569 U.S. 290 (2013)..............................................................9

*Dep't of Transp. v. Ass'n of Am. RRs*,
   575 U.S. 43 (2015)................................................................6

*Gundy v. United States*,
   139 S. Ct. 2116 (2019)............................................... 2, 12, 13

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983)............................................................10

*J.W. Hampton, Jr. & Co. v. United States*,
   276 U.S. 394 (1928)..............................................................5

*Liparota v. United States*,
   471 U.S. 419 (1985)............................................................12

*Loving v. United States*,
   517 U.S. 748 (1996)............................................................13

*Mistretta v. United States*,
   488 U.S. 361 (1989)..............................................................3

*Solem v. Helm*,
   463 U.S. 277 (1983)............................................................14

*Tiger Lily, LLC v. HUD*,
   5 F.4th 666 (6th Cir. 2021) ...............................................8, 9

*Tigner v. Texas*,
   310 U.S. 141 (1940)............................................................10

*United States v. Bajakajian*,
   524 U.S. 321 (1998)............................................................14

iii

*United States v. Bass*,
    404 U.S. 336 (1971)............................................................12

*United States v. Hudson*,
    11 U.S. 32 (1812)..................................................... 13, 15

*United States v. Wiltberger*,
    18 U.S. (5 Wheat.) 76 (1820) ................................. 12, 13

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825) ...................................3, 11

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..........................................................5

**Constitutional Provisions**

U.S. CONST., amend. VIII .........................................................14

U.S. CONST., art. I, § 1 ...................................................... 2, 3, 4

U.S. CONST., art. II, § 1 ........................................................2, 4

U.S. CONST., art. III, § 1 .......................................................2, 4

U.S. CONST., art. IV, § 3 ........................................................5, 6

**Statutes**

43 U.S.C. § 1733(a) ...............................................................2

**Regulations**

43 C.F.R. § 8341.1 ................................................................13

44 Fed. Reg. 34,836 (June 15, 1979) ........................................14

**Other Authorities**

Brenner M. Fissell,
    *When Agencies Make Criminal Law*,
    10 UC IRVINE L. REV. 855 (2020) ...................................10

David Schoenbrod,
    *Power Without Responsibility*
    (Yale U. Press 1993)..........................................................9

iv

Eli Nachmany,
*The Irrelevance of the Northwest Ordinance Example to the Debate About Originalism and the Nondelegation Doctrine,*
2022 U. ILL. L. REV. ONLINE 17 (Feb. 25, 2022)................................6

F. Andrew Hessick & Carissa Byrne Hessick,
*Nondelegation and Criminal Law,*
107 VA. L. REV. 281 (2021)................................ 8, 10, 12

James Madison,
4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*
(Jonathan Elliot ed., 2d ed., 1836)....................................11

Mark Chenoweth & Richard Samp,
*Reinvigorating Nondelegation with Core Legislative Power,*
THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT
(Peter J. Wallison & John Yoo eds., AEI Press 2022) .....................11

Philip Hamburger,
*Nondelegation Blues,*
91 GEO. WASH. L. REV. 1083 (2023)................................5

Resolutions of the Boston Town Meeting
(Sept. 13, 1768), in *A Report of the Record Commissioners of the City of Boston,* Containing the Boston Town Records, 1758 to 1769
(Boston: Rockwell & Churchill, 1886)................................7

St. George Tucker,
*Law Lectures,* vol. 2, Tucker-Coleman Papers, Mss. 39.1 T79, Box 62, Special Collections Research Center, Earl Gregg Swem Library, College of William and Mary ................................4

THE FEDERALIST No. 62 (J. Madison)
(Jacob E. Cooke ed., 1961)................................9

THE FEDERALIST No. 63 (J. Madison)
(Jacob E. Cooke ed., 1961)................................9

THE FEDERALIST No. 78 (Alexander Hamilton)
(Clinton Rossiter ed., 1961)................................8

v

## INTEREST OF AMICUS CURIAE

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization and public-interest law firm. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy.[1]

The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, the President, federal agencies, and even sometimes the Judiciary, have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although the American People still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional state within is the focus of NCLA's concern.

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored any part of this brief. No one other than the *amicus curiae*, its members, or its counsel financed the preparation or submission of this brief.

NCLA strongly supports judicial enforcement of separation-of-powers principles, including the constitutional mandate that "[a]ll legislative powers" "shall be vested in … Congress." U.S. CONST., art. I, § 1 (the "Vesting Clause"). By requiring that no one other than Congress may exercise legislative powers, the Constitution "ensure[d] that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting).

NCLA is particularly troubled by the enforcement provision in the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*, ("FLPMA"). That provision, 43 U.S.C. § 1733(a), violates the Vesting Clause by providing the Bureau of Land Management ("BLM") unfettered authority to criminalize activity on BLM-controlled public lands—an exclusively legislative power.

## INTRODUCTION

By vesting "[a]ll legislative Powers" in Congress, "[t]he executive power" in the President, and "[t]he judicial power" in the courts, the Constitution intentionally separates the branches of government to avoid combining power within a single branch. U.S. CONST., art. I, § 1; U.S. CONST., art. II, § 1; U.S. CONST., art. III, § 1. The nondelegation doctrine "is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S.

361, 371 (1989). The Constitution mandates that only the people's elected representatives may adopt new federal laws restricting individual liberty. U.S. CONST., art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]") (emphasis added). The grant of "[a]ll legislative Powers" to Congress means that Congress may not transfer to others "powers which are strictly and exclusively legislative"—such as the power to write criminal laws. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825).

## ARGUMENT

### I.     CONGRESS MAY NOT DIVEST POWER THE CONSTITUTION VESTS IN IT

The Constitution grants Congress—and Congress alone—the power to legislate, *i.e.*, to make binding rules that limit the liberty that citizens would otherwise enjoy. U.S. CONST., art. I, § 1. The mandatory location of this power in Congress is essential to a fundamental principle of self-government: citizens must consent, through their elected representatives, to all legal limits on their liberty. But it is not only this underlying principle that should guide this Court in barring any relocation of legislative power. Both the drafting debates and the Constitution's text make clear that legislative power cannot be shared, transferred, or subdelegated.

### A.     The Constitution Forbids All Legislative Delegation

The delegation of power was done solely by the people via the Constitution, not by Congress. So, it is difficult to understand how Congress—for example, in

§ 1733(a)—could delegate binding lawmaking power to BLM to create new criminal laws. This point rests not merely on underlying principles but on the text. The Constitution says each of its tripartite powers "shall be vested" in its own branch of government. U.S. CONST., art. I, § 1, art. II, § 1, art. III, § 1. If it had used merely the word "vested" as one might in a grant of property, saying that the legislative powers are hereby vested in Congress, then there arguably could be a transfer of powers between branches. But, in declaring that its powers "shall be vested," the Constitution not only vests legislative, executive, and judicial power in respective branches, but says where such powers "shall be"—and thus must remain—located.

This separation-of-powers requirement was made clear in the earliest surviving academic lectures on the Constitution, which were given in 1791 by the Virginian Judge St. George Tucker at the College of William and Mary. He explained that "all the powers granted by the Constitution are either legislative, executive, or judicial; and to keep them forever separate and distinct, except in the Cases positively enumerated, has been uniformly the policy, and constitutes one of the fundamental principles of the American Government." St. George Tucker, *Law Lectures*, p. 4 of four loose pages inserted in volume 2, Tucker-Coleman Papers, Mss. 39.1 T79, Box 62, Special Collections Research Center, Earl Gregg Swem Library, College of William and Mary.

4

> When the Constitution says the legislative powers *shall be vested* in Congress, it requires them to be there, not elsewhere. That is, when legislative powers are shared with the executive, they are no longer vested merely in Congress, and the sharing thus violates the Constitution's injunction that they *shall be vested* in Congress. The Constitution does not say that the legislative powers, including the power to regulate commerce, 'shall be vested in a Congress of the United States *and such other bodies as Congress specifies*.'

Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. 1083, 1174 (2023) (footnote omitted; emphasis in original).

The phrase "shall be vested" thus reinforces what already should be clear, that "the Constitution's vesting of powers is not just an initial distribution—like an initial dealing out of cards." *Id*. Rather than merely vest all legislative powers in Congress, the Constitution further mandates that all such powers may not be delegated to another branch. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (confirming that the Constitution's "text permits no delegation of [legislative] powers"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]n carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President[.]").

The United States highlights that the Property Clause's, U.S. CONST., art. IV, § 3, "needful" language is interpreted "expansively," but fails to discuss whether and how that fact impacts the nondelegation issue in this matter. *See* OB-11-12. It has

5

been suggested that the Property Clause may provide an exception to this bedrock principle of our tripartite system because it empowers Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST., art. IV, § 3; *see also* Eli Nachmany, *The Irrelevance of the Northwest Ordinance Example to the Debate About Originalism and the Nondelegation Doctrine*, 2022 U. ILL. L. REV. ONLINE 17 (Feb. 25, 2022) (surveying scholarly disagreement on nondelegation and the "Property Clause."). But nothing in the Property Clause undermines the structural and textualist prohibitions on nondelegation of Congressional power. The Property Clause empowers "*Congress* to make all needful Rules and Regulations" and no one else. U.S. CONST., art. IV, § 3 (emphasis added). The Government cannot use federal retention of 67% of the land mass of Nevada to argue that bedrock principles of our representative government cease to exist in two-thirds of the State of Nevada.

**B.     Transferring Legislative Power Undermines Self-Government**

The Constitution's prohibition against delegating legislative power is not only necessary to protect one branch of government from intrusion by another, but "[t]he structural principles secured by the separation of powers protect the individual as well." *Dep't of Transp. v. Ass'n of Am. RRs*, 575 U.S. 43, 55 (2015) (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). That is because legislative delegation collides with the Constitution's most important principle: consent of the people.

6

Without consent, a government would be illegitimate, and its laws would be without obligation.

Consent of the people was essential not only for the original adoption of the Constitution but also for enacting statutes. Such consent must come through the election of representatives to the legislature—the body vested with legislative power. American colonists declared: "the first Principle in Civil Society, founded in Nature and Reason, [is] that no Law of the Society can be binding on any Individual[], without his Consent, given by himself in Person, or by his Representative of his own free Election[.]" Resolutions of the Boston Town Meeting (Sept. 13, 1768), in *A Report of the Record Commissioners of the City of Boston*, Containing the Boston Town Records, 1758 to 1769, at 261 (Boston: Rockwell & Churchill, 1886).

The displacement of legislative power to administrative agencies, not least in § 1733(a) and the crimes created by regulations promulgated under it, threatens this self-governance. It deprives Americans of their freedom to rule themselves through their elected representatives. Judge Thapar recently explained that the Framers designed "Congress [to be] the [branch] most responsive to the will of the people … for a reason: Congress wields the formidable power of 'prescrib[ing] the rules by which the duties and rights of every citizen are to be regulated.' If legislators misused this power, the people could respond, and respond swiftly." *Tiger Lily, LLC v. HUD*,

7

5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring) (quoting THE FEDERALIST No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

The transfer of legislative powers to a less accountable branch necessarily undermines consent. To be sure, the dislocation of legislative power does not deny anyone's right to cast a ballot. But shifting legislative power out of the legislature and into agencies diminishes the value of suffrage. The form remains, but in reality the currency of voting is debased. And if violations of voting rights are worrisome even at a retail level, as the mantra to "count every ballot" attests, there should be at least as much concern about wholesale assault on the franchise by transferring lawmaking power from elected representatives to unelected bureaucrats—particularly when that transfer occurs in the criminal context which is predicated, in part, on a concept of moral condemnation by the community. *See* F. Andrew Hessick & Carissa Byrne Hessick, *Nondelegation and Criminal Law*, 107 VA. L. REV. 281, 300 (2021) ("This need for community condemnation has led criminal theorists to conclude that only laws which were enacted by a democratically accountable body may form the basis of criminal punishment.").

The transfer of legislative powers to agencies also weakens accountability by allowing an evasion of bicameralism and presentment. Bicameralism makes lawmaking difficult by design—to limit corruption and unjust passions and encourage prudence. THE FEDERALIST No. 62, at 420–21 (J. Madison) (Jacob E.

Cooke ed., 1961); THE FEDERALIST No. 63, at 426–28 (J. Madison) (Jacob E. Cooke ed., 1961). Presentment ensures that laws are subject to the possibility of a veto. Together, the requirements ensure that lawmaking responsibilities reside in the two elected legislative bodies and in an elected president—all of whom are personally accountable to the people.

However, "Congress has an incentive to insulate itself from the consequences of hard choices" by "transfer[ring] … hard choices from Congress to the executive branch." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). When Congress transfers its legislative power to an administrative agency, "the people lose control over the laws that govern them. … [T]he public loses the right to have both its elected representatives and its elected president take personal responsibility for the law." David Schoenbrod, *Power Without Responsibility*, 99–105 (Yale U. Press 1993). Indeed, "the citizen … can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting). In this case, there is little doubt that it is BLM—not Congress— doing the legislating.

"By shifting responsibility [to enact criminal laws] to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). Because this shift is the product of collusion between Legislative and

9

Executive Branches, the people must rely on the Judicial Branch to prevent unconstitutional delegations of legislative power. "[T]he uniquely harsh sanctions that result from criminal law violations makes delegation of criminalization a matter of special concern[.]" Brenner M. Fissell, *When Agencies Make Criminal Law*, 10 UC IRVINE L. REV. 855, 880 (2020). Unfortunately, "the Court's decisions on criminal delegations are confused and conflicting." *Hessick & Hessick*, *supra* p. 8, at 295. Skepticism about the validity of criminal delegations is warranted, not only because criminal sanctions invade liberty interests but also because criminalization of behavior is a uniquely legislative act.

## II.   DETERMINING WHAT ACTIONS ARE CRIMINAL IS STRICTLY AND EXCLUSIVELY A LEGISLATIVE POWER

The basic principle—that Congress must determine what is a crime—stems from the legislative nature of the action because defining what actions are crimes necessarily has "the purpose and effect of altering the legal rights, duties and relations of persons … outside the legislative branch." *I.N.S. v. Chadha*, 462 U.S. 919, 952 (1983). The creation of binding policy lies at the core of legislative power. *Cf. Tigner v. Texas*, 310 U.S. 141, 148 (1940) ("How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems.").

The grant of "[a]ll legislative Powers" to Congress means that Congress may not transfer to others "powers which are strictly and exclusively legislative"—such as the power to write criminal laws. *Wayman*, 23 U.S. (10 Wheat.) at 42-43; *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."). "[E]nacting criminal statutes is a core congressional function, because the alternative (delegating legislative power to the executive branch) has an untenable result–placing the lawmaking and the law-enforcing in a single branch of government." Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power*, THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT 97 (Peter J. Wallison & John Yoo eds., AEI Press 2022). As James Madison eloquently explained "[d]etails, to a certain degree, are essential to the nature and character of a law; and on criminal subjects, it is proper that details should leave as little as possible to the discretion of those who are to apply and execute the law." James Madison, 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 559–60 (Jonathan Elliot ed., 2d ed., 1836). But under § 1733(a), the details of what constitutes a crime committed on Bureau-managed lands are left wholly, and unconstitutionally, to the discretion of the Executive Branch who also enforces the law.

11

In our tripartite system, the legislature criminalizes conduct and sets statutory penalties, the executive prosecutes crimes and can recommend a sentence, and the judiciary sentences defendants within the applicable statutory framework. *United States v. Bass*, 404 U.S. 336, 348 (1971). "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.*; *see also Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting); *Hessick & Hessick*, *supra* p. 8, at 300. This separation promotes the constitution's "key liberty-enhancing feature … that no citizen can be imprisoned without the concurrence of all three branches of government and a jury of that citizen's peers." *Chenoweth & Samp*, *supra* p. 11, at 102.

The Court has long recognized the "the plain principle that the power of punishment is *vested* in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (emphasis added). There is little reason to think that vesting the legislative power of punishment in Congress would permit that power to be exercised by the Executive Branch. "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985) (citing *United States v. Hudson*,

11 U.S. 32, 34 (1812)). On close inspection, cases like *Loving v. United States*, 517 U.S. 748 (1996), do not change this process. As Justice Gorsuch elucidated in his *Gundy* dissent, "[w]hile the Constitution vests all federal legislative power in Congress alone, Congress's legislative authority sometimes overlaps with authority the Constitution separately vests in another branch." 39 S. Ct. at 2137 (citing *Loving*, 517 U.S. at 768). He noted that because both Congress and the Executive hold power in those limited scenarios, no separation-of-powers problem may arise. *Id.* Not so here, where the Executive has no independent constitutional power to determine what is or is not a crime. While *dicta* from *Loving* suggests "[t]here is no absolute rule … against Congress' delegation of authority to define criminal punishments[,]" 517 U.S. at 768, the text and structure of the Constitution dictate otherwise.

As the Court has observed in another criminal context, "[i]t would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." *Wiltberger*, 18 U.S. (5 Wheat.) at 96 (providing general observations regarding the construction of criminal statutes). This suggests that crimes must be *enumerated* by statute, which only Congress can do. BLM's regulations at issue here, 43 C.F.R. § 8341.1(f)(5) and (h), may be of "kindred character" to § 1733(a)'s edict to act "with respect to the management, use, and

13

protection of the public lands," but they were not enumerated by Congress. They were instead promulgated by the agency pursuant to its purported § 1733(a) authority. *See* 44 Fed. Reg. 34,836 (June 15, 1979).

The Supreme Court's constitutional proportionality precedent lends additional support to the legislative nature of determining what is or is not a crime. The Eighth Amendment protects individuals from excessive bail and fines, as well as cruel and unusual punishments. U.S. CONST., amend. VIII. The proportionality principle requires "that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm*, 463 U.S. 277, 290 (1983). In *Solem*, the Court also recognized that legislatures possess "broad authority" to "determin[e] the types and limits of punishments for crimes." *Id.* Thus, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *United States v. Bajakajian*, 524 U.S. 321, 336 (1998) (citing *id.*).

By its terms, § 1733(a) is forward-looking and only addresses criminal punishments for regulations promulgated in the future. So, the fundamental judgment of what constitutes appropriate punishment for a crime could not have occurred before Congress adopted § 1733(a) because the crimes that provision applies to did not yet exist. How can Congress determine if a punishment is appropriate for as-yet-undefined crimes? The answer is simple: it can't. This suggests that there is an order in which Congress must decide what is a crime and

14

what the appropriate punishment for that crime is. Both these legislative acts must occur sequentially for them to pass the constitutional proportionality principle. First, Congress must decide whether certain behavior constitutes a crime, then it must determine the appropriate punishment. *See Hudson*, 11 U.S. at 34 ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence."). But § 1733(a) gets this process backward—it determines the punishment for an as-yet-undefined crime—making the proportionality principle unworkable.

## CONCLUSION

This Court should affirm.

Date: April 26, 2024          Respectfully submitted,

/s/ Kara M. Rollins
Kara M. Rollins
John J. Vecchione
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
kara.rollins@ncla.legal

*Counsel for* Amicus Curiae

15

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,400 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016 Times New Roman 14-point font.

Date: April 26, 2024

*/s/ Kara M. Rollins*
Kara M. Rollins
New Civil Liberties Alliance
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
kara.rollins@ncla.legal

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  April 26, 2024

*/s/ Kara M. Rollins*
Kara M. Rollins
New Civil Liberties Alliance
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
kara.rollins@ncla.legal

*Counsel for* Amicus Curiae

17