No. 23-991

———————————

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

GREGORY PHEASANT,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Nevada, No. 3:21-cr-24
Honorable Robert C. Jones, District Judge

———————————

## BRIEF *AMICUS CURIAE* OF PACIFIC LEGAL FOUNDATION IN SUPPORT OF APPELLEE AND AFFIRMANCE

———————————

Molly E. Nixon
*Counsel of Record*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Fax: (916) 419-7747
MNixon@pacificlegal.org

Luke A. Wake
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org

*Attorneys for Amicus Curiae Pacific Legal Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Pacific Legal Foundation states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ...................................................... iii

STATEMENT OF IDENTIFICATION ...................................... 1

ARGUMENT ................................................................ 1

   I.  Congress Impermissibly Delegated Its Legislative Power to the Secretary of the Interior................................................... 2

      A.  Congress Must Provide a Governing Standard. ......................... 3

      B.  Congress Did Not Provide the Secretary with an Intelligible Principle to Guide the Creation of a Sweeping Criminal Code. ................................................ 6

   II.  First Principles Require More Than a Broad and Vague "Intelligible Principle" for Criminal Laws. ................................. 13

      A.  The Framers Recognized a Specific Danger in Delegating Criminal Lawmaking Power to the Executive ......................... 14

      B.  The Supreme Court Has Confirmed the Importance of Seperation of Powers in the Criminal Law Context ............... 17

      C.  Section 1733 Unconstitutionally Confers Criminal Rulemaking Power. ................................................ 21

CONCLUSION ............................................................. 23

CERTIFICATE OF SERVICE ........................................... 24

CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) .................................................. 8–9, 11–12, 18–19

*Abramski v. United States,*
573 U.S. 169 (2014) ................................................................... 20

*B.H. v. State,*
645 So. 2d 987 (Fla. 1994) ......................................................... 19

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
575 U.S. 43 (2015) ....................................................................... 4

*Fahey v. Mallonee,*
332 U.S. 245 (1947) ............................................................. 18–19

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ..................................................................... 19

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ....................................................... 3–5, 11–13

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980) ....................................................................... 5

*J.W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ....................................................................... 4

*Loving v. United States,*
517 U.S. 748 (1996) ..................................................................... 22

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023) ..................................................................... 10

*National Broadcasting Co. v. United States,*
319 U.S. 190 (1943) ....................................................................... 5

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935)................................................ 3–4, 7–8, 11, 18–19

*Rodriguez v. United States,*
480 U.S. 522 (1987)................................................................ 10–11

*Synar v. United States,*
626 F. Supp. 1374 (D.D.C. 1986),
*aff'd,* 478 U.S. 714 (1986)................................................................ 6

*Touby v. United States,*
500 U.S. 160 (1991)................................................................ 18

*United States v. Bass,*
404 U.S. 336 (1971)................................................................ 17

*United States v. Evans,*
333 U.S. 483 (1948)................................................................ 17

*United States v. Grimaud,*
220 U.S. 506 (1911)................................................................ 11–12, 21

*United States v. Hudson,*
11 U.S. 32 (1812)................................................................ 17

*United States v. Kozminski,*
487 U.S. 931 (1988)................................................................ 18

*United States v. Mistretta,*
488 U.S. 361 (1989)................................................................ 5, 10, 12, 19

*United States v. Nichols,*
784 F.3d 666 (10th Cir. 2015)................................................................ 18

*United States v. Robel,*
389 U.S. 258 (1967)................................................................ 18

*United States v. Wiltberger,*
18 U.S. 76 (1820)................................................................ 18

*Wayman v. Southard,*
23 U.S. 1 (1825)................................................................ 3

*West Virginia v. EPA,*
  598 U.S. 697 (2022)................................................................3

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)..................................................... 2, 6, 13

*Whitman v. United States,*
  574 U.S. 1003 (2014)...........................................................20

*Yakus v. United States,*
  321 U.S. 414 (1944).......................................................10–11

### U.S. Constitution

U.S. Const. art. I, § 1.............................................................2

U.S. Const. art. I, § 9.............................................................15

U.S. Const. art. IV, § 3, cl. 2...................................................3

### Statutes

43 U.S.C. § 1701 ..............................................................7–9

43 U.S.C. § 1732 ..............................................................6–7

43 U.S.C. § 1733 ........................................... 1, 6–7, 13, 21–22

### Other Authorities

Barkow, Rachel E., *Separation of Powers and the Criminal Law,*
  58 Stan. L. Rev. 989 (2006)..........................................15–16

Hessick, F. Andrew & Hessick, Carissa Byrne,
  *Nondelegation and Criminal Law,*
  107 Va. L. Rev. 281 (2021).................................................17

Kahan, Dan M., *Lenity and Federal
  Common Law Crimes,*
  1994 Sup. Ct. Rev. 345 (1994) ...........................................20

Locke, John, *Second Treatise of Government: An Essay Concerning the True Original, Extent and End of Civil Government* (1690) .............................................................. 22

Madison, James, The Report of 1800, *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-17-02-0202 ...................................................................... 17

Price, Zachary, *The Rule of Lenity As A Rule of Structure*, 72 Fordham L. Rev. 885 (2004) ........................................ 20

Scalia, Antonin, *The Rule of Law As A Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989).......................................... 14

## **STATEMENT OF IDENTIFICATION**

Pacific Legal Foundation (PLF) is a nonprofit, tax-exempt, California corporation established for the purpose of litigating matters affecting the public interest. PLF attorneys have participated as lead counsel and *amicus curiae* in many cases involving the Constitution's Separation of Powers.

PLF files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief.

Counsel for the Appellee did not author the brief in whole or in part. Appellee did not contribute financial support intended to fund the preparation or submission of this brief. No other individual or organization contributed financial support intended to fund the preparation or submission of this brief.

## **ARGUMENT**

Section 1733 of the Federal Land Policy and Management Act (FLPMA) confers expansive criminal lawmaking power on the Secretary of the Interior in violation of the Constitution, allowing the Secretary, acting through the Bureau of Land Management (BLM), to create a

criminal code applicable over a significant part of the country and a majority of the state of Nevada. Congress did not, however, provide the intelligible principle required by Supreme Court precedent, which prohibits delegation of the legislative power vested in Congress and, accordingly, requires Congress to establish the fundamental policy governing the executive's exercise of discretion.

Moreover, even if FLPMA provided *some* intelligible principle to guide BLM in its general management of public lands, it would nevertheless be constitutionally inadequate to govern the executive in making criminal laws, where the Supreme Court has repeatedly recognized that the liberty interests at stake demand Congress speak clearly.

## I.     Congress Impermissibly Delegated Its Legislative Power to the Secretary of the Interior.

The U.S. Constitution vests all legislative power in Congress, U.S. Const. art. I, § 1, and Congress is prohibited from further delegating its lawmaking powers. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (Article I's vesting of "'[a]ll legislative Powers herein granted . . . in a Congress of the United States' . . . permits no delegation of those powers.").

### A.     Congress Must Provide a Governing Standard.

While it cannot delegate legislative power, Congress can confer limited authority on the executive branch by tasking the executive with "fill[ing] up the details" of a statutory regime. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 426 (1935) (quoting *Wayman v. Southard*, 23 U.S. 1, 20 (1825)).

In conferring such authority, Congress cannot "[leave] the matter to the [executive] without standard or rule, to be dealt with as he please[s]." *Panama Refining*, 293 U.S. at 418. Rather, the "important subjects" "must be entirely regulated by the legislature itself." *Wayman*, 23 U.S. at 20. This is especially true with regard to the regulation of federal lands because the Constitution specifically gives Congress the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. If executive branch regulations are not governed by objective standards set out in law, "unaccountable ministers" assume the role of lawmaker. *West Virginia v. EPA*, 598 U.S. 697, 737 (2022) (Gorsuch, J., concurring). And that would frustrate our "constitutional design." *Gundy v. United States*, 139 S. Ct. 2116, 1233, 2142 (2019)

(Gorsuch, J., dissenting) (emphasizing that Congress cannot "announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals."). Accordingly, the Supreme Court has held that a congressional conferral of authority is constitutional only if it provides an "intelligible principle" to which the executive must conform. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).[1]

Even in upholding legislative conferrals of authority, the Court has consistently reaffirmed the fundamental nondelegation principle. *See Gundy*, 139 S. Ct. at 2123 (explaining that *if* the statute under review had granted the "plenary power" alleged by the defendant in that case, "we *would* face a nondelegation question") (emphasis added). Indeed, the *Gundy* plurality saved the provision of the Sex Offender Registration and

---

[1] "Though worded broadly, the test rested on a narrow foundation." *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 78 (2015) (Thomas, J., concurring). At the time the "intelligible principle test" was articulated, most delegations conditioned the President's action upon the occurrence of a specified event or the determination of specified facts. By contrast, the *Panama Refining* Court stressed that the statute at issue there did "not require any finding by the President as a condition of his action. . . . **[I]t gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment**." 293 U.S. at 415 (emphasis added).

Notification Act (SORNA) under review in that case by *supplying* a narrowing principle. *Id.* at 2129–30 (holding that SORNA only allowed the Attorney General to address "administrative" feasibility issues and gave only "temporary authority;" "distinctly small-bore" and "well within constitutional bounds"); *see also Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) ("In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional."); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality opinion) (reading into a statute authorizing the Secretary of Labor to regulate toxic substances a requirement that the Secretary find a significant risk of harm from the toxin); *National Broadcasting Co. v. United States*, 319 U.S. 190, 216–17 (1943) (interpreting statute granting the executive discretion to regulate radio in the "public interest" as requiring him to exercise that discretion in ways that "encourage the larger and more effective use of radio").

Moreover, the degree of legislative direction required depends on the scope of the delegation. More precise standards are needed to govern

delegations of particularly broad and sweeping powers. *Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."); *see also*, *Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986), *aff'd*, 478 U.S. 714 (1986) (stating that as the "scope" of a law increases, "the standards must be correspondingly more precise").

### B. Congress Did Not Provide the Secretary with an Intelligible Principle to Guide the Creation of a Sweeping Criminal Code.

Congress failed to impose any real limits on the Secretary's criminal rulemaking authority in the statutory provision at issue here, which says only that "[t]he Secretary shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property located thereon," and that violators of those regulations are subject to a fine and imprisonment. 43 U.S.C. § 1733.

The government asserts that BLM is bounded in Section 1733 by the direction in Section 1732 to "manage" public lands "under principles of multiple use and sustained yield" and to prevent "unnecessary or undue degradation of the lands." Gov't Br. [Dkt. 7.1] at 17 (quoting 43

U.S.C. § 1732(a)–(b)). But those general phrases confer almost unlimited policy discretion and "contain[ ] nothing as to the circumstances or conditions in which" BLM should criminalize activities on public lands. *Panama Refining*, 293 U.S. at 417. And even if they did provide meaningful boundaries, they apply only to the management of the land. The regulatory authority conferred is even broader than that, encompassing also "use" and "protection." *Id.* § 1733.

The government also refers to certain criteria BLM must consider in developing land use plans, as well as the purposes for which it may issue rights-of-way, neither of which are relevant in constraining the scope of Section 1733, which is specific to neither areas in which a land use plan exists nor confined to rights-of-way. Gov't Br. at 17–18.

Finally, the government asserts that the congressional declaration of policy set out in Section 1701(a) "provides guidance" to the Secretary. Gov't Br. at 18. But Section 1701(b) expressly cautions that those general policies "shall become effective only as specific statutory authority for their implementation is enacted by this Act or subsequent legislation . . . ." They are not, accordingly, self-executing limits on the Secretary's power. And if those provisions actually provided any guidance as to the

7

Secretary's goals then, as the District Court observed, they would actually provide the Secretary "with *more* authority, not a guiding principle to limit authority." ER-21 (emphasis added). They "provide authority over almost every subject matter [and f]or that reason . . . do not provide an intelligible principle." *Id.*

Regardless of whether Section 1701(a)'s policy aspirations expand or cabin BLM's authority, the Supreme Court has rejected the argument that an intelligible principle can be inferred from a statute's general statements of policy. An intelligible principle must be rooted in statutory text, rather than claims about the general purpose of the statute. *See Panama Refining*, 293 U.S. at 417–18 (considering and rejecting the idea that there might be an intelligible principle in the National Industrial Recovery Act's (NIRA) general statement of policy).

Indeed, FPLMA's policy aspirations are similar to the NIRA's "general declaration of policy," also rejected by the Court in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 534–35 (1935)

8

(reviewing the many policy goals articulated in the NIRA).[2] The *Schechter Poultry* Court held that "aside from the statement of the general aims," and the few restrictions imposed elsewhere in the Act, "the discretion of the President . . . is virtually unfettered." *Id.* at 541–42.

Accordingly, BLM cannot rescue FLPMA's delegation by pointing to the hortatory goals set out in Section 1701(a), which themselves reflect often competing, if not irreconcilable, values. *See, e.g.*, 43 U.S.C. § 1701(a)(8) (stating a policy that "the public lands be managed in a

---

[2] The *Schechter Poultry* Court quotes the NIRA's policy:

> to remove obstructions to the free flow of interstate and foreign commerce . . . to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production . . . to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.

*Id.* The breadth and scope of the NIRA declarations are similar to those in Section 1701(a) of FLPMA and are, accordingly, also unable to constitute an intelligible principle.

9

manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" *and*, among other things, "that will provide for outdoor recreation and human occupancy and use"). The weighing of the "competing values" set out in FLPMA is "the very essence of legislative choice . . . ." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (emphasizing that it is the role of lawmakers to weigh "competing" "incommensurable" values).

No doubt, the Court has sometimes gone so far as to suggest that Congress need only "clearly delineate[ ] the general policy" to guide an agency's conduct. *Mistretta*, 488 U.S. at 372–73. But such broad articulations arise in cases in which the legislative grant of discretion is tied to specific statutory provisions that expressly direct the exercise of that discretion. *See, e.g.*, *id.* at 375–76 (containing a direct link between discretion and direction); *Yakus v. United States*, 321 U.S. 414, 420–21 (1944) (same).

So, too, with the various cases cited in the government's brief, which found a single identifiable policy goal that channeled the agency's

10

authority, Gov't Br. at 13–14, unlike the assorted statements of policy and conflicting values set out in FLPMA, which are the very competing interests that Congress is tasked by the Constitution with resolving. *Cf. Rodriguez*, 480 U.S. at 525–26.

The government relies on *United States v. Grimaud*, in which the Court rejected a nondelegation challenge to a statute that delegated authority to the Secretary of Agriculture to regulate the occupancy and use of public forest reservations to preserve them from destruction. 220 U.S. 506, 515, 522 (1911). But the *Grimaud* Court again understood this rulemaking authority as narrowly tied to a charge to protect against "destruction" and "depredations" of public forests. *See Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting) (highlighting *Grimaud* and observing that, "[t]hrough all these cases, small or large, runs the theme that Congress must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." (quoting *Yakus*, 321 U.S. at 426)).

Moreover, *Grimaud* predates the Court's decisions in *Panama Refining* and *Schechter Poultry*. In deciding the latter cases, then, the

Court was no doubt aware of *Grimaud* and was able to discern the difference between a law with an intelligible principle—protecting against the destruction of public forests—and the NIRA, which identified numerous broad (and, as here, conflicting) policy goals that could not constitute an intelligible principle.

Even if FLPMA's provisions limit BLM's authority in some conceptual way—the Bureau could not, presumably, render all public land off limit to human uses—such general constraints do not provide an intelligible principle because they would leave almost the entire realm of policy open to the Secretary, allowing the agency to "make the important policy choices that belong to Congress while frustrating meaningful judicial review." *Gundy*, 139 S. Ct. at 2145 (Gorsuch, J., dissenting) (internal quotation marks omitted); *see also Schechter Poultry*, 295 U.S. at 538 (concluding that the NIRA's restrictions left "virtually untouched . . . the wide field of legislative possibilities . . . .").[3]

---

[3] There can be no serious argument here that Congress needed to delegate such wide-ranging authority due to some need for expertise by the agency. *See Mistretta*, 488 U.S. at 372 (observing that Congress needs the ability to delegate power given "our increasingly complex society, replete with ever changing and more technical problems"). It is surely

For the same reason, this Court cannot supply an intelligible principle, as the Supreme Court did in *Gundy* and other cases. Selecting from among the many goals FLPMA identifies is a legislative power vested in Congress, not BLM *or* the judiciary. *Cf. Whitman*, 531 U.S. at 471 ("No matter how severe the constitutional doubt, courts may choose only between reasonably available interpretations of a text.").

## II. First Principles Require More Than a Broad and Vague "Intelligible Principle" for Criminal Laws.

Even if this Court finds that Congress provided some broad intelligible principle to BLM in its general management of public lands, that would not suffice to uphold Congress's attempt in Section 1733 to delegate wholly its power to make criminal laws. The Framers of the Constitution recognized the importance of separating the power to make criminal laws from the power to enforce those laws. And the Supreme Court has repeatedly recognized and enforced that principle.

Indeed, all of the arguments against delegating legislative power apply to an even greater degree in the context of criminal lawmaking,

---

practicable for Congress to provide BLM the specific authority to promulgate traffic rules under an intelligible principle.

13

where state power is at its apex and the consequences of its exercise are the loss of liberty or even life. Congress must, accordingly, provide more clarity when conferring any rulemaking power with criminal penalties attached. This Circuit should join the others that have required a stricter nondelegation principle in conferring criminal lawmaking authority. *See* Pheasant Br. [Dkt. 22.1] at 17; *see generally* Antonin Scalia, *The Rule of Law As A Law of Rules*, 56 U. Chi. L. Rev. 1175, 1180 (1989) (stating that judges' "most significant roles, in our system, are to protect the individual criminal defendant . . . and to preserve the checks and balances within our constitutional system that are precisely designed to inhibit swift and complete accomplishment of th[e] popular will.").

### A.    The Framers Recognized a Specific Danger in Delegating Criminal Lawmaking Power to the Executive.

The Framers viewed separation of powers as particularly important in the criminal context, for at least two reasons. First, it protected liberty by making it harder to implement criminal laws. Second, it limited the discretion of the executive, which is the most dangerous in the criminal context because it is the branch that enforces the law, prosecuting individuals and putting them in prison.

14

In drafting the Constitution, the "Framers weighed the need for federal government efficiency against the potential for abuse and came out heavily in favor of limiting federal government power over crime." Rachel E. Barkow, *Separation of Powers and the Criminal Law,* 58 Stan. L. Rev. 989, 1017 (2006). They did so by separating power "into strict categories."[4] *Id.* "The inefficiency associated with the separation of powers serves a valuable function, and, in the context of criminal law, no other mechanism provides a substitute." *Id.* at 1031.

Consolidating the legislative power and the executive power makes it easier to take someone's liberty because—unlike statutes, which must pass two houses of Congress and be signed by the President (and are then subject to a separate executive decision to enforce in any given circumstance)—only one body must decide that an activity should be

---

[4] The Constitution, accordingly, includes many limits on criminal lawmaking and enforcement. Prohibitions on ex post facto laws and bills of attainder curtail the substance of criminal laws. U.S. Const. art. I, § 9. And there are additional procedures that the government must follow in criminal cases, such as the grand jury requirement, the right to the assistance of counsel, the speedy and public trial guarantee, and the prohibition on double jeopardy. *Id.* at amends. V & VI.

regulated and prosecuted.[5] It is for that reason that James Madison warned that "[t]he accumulation of all powers . . . in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47.

Indeed, because delegation consolidates power (the legislative power and the executive power) in one branch, it is in direct conflict with

_____

[5] Professor Barkow has highlighted some of the separation of powers concerns at issue in the overlap of criminal and administrative law:

> [T]here are currently almost no institutional checks on federal criminal power. First, federal prosecutors face no restrictions on their powers that are comparable to the complex code of conduct and organizational design established by the APA. . . . Criminal defendants do not coalesce into an organized group, and those individuals and organizations that represent their interests tend to be disorganized and weak political forces. In contrast, powerful interests often lobby for more punitive laws. The executive branch in particular has an incentive to push for tough laws to encourage plea bargaining and cooperation. The politics of crime definition and sentencing are therefore far more lopsided than the politics associated with the administrative state, where it is more common to have groups on both sides of the issue that act to check government abuse of power. Thus, **in the very area in which state power is most threatening—where it can lock away someone for years and impose the stigma of criminal punishment—institutional protections are currently at their weakest**.

58 Stan. L. Rev. at 995 (emphasis added).

the protections the Framers tried to guard through separation, particularly with respect to "criminal subjects," where Congress should "leave as little as possible to the discretion of those who are to apply and to execute the law." James Madison, The Report of 1800, *Founders Online,* NATIONAL ARCHIVES.[6] Congress's delegation of any significant criminal lawmaking responsibility to agencies does not comport with centuries-old understanding about how criminal law is enacted. *See, e.g.*, *United States v. Hudson*, 11 U.S. 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.").

### B. The Supreme Court Has Confirmed the Importance of Separation of Powers in the Criminal Law Context.

The Supreme Court has made clear that "defining crimes" is a "legislative" function, *United States v. Evans*, 333 U.S. 483, 486 (1948),

---

[6] Criminal law and the punishment for its violation is also a moral judgment. *United States v. Bass*, 404 U.S. 336, 348 (1971). Accordingly, "[t]his need for community condemnation has led criminal theorists to conclude that only laws which were enacted by a democratically accountable body may form the basis of criminal punishment." F. Andrew Hessick & Carissa Byrne Hessick, *Nondelegation and Criminal Law*, 107 Va. L. Rev. 281, 300 (2021).

and that Congress cannot delegate "the inherently legislative task" of determining what conduct "should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988); *see also United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (noting "the plain principle that the power of punishment is vested in the legislative . . . department. It is the legislature . . . which is to define a crime, and ordain its punishment.").

Consequently, the Court has repeatedly suggested that in the criminal context Congress must provide more "meaningful[]" guidance than an "intelligible principle." *Touby v. United States*, 500 U.S. 160, 165–66 (1991); *see also United States v. Robel*, 389 U.S. 258, 274–81 (1967) (Brennan, J., concurring) ("It is generally enough that, in conferring power upon an appropriate authority, Congress indicates its general policy . . . . The area of permissible indefiniteness narrows, however, when the regulation invokes criminal sanctions . . . .").[7]

Indeed, in the course of upholding a statute authorizing the promulgation of non-criminal regulations, the Court distinguished

---

[7] "The Court has never expressly held that an intelligible principle alone suffices to save a putative delegation when the criminal law is involved." *United States v. Nichols*, 784 F.3d 666, 672 (10th Cir. 2015) (Gorsuch, J., dissenting from denial of rehearing en banc).

*Panama Refining* and *Schechter Poultry* on the ground that violating the agency regulations in those cases constituted a crime. *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947). While neither *Panama Refining* nor *Schechter Poultry* expressly relied on the existence of criminal penalties in striking down the delegations, the *Fahey* Court said that one reason it struck down the delegations in those cases was that they delegated the "power to make federal crimes." *Id.*; *see also Mistretta*, 488 U.S. at 396 (explaining that the statute survived non-delegation review because it did *not* involve writing regulations that "bind or regulate the primary conduct of the public"); *B.H. v. State*, 645 So. 2d 987, 993 (Fla. 1994) (reasoning that separation of powers requires more stringent scrutiny for delegations to define criminal conduct).

The Court's reluctance to allow Congress to abdicate its legislative role in the criminal context is also demonstrated in various interpretive doctrines the Court has embraced over the years to police delegations. Vague criminal statutes, for example, are prohibited in part because they "impermissibly delegate[ ] basic policy matters to policemen . . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

Similarly, the rule of lenity "vindicates the principle that only the *legislature* may define crimes and fix punishments. Congress cannot, through ambiguity, effectively leave that function to the courts—much less to the administrative bureaucracy." *Whitman v. United States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., statement respecting denial of certiorari). Scholars, too, have recognized that "[l]enity is in effect a non-delegation doctrine: It prevents legislatures from passing off the details of criminal lawmaking to courts." Zachary Price, *The Rule of Lenity As A Rule of Structure*, 72 Fordham L. Rev. 885, 909 (2004); *see also* Dan M. Kahan, *Lenity and Federal Common Law Crimes*, 1994 Sup. Ct. Rev. 345, 350 (1994) ("[C]riminal lawmaking is the prerogative of Congress and Congress alone.").

And the Court's refusal to grant *Chevron* deference in the criminal context further reflects its repeated admonition that Congress, not the executive, must specify the terms of criminal laws. *See, e.g.*, *Abramski v. United States*, 573 U.S. 169, 191 (2014) (rejecting agency interpretation of criminal statute as irrelevant because "criminal laws are for courts, not for the Government, to construe").

20

In using these doctrines and canons—and by supplying constraining intelligible principles when it upholds an allocation of power to the executive, *see supra* Part I.A—the Supreme Court has made clear that conferrals of criminal authority require more than a cursory review of whether Congress has made some broad policy decision. Fundamental separation of powers precepts and the Court's lines of precedent checking criminal lawmaking power confirm that the rationales motivating the non-delegation doctrine are amplified in the criminal context and that Congress may not confer sweeping criminal rulemaking authority on the executive.

### C.    Section 1733 Unconstitutionally Confers Criminal Rulemaking Power.

For all the reasons identified in Section I above, Section 1733 unconstitutionally delegates lawmaking power without an intelligible principle. But even if some hazy intelligible principle were located, it would be inadequate to rescue the criminal delegation here, given the scope and nature of the power delegated.

BLM's only case even arguably on point is *Grimaud*, which is inapposite for the reasons already discussed. *See supra* Part I.B. Here, in contrast to the limited power conferred in *Grimaud*, Congress has plainly

21

given BLM the authority to create an entire criminal code for a large swath of the nation's land.[8]

Holding that in Section 1733 Congress "created" the crime and appropriately left to the executive the responsibility of determining what vast array of conduct constitutes that crime would render illusory any limitations on the conferral of criminal lawmaking authority outside the legislative branch. If a delegation of criminal authority with such an expansive substantive scope and without meaningful guiding principles were upheld, virtually all legislative authority would presumably be conferrable. Such a scheme would not be consistent with the basic separation of powers principles upon which this country was founded. *See, e.g.*, John Locke, S*econd Treatise of Government: An Essay Concerning the True Original, Extent and End of Civil Government* § 141 (1690) ("The power of the *legislative* being derived from the people by a positive voluntary grant and institution, can be no other, than what that

---

[8] *Loving v. United States*, 517 U.S. 748 (1996), falls more appropriately into the category of cases considering powers that are not vested solely in Congress. *See id.* at 776 (Scalia, J., concurring) ("[I]t would be extraordinary simply to infer such a special limitation upon tasks given to the President as Commander in Chief, where his inherent powers are clearly extensive.").

positive grant conveyed, which being only to make *laws*, and not to make *legislators*, the *legislative* can have no power to transfer their authority of making laws, and place it in other hands."). Nor would it comport with Supreme Court precedent in this area.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the District Court should be affirmed.

DATE:  April 26, 2024          Respectfully submitted,

                               s/  Molly E. Nixon
                               Molly E. Nixon
                               Luke A. Wake

                               *Attorneys for Amicus Curiae*
                               *Pacific Legal Foundation*