No. 23-991

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

GREGORY W. PHEASANT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nevada

No. 3:21-cr-24-RCJ
The Honorable Robert C. Jones

## BRIEF OF IDAHO, ALABAMA, ALASKA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, SOUTH CAROLINA, TENNESSEE, UTAH, AND WEST VIRGINIA AS *AMICI CURIAE* SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE

RAÚL R. LABRADOR
*Attorney General*

Idaho Office of the
Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

ALAN HURST
*Solicitor General*

Sean M. Corkery
*Assistant Solicitor General*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ...............................................................................1

SUMMARY OF ARGUMENT ...............................................................................3

ARGUMENT ..........................................................................................................3

I. The Principle that Power Stems from the Consent of the People Requires a Nondelegation Doctrine. .........................................................................3

    A.   At Common Law, Delegation Required the Principal's Consent ...................4

    B.   Locke Likewise Opposed Delegation Without Consent ................................6

    C.   The Text and Structure of the Constitution Prohibit Delegation. ..................8

II. Delegation Has Damaged the Government's Legitimacy and Effectiveness....... 11

CONCLUSION ...................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Barbier v. Connolly,*
113 U.S. 27 (1884) ................................................................1

*Carpenter v. United States,*
585 U.S. 296 (2018) ..............................................................6

*Cohens v. State of Virginia,*
19 U.S. 264 (1821) ................................................................4

*Engle v. Isaac,*
456 U.S. 107 (1982) ..............................................................2

*Gundy v. United States,*
139 S. Ct. 2116 (2019) .............................................1, 8, 10, 12

*Kleppe v. New Mexico,*
426 U.S. 529 (1976) ..............................................................2

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) .............................................................14

*Meyer v. Holley,*
537 U.S. 280 (2003) ..............................................................4

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
584 U.S. 453 (2018) ..............................................................1

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) .............................................................14

*Shankland v. Mayor of Wash.,*
30 U.S. 390 (1831) ................................................................4

*U.S. Term Limits, Inc. v. Thornton,*
514 U.S. 779 (1995) ..............................................................3

*Virginia Uranium, Inc. v. Warren,*
139 S. Ct. 1894 (2019) ..........................................................12

## CONSTITUTIONS AND STATUES

U.S. CONST. pmbl. ...............................................................8

U.S. CONST. art. I, § 7 ..........................................................9

43 U.S.C. § 1733(a) ..............................................................2

## RULES

43 C.F.R. § 8365.1-6..............................................................................2

Federal Rule of Appellate Procedure 29(a)(2)......................................2

## OTHER AUTHORITIES

1 Samuel Livermore, *A Treatise on the Law of Principal and Agent and of Sales by Auction* (1818)........................................................................................5

1 The Digest of Justinian (Alan Watson trans., Univ. of Pa. Press 1985) .....................6

*Agencies*, Federal Register, https://tinyurl.com/4a6rkbsw (last visited Apr. 24, 2024)..........................................................15

Andrew Solender, *Capitol Hill stunner: 2023 led to fewest laws in decades*, Axios (Dec. 18, 2023) https://tinyurl.com/2spmvxzw...........................................11

Clyde Wayne Crews Jr., *Biden's 2023 Federal Register Page Count Is The Second-Highest Ever*, Forbes (Dec. 29, 2023) https://tinyurl.com/mr3zfd2z.......................................11

Clyde Wayne Crews Jr., *Laws Have Mercy: Here Is How Biden Is Restricting Access To Regulatory Guidance Documents*, Forbes (Apr. 26, 2021) https://tinyurl.com/2xjef2km ..........................................11

Cong. Rsch. Serv., R42346, *Federal Land Ownership: Overview and Data* (2020) https://tinyurl.com/yck9xejr .......................................................2

David E. Lewis & Jennifer L. Selin, *Sourcebook of United States Executive Agencies*, Administrative Conference of the United States (Dec. 2012), https://tinyurl.com/3n6kfpyz.....................................................15

David Schoenbrod, *A Judicially Manageable Test to Restore Accountability, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) .............................................................8, 9

David Schoenbrod, *Delegation and Democracy: A Reply to My Critics*, 20 CARDOZO L. REV. 731 (1998-99).......................................................9, 12

Douglas H. Ginsburg, *Reviving the Nondelegation Principle in the US Constitution, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ...........................................................13

Douglas H. Ginsburg & Steven Menashi, *Our Illiberal Administrative Law*, 10 N.Y.U. J.L. & LIBERTY 475 (2016)....................................................4, 14

Edward Coke, *The Second Part of the Institutes of the Laws of England* (London, M. Flesher & R. Young 1642).......................................................5

iv

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527 (1947) ..................................................................................................4

Gary Lawson, *A Private-Law Framework for Subdelegation, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ................................... 4, 5, 6

John Locke, *Second Treatise of Civil Government* (1690) ................................. 1, 7, 8

Jonathan H. Adler, *A "Step Zero" for Delegations, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ....................................... 9, 12

Jonathan H. Adler & Christopher J. Walker, *Delegation & Time*, 105 IOWA L. REV. 1931 (2020) ..................................................................................11, 12, 13

Joseph Story, *Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence* (1844) ..................................................................................5

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277 (2021) ..................................................................................6

Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ..................................................................................10

Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. 1083 (2023) ..................................................................................5, 6, 7, 10

*Public Trust in Government: 1958-2023*, Pew Research Center (Sept. 19, 2023), https://tinyurl.com/48pj7crc ..................................................................................15

Ronald Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 HARV. J.L. & PUB. POL'Y 147 (2017) ..................................................12

Saikrishna Bangalore Prakash, *The Sky Will Not Fall: Managing the Transition to a Revitalized Nondelegation Doctrine, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ....................................................11

THE FEDERALIST NO. 51 (James Madison).......................................................8, 9

THE FEDERALIST NO. 62 (James Madison).......................................................9

THE FEDERALIST NO. 75 (Alexander Hamilton).................................................9

THE FEDERALIST NO. 78 (Alexander Hamilton).................................................3

Todd Gaziano & Ethan Blevins, *The Nondelegation Test Hiding in Plain Sight: The Void-for-Vagueness Standard Gets the Job Done, in The Administrative State Before the Supreme Court* (Peter J. Wallison & John Woo eds., 2022) ....................................................10

## INTEREST OF *AMICI CURIAE*

When the States declared their independence, they claimed all "the powers inherent in sovereignty," including the power to legislate. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). Under the Constitution, they retained the power to "prescribe regulations to promote the health, peace, morals, education, and good order of the people," *Barbier v. Connolly*, 113 U.S. 27, 31 (1884), but they granted Congress the power to legislate on specific topics and even, through legislation, to overrule the States' own laws. *Murphy*, 584 U.S. at 471. In short, they delegated a portion of their sovereign legislative power to Congress.

But *only* to Congress. "The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other than what that positive grant conveyed, which being only to make laws, and not to make legislators, the legislative can have no power to transfer their authority of making laws, and place it in other hands." John Locke, *Second Treatise of Civil Government* § 141 (1690). Or, as the Supreme Court recently put it, Congress may not transfer "powers which are strictly and exclusively legislative" to other branches of government. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (citation omitted).

Despite this long-established, still-valid doctrine, Congress has slowly relinquished its role as lawmaker and turned it over to executive agencies. This case illustrates the problem. Congress authorized the BLM to pass any criminally enforceable regulations it wishes as long as they relate "to the management, use, and protection of

1

[BLM] lands." 43 U.S.C. § 1733(a). The BLM used that power to create a wide range of crimes—"outdated vehicle registration, coal exploration, horse adoption, noisiness, fraud, discrimination, and homelessness"—many of which address subjects traditionally regulated by the states. ER-016.

The States of Idaho, Alabama, Alaska, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, Tennessee, Utah, and West Virginia, as well as their people, are undeniably harmed by Congress's unconstitutional habit of delegation. The states supposedly "possess primary authority for defining and enforcing the criminal law." *Engle v. Isaac,* 456 U.S. 107, 128 (1982). Yet, with respect to a large portion of their land, their sovereignty is infringed. *Kleppe v. New Mexico,* 426 U.S. 529, 543 (1976) (holding that although the federal government does not have exclusive jurisdiction over all federal land, any state laws which conflict with legislation passed pursuant to the property clause are void). Indeed, Idaho alone is 61.6% federal land, subject to the Federal Government's police powers. Cong. Rsch. Serv., R42346, *Federal Land Ownership: Overview and Data*, 7, 9 (2020), https://tinyurl.com/yck9xejr. And a third of that federal land is controlled by the dictates of a single BLM official. *See id*; 43 C.F.R. § 8365.1-6 (allowing State BLM Directors to establish supplementary regulations "as he/she deems necessary").

Accordingly, *Amici Curiae* file this brief in support of Defendant-Appellee under Federal Rule of Appellate Procedure 29(a)(2).

**SUMMARY OF ARGUMENT**

Legislative authority derives from the consent of the people, and because it requires the people's consent it may not be delegated. This principle—a delegated power may not be further delegated—was clearly established at common law, defended by John Locke, and visible in the text and structure of the Constitution.

By delegating legislative power, Congress has damaged the link between lawmaking and the consent of the governed, enabling agencies to enact laws that lack the broad popular support the Constitution was intended to require. It has spread the power to preempt the states—once held only by Congress—across hundreds of federal agencies, leaving state legislation perpetually vulnerable to a change of administrations. And, by permitting each party to achieve many of its policy goals simply by winning the White House, without any need for legislative compromise, it has transformed the executive branch into a leviathan, prompting a crisis every four years.

These consequences will continue until the Judiciary, "the guardian of the constitution," intercedes. *See* THE FEDERALIST NO. 78 (Alexander Hamilton).

**ARGUMENT**

## I. The Principle that Power Stems from the Consent of the People Requires a Nondelegation Doctrine.

"The ultimate source of the Constitution's authority is the consent of the people of each individual State." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 846 (1995) (Thomas, J., dissenting). And "[t]he people do not consent to obey any laws except

3

those passed by their representatives according to the constitution." *Cohens v. State of Virginia*, 19 U.S. 264, 341 (1821). For this simple reason, the authority that the people have loaned to the Federal Congress "cannot be delegated." *See Shankland v. Mayor of Wash.*, 30 U.S. 390, 395 (1831).

This principle—i.e., that legislative power may not be delegated because lawmaking requires consent—can be seen in English common law, in the political philosophy that influenced the Framers, and in the Constitution's text and structure.

### A. At Common Law, Delegation Required the Principal's Consent

The Constitution is a legal instrument and must be interpreted as such. *See* Gary Lawson, *A Private-Law Framework for Subdelegation, in The Administrative State Before the Supreme Court* 123, 130 (Peter J. Wallison & John Woo eds., 2022). And the Constitution, in its form, is a delegation of authority from a principal to an agent—from "We the People" to "a Congress of the United States." *Id.* at 131.

This principal/agent relationship would be familiar to every person responsible for drafting the Constitution. *Id.* And, like all other legal concepts "obviously transplanted from another legal source, whether common law or other legislation, it brings the old soil with it." *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947).

At common law as today, a central theme of agency law is the consent of the principal. *See, e.g., Meyer v. Holley*, 537 U.S. 280, 286 (2003) (citing 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1137, pp. 300-301 (rev. ed.1991-1994); 10 *id.*,

§ 4877 (rev. ed.1997-2001)) ("The Restatement § 1 specifies that the relevant principal/agency relationship demands not only control (or the right to direct or control) but also "the manifestation of *consent* by one person to another that the other shall act on his behalf . . . .") (emphasis added)); 1 Samuel Livermore, *A Treatise on the Law of Principal and Agent and of Sales by Auction* 1 (1818) (noting the importance of consent on the first page of his treatise on the law of agency).

Because consent was indispensable, 18th-century common law presumed that delegations of authority to a fiduciary did not permit the fiduciary to delegate the authority further. *See* Lawson, *supra* at 132. *See* 2 Edward Coke, *The Second Part of the Institutes of the Laws of England* 597 (London, M. Flesher & R. Young 1642) ("*delegatam potestatem, quae non potest delegari.*"[1]). For instance, Samuel Livermore, a noted agency-law theorist, searched through various attempts at subdelegation across many areas of law and concluded, "[a]n authority given to one person cannot in general be delegated by him to another; for being a personal trust and confidence it is not in its nature transmissible." Lawson, *supra* at 132 (quoting Livermore, *supra* at 54). Joseph Story came to the same conclusion. *Id.* (quoting Joseph Story, *Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence* § 13 (1844)). *See* Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. 1083, 1161 (2023) ("If a permissive approach to the subdelegation of legislative power was the prevailing eighteenth-century

---

[1] "a delegated power, which cannot be delegated."

American position, one would expect to find at least one prominent theoretical exposition of it.").

The Constitution's text was drafted by four lawyers and a businessman.[2] *See* Lawson, *supra* at 131 n.33. It is difficult to doubt they knew the common-law rule.

### B. Locke Likewise Opposed Delegation Without Consent

Although the rule against subdelegation dates to Roman times, John Locke was the first significant philosopher to derive the rule from the need for popular consent. Hamburger, *supra* at 1153, 1154, 1160; *see also* 1 The Digest of Justinian 39 (Alan Watson trans., Univ. of Pa. Press 1985) ("It is obvious that one cannot delegate to another a jurisdiction which one holds by delegation."). *But see* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277, 297 (2021) (describing the nondelegation doctrine as one of "private law"). And Locke's philosophy "permeated the 18th-century political scene in America." *Carpenter v. United States*, 585 U.S. 296, 348 (2018) (Thomas, J., dissenting) (citations omitted).

Like the common law, Locke believed subdelegation was inconsistent with the principle of consent, but in his philosophy the belief took on new importance because, to him, consent lay at the root of all legitimate government. Hamburger, *supra* at 1160;

---

[2] The Committee of Detail, the group responsible for shaping the Constitutional Convention's principles into a concrete draft of the Constitution, was comprised of Oliver Ellsworth, Nathaniel Gorham, Edmund Randolf, John Rutledge, and James Wilson. Lawson, *supra* at 131 n.33.

*see id.* ("Locke's reasoning against delegation was part of his broader arguments defending representative lawmaking and justifying revolution.").

According to Locke, before government existed, man followed the law of nature and the execution of that law was put into his hands. Locke, *supra* at § 4. However, with that freedom came a lack of security. *See id.* at § 97. Accordingly, man relinquished the liberty in nature and appointed individuals to draft laws. *Id.* In return, he received civil liberty. *Id.* This was the freedom "to be under no other legislative power but that established by *consent* in the commonwealth; nor under the dominion of any will or restraint of any law, *but what that legislative shall enact according to the trust put in it.*" *Id.* at § 22 (emphasis added).

The nondelegation doctrine logically follows from this need for consent, making sure legislation cannot pass without the people's consent by forcing the people's appointed representatives to make laws themselves rather than authorizing others to make them. Hamburger, *supra* at 1166-67. "The Legislative neither must nor can transfer the Power of making laws to any Body else, or place it anywhere but where the People have." Locke, *supra* at § 142; Hamburger, *supra* at 1167-68.

In Locke's view, apart from the need for consensual lawmaking, the nondelegation doctrine also followed from the nature of constitutions, namely the structure of the government chosen by the people. Hamburger, *supra* at 1167.

> The People alone can appoint the Form of the Common
> wealth . . . . And when the People have said, We will submit

7

> to rules, and be govern'd by Laws made by such Men, and in such Forms, no Body else can say other Men shall make Laws for them; nor can the people be bound by any Laws but such as are Enacted by those, whom they have Chosen, and Authorized to make Laws for them.

Locke, *supra* at § 142.

By allowing the "legislative" to delegate its power and "make legislators," Congress would be breaking the link between legislation and the consent of the people, the source of Congress' power. Locke, *supra* at § 141.

### C. The Text and Structure of the Constitution Prohibit Delegation.

With Locke's philosophy and agency law close in the background, the framers etched a radical idea into the very beginning of our founding document: "We the People . . . ordain and establish this Constitution." U.S. CONST. pmbl.; *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). And the framers included an unmistakable implication in that document: the consent of the people requires that lawmaking power be exercised by their elected representatives—not by unelected magistrates like the ones they had recently defenestrated.

Central to the Constitutional framework was that legislators are personally responsible for the use of these powers. David Schoenbrod, *A Judicially Manageable Test to Restore Accountability, in The Administrative State Before the Supreme Court* 346, 349 (Peter J. Wallison & John Woo eds., 2022). In Article I of the text, the Constitution "vested" the power to legislate in the two Houses of Congress, the branch of government that "necessarily predominates." THE FEDERALIST NO. 51 (James Madison). By this phrase,

the Constitution made "the essence of the legislative authority [] to enact laws, or in other words, to prescribe rules for the regulation of the society." THE FEDERALIST NO. 75 (Alexander Hamilton); *See* Schoenbrod, *Judicially Manageable Test*, *supra* at 349.

And the reason the founders made legislators personally responsible for the use of the powers was to ensure lawmakers continued to depend on the consent of the people. THE FEDERALIST NO. 51 (James Madison); Schoenbrod, *Judicially Manageable Test*, *supra* at 349.

Apart from the Vesting Clause, Article I further ensures that consent of the people is required at each stage of the legislative process by requiring Congress to "publish" their proceedings. U.S. CONST. art. I, § 7; Jonathan H. Adler, *A "Step Zero" for Delegations, in The Administrative State Before the Supreme Court* 161, 163-64 (Peter J. Wallison & John Woo eds., 2022) (citing David Schoenbrod, *Delegation and Democracy: A Reply to My Critics*, 20 CARDOZO L. REV. 731 (1998-99)). This feature was to ensure that "government may not expand its powers in any controversial way unless voters know just whom to blame if blame there be." Adler, *supra* at 163-64 (quoting Schoenbrod, *Delegation and Democracy, supra* at 731).

Finally, the lawmaking process itself requires broad consent because of bicameralism and presentment. "No law or resolution [could] be passed without the concurrence first of a majority of the people, and then of a majority of the states," THE FEDERALIST NO. 62 (James Madison), and the veto power makes the president an additional barrier to legislation. U.S. CONST. art. I, § 7, cl. 2.

In short, the Framers ensured each new law would have popular consent by specifically and exclusively vesting the people's lawmaking power in Congress, specifying how Congress was elected, forcing Congress to publish proceedings, and requiring each new law to obtain the approval of three different sets of the people's representatives. *See* Todd Gaziano & Ethan Blevins, *The Nondelegation Test Hiding in Plain Sight: The Void-for-Vagueness Standard Gets the Job Done, in The Administrative State Before the Supreme Court* 45, 49 (Peter J. Wallison & John Woo eds., 2022).

These safeguards logically imply a nondelegation doctrine: without one, the great care the founders gave to ensuring the consent of the people would not be worth the effort. Instead, legislation would become "nothing more than the will of the current President" as agencies could pass the same rules without satisfying Article I's demands. *Gundy,* 139 S. Ct. at 2135 (Gorsuch, J., dissenting).[3]

That the founding generation would have found such a system absurd is confirmed by historical records from nondelegation controversies immediately before, during, and after the Constitutional Convention. *See, e.g.,* Hamburger, *supra* at 1161-1166 (citations omitted) (examining the founders' nondelegation controversies in the State

---

[3] And in the criminal context, the problems with delegating Congress' powers due to the lack of consent are exacerbated. The Constitution ensures no citizen can be convicted under a criminal law without the efforts of all three branches. Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power, in The Administrative State Before the Supreme Court* 81, 102 (Peter J. Wallison & John Woo eds., 2022). "If Congress could delegate its criminal law-drafting function, it would collapse the division of the government's potent criminal power built into the Constitution." *Id.*

of New York and at the Constitutional Convention); *id.* at 1159 (examining a broadly read New York newspaper's praise of Locke's views on nondelegation at the time of the founding); Saikrishna Bangalore Prakash, *The Sky Will Not Fall: Managing the Transition to a Revitalized Nondelegation Doctrine, in The Administrative State Before the Supreme Court* 274, 276 (Peter J. Wallison & John Woo eds., 2022) (citations omitted) (noting the nondelegation controversy at the Second Congress).

## II. Delegation Has Damaged the Government's Legitimacy and Effectiveness

In recent decades, Congress has increasingly shirked its responsibility under the Constitution to make laws. *See* Jonathan H. Adler & Christopher J. Walker, *Delegation & Time*, 105 IOWA L. REV. 1931, 1974 (2020) (noting the "fall of lawmaking by legislation and the rise of lawmaking by regulation."). Although it is difficult to measure precisely this shift to agency lawmaking, one useful metric is the number of pages in the federal register. *See id*; Clyde Wayne Crews Jr., *Biden's 2023 Federal Register Page Count Is The Second-Highest Ever*, Forbes (Dec. 29, 2023), https://tinyurl.com/mr3zfd2z. From 2022 to 2023, the number of pages on the Federal Register increased by 11%. Crews, *supra*.[4] Since 2017, the number of pages has increased 50%. *Id.* In contrast, Congress enacted only 20 laws in 2023, the fewest in modern history. Andrew Solender, *Capitol*

---

[4] These numbers do not include sub-regulatory "guidance" documents, which the Biden Administration has intentionally hidden from public view. Clyde Wayne Crews Jr., *Laws Have Mercy: Here Is How Biden Is Restricting Access To Regulatory Guidance Documents*, Forbes (Apr. 26, 2021), https://tinyurl.com/2xjef2km.

*Hill stunner: 2023 led to fewest laws in decades*, Axios (Dec. 18, 2023), https://tinyurl.com/2spmvxzw.

"In other words, we live in an era in which the vast majority of federal lawmaking does not take place in Congress, but within the hundreds of federal agencies spread across the modern regulatory state." Adler & Walker, *supra* at 1974.

The consequences should have been easy to predict. As discussed above, the Constitution was supposed to require broad support for any new law. *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1908 (2019). This requirement leads to messy "legislative compromises." *Id.* However, by requiring compromises, the system helps ensure that legislation is "the product of widespread social consensus, likely to protect minority interests, and apt to provide stability and fair notice." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). When unpopular compromises are passed, the system includes an additional safeguard by allowing the people to punish legislators for unwise votes. Adler, *supra* at 165 (citing Schoenbrod, *Delegation and Democracy, supra at* 747).

A system which allows delegation of authority offers a perverse incentive for legislators to avoid both legislative compromises and unpopular votes by distancing themselves from lawmaking altogether. *Id. See* Ronald Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 HARV. J.L. & PUB. POL'Y 147, 154 (2017) ("Acknowledgement of official self-interest in delegation of power as much as in the acquisition of power should be enough in itself to raise questions about the practice."). Instead, such a system incentivizes legislators merely to endorse a list of

vague goals that no constituent could possibly disagree with and to leave all the difficult details to agency officials who don't answer to voters. Douglas H. Ginsburg, *Reviving the Nondelegation Principle in the US Constitution, in The Administrative State Before the Supreme Court* 20, 21 (Peter J. Wallison & John Woo eds., 2022).

These concerns are exacerbated when agencies issue new regulations based on ambiguous legislation from decades past. Adler & Walker, *supra* at 1942. When this occurs, agencies run two risks. First, they risk using the authority they have been delegated for purposes or concerns Congress never considered or intended. *Id.* at 1945. Second, even if the agency had the ability to divine what a previous Congress would have done if confronted with a novel issue, the policy that a past Congress would have enacted may no longer have the support of the people. *See id.* And this problem is only worsening. *Id.* at 1946 (citing Suzanne Mettler, *The Policyscape and the Challenges of Contemporary Politics to Policy Maintenance*, 14 PERSP. ON POL. 369, 379-82 (2016)).

Examples are hardly few and far between; they come from presidencies of both parties. *See, e.g.,* Adler & Walker, *supra* at 1942-43 (EPA uses a 1970 statute to regulate greenhouse gas emissions to reduce the threat of global warming); *id.* at 1941-42 (FCC attempts to adopt an "open internet" order relying on a 1934 statute which was last amended before the invention of Wi-Fi); *id.* at 1944 (the President uses a 1977 statute, which allows the president to respond to "any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States," to impose tariffs on Mexico in response to immigration).

What's worse, in part due to *Chevron* deference, any statutory ambiguity or fuzziness lets agency positions flip-flop depending on the administration—making broad support unnecessary and raising the stakes of presidential elections. *See, e.g.,* Douglas H. Ginsburg & Steven Menashi, *Our Illiberal Administrative Law*, 10 N.Y.U. J.L. & LIBERTY 475, 482-83 (2016) ("[NLRB's] partisan majority . . . routinely displaces the previous majority's psychological assertions about what employer tactics do or do not coerce workers[.]") *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (agency changing the regulatory standard for cable modem services); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) (agency changing who receives contraception exceptions and under what circumstances). In these and many more cases, the supposed "expertise" on the part of agency bureaucrats is merely "a euphemism for policy judgments," judgments that properly belong with the people's representatives in Congress. *See* Ginsburg & Menashi, *supra* at 482-83.

Or rather, these judgments properly belong with the people's representatives in Congress *and in the states.* The states, like Congress, can claim the consent of the people; in fact, they are closer to the people and have a better claim. And when Congress delegates legislative power to agencies, it is not only Congress whose lawmaking suffers.

State laws could always be preempted by federal laws, but that used to mean only that they could be preempted by Congress when a new law cleared the hurdles of bicameralism and presentment. Today, state laws exist at the sufferance of hundreds of

federal agencies,[5] any one of which might choose to upset state legislators' careful compromises with new regulation. And when they do, they leave people who supported the now-preempted law with no choice but to direct ever more of their political energies away from their local representatives and towards the federal government—towards an atrophied Congress unlikely to help them, towards an imperial presidency whose elections come to feel like existential crises, and towards the federal courts, which are quite busy enough without the burdensome, ever-multiplying administrative challenges that states and citizens file because they have no other hope for relief.

Considering how hard it has become for the people to influence lawmaking, it should come as no surprise that popular trust in government has fallen from 77% in 1964 to a mere 16% today. *Public Trust in Government: 1958-2023*, Pew Research Center (Sept. 19, 2023), https://tinyurl.com/48pj7crc. This problem has many causes and no easy solutions, but to the extent a solution exists, *Amici* believe the nondelegation doctrine is part of it—that people will trust their government more as more of it is run by people they can vote for and speak to. And to help recover that state of affairs, to

---

[5] "Since what constitutes an agency under the APA is governed on a case-by-case basis through litigation, there is no authoritative list of government agencies. Every list of federal agencies in government publications is different." David E. Lewis & Jennifer L. Selin, *Sourcebook of United States Executive Agencies*, Administrative Conference of the United States, 14-15 (Dec. 2012), https://tinyurl.com/3n6kfpyz. However, the Federal Register agency list includes 439 agencies. *Agencies*, Federal Register, https://tinyurl.com/4a6rkbsw (last visited Apr. 24, 2024).

reestablish the link between lawmaking and consent, courts should scrutinize the representatives' efforts to pass the buck to bureaucrats.

In short, Congress should do its job.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Date: April 26, 2024

Respectfully Submitted,

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL

*/s/ Sean M. Corkery*
Sean M. Corkery
  *Assistant Solicitor General*
Alan Hurst
  *Solicitor General*
Idaho Office of the Attorney General
700 W. Jefferson St.,
Suite 210
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
*State of Alabama*

TREG TAYLOR
Attorney General
*State of Alaska*

KRIS W. KOBACH
Attorney General
*State of Kansas*

LIZ MURRILL
Attorney General
*State of Louisiana*

LYNN FITCH
Attorney General
*State of Mississippi*

ANDREW BAILEY
Attorney General
*State of Missouri*

AUSTIN KNUDSEN
Attorney General
*State of Montana*

MICHAEL T. HILGERS
Attorney General
*State of Nebraska*

ALAN WILSON
Attorney General
*State of South Carolina*

JONATHAN SKRMETTI
Attorney General
*State of Tennessee*

SEAN D. REYES
Attorney General
*State of Utah*

PATRICK MORRISEY
Attorney General
*State of West Virginia*

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Circuit Case No.:            23-991

I am the attorney representing *Amici* State of Idaho et. al.

**This brief contains 3,956 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).


/s/ *Sean M. Corkery*                     Date: April 26, 2024
Sean M. Corkery

18

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing on this date with the Clerk of the Court for the United States Cout of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

*/s/ Sean M. Corkery*                    Date: April 26, 2024
Sean M. Corkery