**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-991 |
| *Plaintiff - Appellant*, | D.C. No. 3:21-cr-00024-RCJ-CLB-1 |
| v. | |
| GREGORY W. PHEASANT, | |
| *Defendant - Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Senior District Judge, Presiding

Argued and Submitted October 10, 2024
Las Vegas, Nevada

Filed February 19, 2025

Before: Carlos T. Bea, Mark J. Bennett, and Eric D. Miller,
Circuit Judges.

Opinion by Judge Miller

## SUMMARY[*]

### Criminal Law

The panel reversed the district court's dismissal of a count charging Gregory W. Pheasant with driving an off-road vehicle on public lands at night without a taillight, in violation of 43 C.F.R. § 8341.1(f)(5), and remanded.

Section 8341.1(f)(5) was adopted by the Secretary of the Interior under authority vested in him by section 303(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), which directs the Secretary to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands, including the property located thereon." The statute provides that "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both."

The district court held that section 303(a) is an unconstitutional delegation of legislative power because it gives the Secretary "unfettered legislative authority" to make rules that "cover almost all conduct on public lands" without "any guidance or restraint as to when the Secretary . . . shall promulgate rules."

Article I of the Constitution vests all legislative powers in Congress. Accompanying that assignment of power to Congress is a bar on its further delegation—Congress may

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not transfer to another branch powers which are strictly and exclusively legislative. But Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. Under the Supreme Court's "intelligible principle" test, a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.

The panel held that section 303(a) easily satisfies the "intelligible principle" test because, taken together, the FLPMA's provisions set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way. Such constraints are enough to satisfy Article I.

## COUNSEL

Adam M. Flake (argued), Appellate Chief and Assistant United States Attorney; Jason M. Frierson, United States Attorney; Office of the United States Attorney, Las Vegas, Nevada; Robert L. Ellman, Appellate Chief, Office of the United States Attorney, Reno, Nevada; for Plaintiff-Appellant.

Ellesse Henderson (argued) and Rohit Rajan, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender's Office for the District of Nevada, Las Vegas, Nevada; Christopher P. Frey, Assistant Federal Public Defender; Federal Public Defender's Office for the District of Nevada, Reno, Nevada; for Defendant-Appellee.

Thomas A. Berry and Alexander R. Khoury, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Michael D. Pepson, Americans for Prosperity Foundation, Arlington, Virginia, for Amicus Curiae Americans for Prosperity Foundation.

Kara M. Rollins and John J. Vecchione, New Civil Liberties Alliance, Washington, D.C., for Amicus Curiae New Civil Liberties Alliance.

Molly E. Nixon, Pacific Legal Foundation, Arlington, Virginia; Luke A. Wake, Pacific Legal Foundation, Sacramento, California; for Amicus Curiae Pacific Legal Foundation.

Sean M. Corkery, Assistant Solicitor General; Alan Hurst, Solicitor General; Raúl R. Labrador, Idaho Attorney General; Office of the Idaho Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Alan Wilson, South Carolina Attorney, Office of the South Carolina Attorney General, Columbia, South Carolina; Jonathan Skrmetti, Tennessee

Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae the State(s) of Idaho, Alabama, Alaska, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, Tennessee, Utah, and West Virginia.

## OPINION

MILLER, Circuit Judge:

Late at night on the Friday of Memorial Day weekend in 2021, Bureau of Land Management rangers were patrolling Moon Rocks, an area of BLM-administered land north of Reno, Nevada. When the rangers saw a group of motorcyclists riding without lights, they turned on their emergency lights to direct them to stop. According to the rangers, one of the motorcyclists, Gregory Pheasant, refused to stop. After the rangers chased him down, he allegedly came to a stop only to spin his rear wheel—thereby throwing rocks and dirt at the rangers—while making obscene gestures and abusive comments. He then sped away again.

Pheasant was eventually apprehended, and a grand jury in the District of Nevada returned a three-count indictment charging him with assault on a federal officer, resisting the issuance of a citation or arrest, and—in the only count at issue in this appeal—driving an off-road vehicle on public lands at night without a taillight, in violation of 43 C.F.R.

6                       USA v. PHEASANT

§ 8341.1(f)(5). That regulation was adopted by the Secretary
of the Interior under authority vested in him by section
303(a) of the Federal Land Policy and Management Act of
1976 (FLPMA), 43 U.S.C. § 1733(a), which directs the
Secretary to "issue regulations necessary to implement the
provisions of [the FLPMA] with respect to the management,
use, and protection of the public lands, including the
property located thereon." The statute provides that "[a]ny
person who knowingly and willfully violates any such
regulation which is lawfully issued pursuant to this Act shall
be fined no more than $1,000 or imprisoned no more than
twelve months, or both." *Id.*

Pheasant moved to dismiss the indictment, and the
district court granted the motion. As to the taillight count,
the court held that section 303(a) is an unconstitutional
delegation of legislative power because it gives the Secretary
"unfettered legislative authority" to make rules that "cover
almost all conduct on public lands" without "any guidance
or restraint as to when the Secretary . . . shall promulgate
rules." The government appeals the dismissal of that count,
and we review the district court's decision de novo. *United
States v. Melgar-Diaz*, 2 F.4th 1263, 1266 (9th Cir. 2021).

Article I of the Constitution vests "[a]ll legislative
Powers . . . in a Congress of the United States." U.S. Const.
art. I, § 1. "Accompanying that assignment of power to
Congress is a bar on its further delegation"—Congress "may
not transfer to another branch 'powers which are strictly and
exclusively legislative.'" *Gundy v. United States*, 588 U.S.
128, 135 (2019) (plurality opinion) (quoting *Wayman v.
Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). But
"Congress does not violate the Constitution merely because
it legislates in broad terms, leaving a certain degree of

discretion to executive or judicial actors." *Touby v. United States*, 500 U.S. 160, 165 (1991).

The Supreme Court has defined the point beyond which a grant of discretion is too broad—and is thus a delegation of legislative power—through the "intelligible principle" test. *See Gundy*¸ 588 U.S. at 135 (plurality opinion). Under that test, "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

The requirement that Congress set out an "intelligible principle" to constrain executive discretion "is an exceedingly modest limitation." *Melgar-Diaz*, 2 F.4th at 1266. That is because "the extent and character" of the assistance that Congress may seek from the coordinate branches "must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). And "[s]ince Congress is no less endowed with common sense than [courts] are, and better equipped to inform itself of the 'necessities' of government," courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting). As courts confronted with non-delegation challenges regularly point out, the Supreme Court has only twice invalidated a statute as an impermissible delegation—both times in 1935, and "in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy*, 588 U.S. at 146 (plurality opinion) (quoting *Mistretta*, 488 U.S. at 373 n.7);

USA v. PHEASANT

*see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

As long as Congress has provided *some* standard constraining discretion—even one phrased in broad terms— the Supreme Court has upheld statutes against constitutional scrutiny. *See, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398–99 (1940) ("just and reasonable" rates); *National Broadcasting Co. v. United States*, 319 U.S. 190, 216–17 (1943) ("public interest, convenience, or necessity"); *Yakus v. United States*, 321 U.S. 414, 423–26 (1944) ("fair and equitable" prices); *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472–74 (2001) ("requisite to protect the public health"). As Justice Scalia asked, "What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a 'public interest' standard?" *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting).

Section 303(a) easily satisfies the "intelligible principle" test. The statute directs the Secretary to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733(a). The FLPMA instructs the Secretary to "manage the public lands under principles of multiple use and sustained yield." *Id.* § 1732(a). The "multiple use" mandate requires ensuring the utilization of "public lands and their various resource values"—including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values"—in a manner that takes into account "the relative values of the resources" and avoids "permanent impairment of the productivity of the land and the quality of the environment." *Id.* § 1702(c); *see Public Lands Council v. Babbitt*, 529 U.S.

728, 737–38 (2000). The "sustained yield" mandate requires controlling depleting land uses to ensure "maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources." 43 U.S.C. § 1702(h). To that end, the statute also requires the Secretary to exercise his authority "to prevent unnecessary or undue degradations of the lands." *Id.* § 1732(b). Taken together, those provisions set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way.

The Supreme Court's decision in *United States v. Grimaud* makes clear why that principle is sufficiently intelligible. 220 U.S. 506 (1911). In that case, the Court considered a statute authorizing the Secretary of Agriculture to issue rules "regulating the use and occupancy of the public forest reservations and preserving the forests thereon from destruction." *Id.* at 509. Acting under that authority, the Secretary issued a regulation—backed by criminal penalties—prohibiting grazing in a forest reserve without a permit. *Id.* at 514. The Court held that the statute sufficiently constrained the Secretary's authority because it "clearly indicated" that he was "to make provision to protect [the lands] from depredations and from harmful uses." *Id.* at 522. Section 303(a) and its complementary provisions provide similar guidance to the Secretary of the Interior. As in *Grimaud*, the constraints imposed by the FLPMA are enough to satisfy Article I.

Pheasant objects to this conclusion on three grounds. First, he argues that the adjacent statutory provisions in the FLPMA do not prescribe a relevant intelligible principle because they do not affect how the Secretary must execute his responsibilities under section 303(a). That argument runs headlong into the Supreme Court's instruction that, in non-

delegation cases as elsewhere, statutory provisions "need not be tested in isolation" because "[t]hey derive much meaningful content from the purpose of the [relevant] Act, its factual background and the statutory context in which they appear." *American Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946); *accord Gundy*, 588 U.S. at 141 (plurality opinion) ("To define the scope of delegated authority, we have looked to the text in 'context' and in light of the statutory 'purpose.'" (quoting *National Broadcasting Co.*, 319 U.S. at 214, 216)). Section 303(a) directs the Secretary to issue regulations "necessary to implement the provisions of [the FLPMA] with respect to the *management*, use, and protection of the public lands." 43 U.S.C. § 1733(a) (emphasis added). Other provisions of the FLPMA define how the Secretary is to conduct the "[m]anagement of use, occupancy, and development of public lands," *id.* § 1732(a), and constrain the Secretary's "management of the public lands," *id.* § 1702(c); *see id.* § 1702(h). Those provisions are even more directly relevant than the "general policy declarations" that the Court considered in *American Power & Light Co.*; they expressly define the terms that limit the scope of the Secretary's authority. 329 U.S. at 105. The FLPMA thus makes clear that section 303(a) does not, as Pheasant suggests, permit the Secretary to issue any regulation he wishes with a colorable connection to the use of public lands. Instead, the remainder of the statute specifies the policy goals that the Secretary must advance.

Second, Pheasant argues that Congress had to provide the Secretary with more detailed guidance because the FLPMA authorizes the Secretary to promulgate regulations that apply on large areas of land in the American West. *See Whitman*, 531 U.S. at 475 (explaining that "the degree of agency discretion that is acceptable varies according to the

scope of the power congressionally conferred"). But the Supreme Court has never required Congress to provide something more specific than an "intelligible principle" simply because a statute authorizes economically or socially significant regulations. In *Yakus*, for instance, the Court considered a statute that authorized an executive official to promulgate regulations "fixing . . . maximum prices of commodities and rents." 321 U.S. at 419. That delegation undoubtedly had sweeping economic consequences, but the Court upheld it because it determined that the statute's directive to set prices in a manner that was "fair and equitable" and to "give due consideration, so far as practicable, to prevailing prices during the designated base period" sufficiently constrained the executive's discretion. *Id.* at 423. Likewise, in *Whitman*, the Court considered a statute that authorized the EPA to set air quality standards for certain pollutants. 531 U.S. at 472. Even though the Court conceded that this "sweeping regulatory scheme[]" allowed the EPA to "set[] air standards that affect the entire national economy," it held that the guidance in the statute— which called for standards to be set "at a level that is requisite to protect public health from the adverse effects of the pollutant in the ambient air"—constituted an "intelligible principle" and thus "fit[] comfortably within the scope of discretion permitted by [the Court's] precedent." *Id.* at 473– 76. That the delegation here authorizes regulations that may affect a large area of land does not compel heightened constitutional scrutiny.

Pheasant's related argument—that something more than an intelligible principle is required because BLM's mission provides no inherent limitation on the scope of its regulations—is similarly unavailing. BLM does not have plenary regulatory authority; it has defined responsibilities

12          USA v. PHEASANT

related to the "management of lands and resources." 43
U.S.C. § 1731(a). The regulations that Pheasant cites to
demonstrate the breadth of BLM's authority prove just the
opposite. BLM surely regulates a wide range of conduct.
*See, e.g.*, 43 C.F.R. § 8365.1-4(a)(1) (noise disturbances); *id.*
§ 8365.1-2(a) (camping); *id.* § 4140.1 (grazing). But all of
its regulations cover conduct with a strong connection to the
management, use, and protection of public lands. *See id.*
§§ 8365.1-4, 8365.1-2(a), 4140.1 (confining the regulations
to public lands). Pheasant points to no examples of BLM
regulations of private conduct that does not affect public
lands; BLM has no authority to promulgate such regulations.

If anything, section 303(a)'s relationship to public lands
counsels in favor of more, rather than less, deference to
Congress's choice about the degree of responsibility to
assign to the Executive Branch. The Constitution expressly
vests in Congress the authority to manage "Property
belonging to the United States." U.S. Const. art. IV, § 3, cl.
2. That authority is plenary—the Supreme Court has
described it as "without limitations," *United States v. City &
Cnty. of San Francisco*, 310 U.S. 16, 29 (1940), and
analogous "to the police power of the several states,"
*Camfield v. United States*, 167 U.S. 518, 525 (1897). The
Court has therefore recognized that Congress can, without
creating a delegation problem, circumscribe the "implied
license under which the United States [allows] its public
domain to be used" by authorizing an agency to make "rules
and regulations" that define "an unlawful use of the
government's property." *Grimaud*, 220 U.S. at 521. That is
precisely what Congress has done here.

Third, Pheasant and his *amici* urge us to apply greater
scrutiny to section 303(a) because it empowers the Secretary
to promulgate regulations whose violation may be punished

by criminal sanctions. Although Pheasant refers to a "delegation of criminal lawmaking power," that description is somewhat imprecise: It is Congress, not BLM, that created a criminal offense by providing that "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both." 43 U.S.C. § 1733(a); *see Melgar-Diaz*, 2 F.4th at 1267. And Pheasant does not contend that Congress is prohibited from leaving to the agency the authority to fill in the details of a regulatory scheme simply because the scheme is enforced through criminal penalties. So the question is, as it always is in non-delegation cases, how much discretion can the agency exercise before it is legislating? That is precisely the question that the "intelligible principle" test answers. *See Loving v. United States*, 517 U.S. 748, 771 (1996).

Pheasant emphasizes that liberty concerns are especially salient in criminal law, but those concerns have only an attenuated relationship to the constitutional principles he invokes. The non-delegation doctrine guarantees that Congress does not give away the legislative power that Article I has vested in it. That guarantee protects individual liberty by preserving the separation of powers. But a power does not become more legislative simply because its exerciser can issue rules backed by criminal penalties. Thus, although the Supreme Court has not expressly resolved whether "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions," *Touby*, 500 U.S. at 165–66, it has routinely applied the "intelligible principle" test even when the challenged statute authorized regulations backed by criminal

14          USA v. PHEASANT

penalties. In *Grimaud*, for example, the Court explained that "the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense." 220 U.S. at 521; *see Yakus*, 321 U.S. at 418, 427 (upholding grant of authority to executive to set price regulations backed by criminal penalties); *Loving*, 517 U.S. at 771–72 (upholding grant of authority to President to define aggravating factors applicable in military capital cases).

Pheasant's view finds no support in circuit precedent, either. To the contrary, in *Melgar-Diaz*, we rejected a non-delegation challenge to a statute that criminalized crossing the border at a time or place other than as designated by an immigration official. 2 F.4th at 1265. The criminal character of the statute was irrelevant to our conclusion that Congress provided a sufficiently intelligible principle. It mattered only that the statute "does not cast immigration officials completely adrift when they designate times and places of entry," which meant that Congress had not delegated legislative power. *Id.* at 1268. Other circuits have also "decline[d] to abandon the well-settled 'intelligible principle' standard" when reviewing "a statute with criminal consequences." *United States v. Nichols*, 775 F.3d 1225, 1232 (10th Cir. 2014), *rev'd on other grounds*, 578 U.S. 104 (2016); *accord United States v. Cooper*, 750 F.3d 263, 270–71 (3d Cir. 2014).

Even in the criminal context, the "intelligible principle" test provides the controlling legal standard for evaluating non-delegation challenges. And under that test, the district court erred in invalidating section 303(a).

**REVERSED and REMANDED.**