Case No. 23-991

# United States Court of Appeals
## for the Ninth Circuit

United States of America,

   Plaintiff/Appellant,

v.

Gregory W. Pheasant,

   Defendant/Appellee.

D.C. No. 3:21-cr-24-RCJ-CLB-1

Appeal from the United States District Court
for the District of Nevada

## Appellee Gregory W. Pheasant's Petition
## for Panel and En Banc Rehearing

Tobias S. Loss-Eaton
Vishnu Tirumala
Bridget Pranzatelli
Sidley Austin LLP
1501 K Street NW
Washington, D.C. 20005

Jeffrey T. Green
The Carter G. Phillips
 Supreme Court Clinic
Northwestern Pritzker
 School of Law
375 East Chicago Avenue
Chicago, IL 60611

Rene L. Valladares
Federal Public Defender
Rohit Rajan
Ellesse Henderson
Sean McClelland
Assistant Federal Public Defenders
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
Rohit_Rajan@fd.org
Ellesse_Henderson@fd.org
Sean_McClelland@fd.org

*Counsel for Appellee Gregory Pheasant*

# Table of Contents

**Page**

Table of Authorities ..................................................................ii

Statement in Support of Rehearing and En Banc Review ......................1

Analysis and Authority .............................................................3

I.  The Panel decision misreads circuit precedent as resolving
    the nondelegation standard in criminal cases. ...............................3

II. Criminal law delegations require heightened specificity. ...............7

    A.  Writing criminal law is an exclusive legislative
        function. ....................................................................7

    B.  Congress did not criminalize Mr. Pheasant's actions. .........11

    C.  Whether BLM can decide what conduct is criminal
        warrants en banc review .........................................13

III. Section 1733(a) lacks an intelligible principle—especially
     under the heightened standard for criminal offenses. .................14

Conclusion ...........................................................................18

Certificate of Compliance

Certificate of Service

Appendix

i

# Table of Authorities

**Page(s)**

**Cases**

*City of Grants Pass v. Johnson,*
603 U.S. 520 (2024) .................................................................. 10

*Consumers' Rsch. v. Fed. Commc'ns Comm'n,*
109 F.4th 743 (5th Cir. 2024) ......................................... 13–14

*Fahey v. Mallonee,*
32 U.S. 245 (1947) .................................................................. 17

*Gundy v. United States,*
588 U.S. 128 (2019) .................................................... 8, 11, 14

*J.W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ................................................................ 17

*In re Kollock,*
165 U.S. 526 (1897) ................................................................ 12

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................. 7

*Touby v. United States,*
500 U.S. 160 (1991) ........................................................... 6, 17

*United States v. Bass,*
404 U.S. 336 (1971) .................................................................. 8

*United States v. Davis,*
588 U.S. 445 (2019) ........................................................ 8, 9, 10

*United States v. Eaton,*
144 U.S. 677 (1892) ................................................................ 12

*United States v. Gradwell,*
243 U.S. 476 (1917) .................................................................. 8

*United States v. Grimaud,*
220 U.S. 506 (1911) ................................................................. 17

*United States v. Hudson & Goodwin,*
11 U.S. (7 Cranch) 32 (1812) .................................................. 8, 11, 12

*United States v. Melgar-Diaz,*
2 F.4th 1263 (9th Cir. 2021) ................................................. 1, 3, 4, 5, 6

*United States v. Motamedi,*
No. 20-10364, 2022 WL 101951 (9th Cir. Jan. 11, 2022) .................... 6

*United States v. Nunez-Soberanis,*
406 F. Supp. 3d 835 (S.D. Cal. 2019) .................................................. 8

*United States v. Pheasant,*
No. 3:21-CR-00024-RCJ-CLB, 2023 WL 3095959 (D. Nev.
Apr. 26, 2023) ................................................................................. 2, 6

*United States v. Wiltberger,*
18 U.S. (5 Wheat.) 76 (1820) .......................................... 8, 11, 12

*Wayman v. Southard,*
23 U.S. (10 Wheat.) 1 (1825) ............................................. 8, 9, 11

*In re Winship,*
397 U.S. 358 (1970) ......................................................................... 9

*Yakus v. United States,*
321 U.S. 414 (1944) ....................................................................... 16

**Statutes and Regulations**

8 U.S.C. § 1325(a)(1) ........................................................................ 4

43 U.S.C. § 1702(c) ......................................................................... 15

43 U.S.C. § 1702(h) ......................................................................... 15

43 U.S.C. § 1731 ............................................................................... 1

43 U.S.C. § 1732(a) ......................................................................... 15

43 U.S.C. § 1733 ........................................................... 5

43 U.S.C. § 1733(a) ................................ 1, 2, 5, 9, 10, 11, 14, 15

43 C.F.R. § 3715.6(j) ..................................................... 5

43 C.F.R. § 8341.1(f)(5) .............................................. 2, 5

43 C.F.R. § 8365.2-2(a) .................................................. 5

43 C.F.R. § 8365.2-3(f) .................................................. 5

43 C.F.R. § 8365.2-5(b) .................................................. 6

43 C.F.R. § 6302.20(e) ................................................... 5

43 C.F.R. § 6302.20(i) ................................................... 5

43 C.F.R. § 2868.10(c) ................................................... 6

43 C.F.R. § 9269.3-4(c) .................................................. 6

43 C.F.R. § 9264.7(a)(2) ................................................. 6

Exec. Order No. 14241, 90 Fed. Reg. 56, 13673 (2025) .......................... 16

## Other Authorities

Bureau of Land Management, *Federal Public Land Sales FAQs*, https://www.blm.gov/programs/lands-and-realty/sales-and-exchanges/federal-public-land-sales-faqs (last visited May 30, 2025) ................................................ 13

4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) (James Madison) ....................... 9, 10

The Federalist No. 47 (Madison) ............................................. 9

17 Univ. of Va. Press, *The Papers of James Madison* 303-351 (David B. Mattern et al. eds., 1991) ....................................... 10

iv

The White House, *Executive Order: Fighting Overcriminali-
    zation in Federal Regulations* (May 9, 2025),
    https://www.whitehouse.gov/presidential-actions/2025/05/
    fighting-overcriminalization-in-federal-regulations/ .......................... 7

## Statement in Support of Rehearing and En Banc Review

This case is about whether only an "exceedingly modest limitation" restrains Congress from delegating authority to administrative agencies to write—and then enforce—their own criminal laws. Op. 7 (quoting *United States v. Melgar-Diaz,* 2 F.4th 1263, 1266 (9th Cir. 2021)). The Panel's answer was yes. En banc review is warranted because the Panel decision misreads this Court's precedent and conflicts with Supreme Court decisions. It also creates perverse incentives for Congress to abdicate its criminal lawmaking authority. And it raises vitally important questions about the separation of powers and individual liberty.

The Federal Land Policy and Management Act governs how the Secretary of Interior, through the Bureau of Land Management ("BLM"), manages federal land under its jurisdiction. 43 U.S.C. § 1731. The Act instructs the Secretary to "issue regulations necessary to implement the provisions of [the] Act with respect to the management, use, and protection of the public lands, including the property located thereon." *Id.* § 1733(a). Violations carry criminal penalties: "Any person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no

1

more than twelve months, or both." *Id.* This vast delegation thus grants the Secretary "unfettered legislative authority" to criminalize conduct on federal lands. *United States v. Pheasant*, No. 3:21-CR-24-RCJ-CLB, 2023 WL 3095959, at *6 (D. Nev. Apr. 26, 2023), *rev'd*, 129 F.4th 576 (9th Cir. 2025).

BLM seized on this limitless authority to create—among a wide variety of other federal crimes—a criminal offense for riding an "off-road vehicle" at night without a taillight. 43 C.F.R. § 8341.1(f)(5). BLM officers then arrested Mr. Pheasant for allegedly violating the administrative crime that BLM created. Op. 5–6. Recognizing the dangers of this scheme, the district court held that Section 1733(a) violates the nondelegation doctrine because it "does nothing to cabin the Secretary of the Interior's ability to choose what is a crime." *Pheasant*, 2023 WL 3095959, at 7. The Panel reversed.

En banc review is warranted for two reasons. First, the Panel misread circuit precedent to expand the "intelligible principle" standard for congressional delegations to govern criminal law, whether or not Congress criminalizes specific acts in the statute. Second, the Panel ignored early Founding practice and Supreme Court precedent to conclude that

2

Congress—and not BLM—created the federal offense in question. Together, the Panel's errors grant BLM free rein to create and enforce its own criminal regulations that govern nearly two-thirds of Nevada and 245 million acres of federal land nationally, mostly in this circuit. The Court should grant en banc review to prevent this perverse result.

## Analysis and Authority

## I.  The Panel decision misreads circuit precedent as resolving the nondelegation standard in criminal cases.

The Panel misapplied *Melgar-Diaz*, this circuit's most recent decision addressing the nondelegation doctrine in the criminal context. Per the Panel, *Melgar-Diaz* mandates that "[e]ven in the criminal context, the 'intelligible principle' test provides the controlling legal standard for evaluating non-delegation challenges." Op. 14. The Panel thus declined to consider that question anew. But *Melgar-Diaz* says no such thing. The "delegation" at issue in *Melgar-Diaz* bears no resemblance to the one here, so the Court had no chance to consider this weighty issue. This Court should not adopt a constitutional rule, with implications for basic liberties, without careful consideration.

3

The *Melgar-Diaz* defendants raised a nondelegation challenge to a statute that criminalized "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." 2 F.4th at 1266 (quoting 8 U.S.C. § 1325(a)(1)). As the Court recognized there, Congress's delegation was narrowly cabined: This statute did "not give immigration officials the power to create crimes." *Id.* at 1267. Rather, *Congress* "penalized a particular type of conduct"—unlawfully entering the United States—and "left for the Executive Branch merely the interstitial task of determining [approved] times and places." *Id.* Conferring that type of "ministerial authority," the Court decided, is consistent with the nondelegation doctrine. *Id.* In other words, the statute challenged in *Melgar-Diaz* "[did] not cast immigration officials completely adrift when they designate[d] times and places of entry." *Id.* at 1268.

The Panel misread *Melgar-Diaz* to apply even where, as here, Congress has not criminalized any conduct. Op. 13. Though the Panel said that "Congress, not BLM, ... created [the] criminal offense," *id.*, it failed to identify any conduct that Congress criminalized. Nor could it—

4

Section 1733(a) is standardless in exactly the way the immigration law in *Melgar-Diaz* was not.

Congress did not, for example, criminalize operating "vehicles" on BLM land and authorize BLM to determine which types of vehicles would be prohibited. *See* 43 C.F.R. § 8341.1(f)(5). Rather, Congress directed the Secretary of the Interior to "issue regulations necessary to implement the provisions of [the Act] with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733. Section 1733(a) allows criminal punishment of "no more than twelve months" for any violation of the Secretary's criminal regulations. *Id.* This language merely defines the punishment for a statutorily non-existent criminal act.

It is difficult to imagine a crime on BLM land that could not relate to the "management, use, and protection" of that very land. Op. 6. BLM certainly has not lacked imagination. It has created federal criminal offenses for watching television too loudly, 43 C.F.R. § 8365.2-2(a); "[m]ov[ing] any table, stove, barrier, litter receptacle or other campground equipment," *id.* § 8365.2-3(f); "searching for buried treasure," *id.* § 3715.6(j); landing a hot air balloon in the wilderness, *id.* § 6302.20(e); engaging in "foot races" in the wilderness, *id.* § 6302.20(i);

"[a]ffixing communications equipment, such as antennas, to vegetation or rocks," *id.* § 2868.10(c); bringing a dog to a swimming area, *id.* § 8365.2-5(b); unpermitted reindeer grazing, *id.* § 9269.3-4(c); and horse adoption, *id.* § 9264.7(a)(2)—among many more. *See Pheasant*, 2023 WL 3095959, at *7 n.9.

By nevertheless relying on *Melgar-Diaz* to uphold the BLM scheme, the Panel essentially backed this circuit into a constitutional rule without careful consideration. It did so even though the Supreme Court has acknowledged that "whether more specific guidance is required" when Congress "authorizes another Branch to promulgate regulations that contemplate criminal sanctions" is an open question. *Touby v. United States,* 500 U.S. 160, 165–66 (1991). This Court, too, has noted that the question remains open. *United States v. Motamedi*, No. 20-10364, 2022 WL 101951, at *2 (9th Cir. Jan. 11, 2022). Yet the Panel here treated it as closed.

By improperly treating *Melgar-Diaz* as dispositive, the Panel's decision fails to meaningfully address the important and unresolved question of whether delegations of criminal lawmaking authority require

greater statutory specificity. En banc rehearing is warranted to address that question directly.

## II.  Criminal law delegations require heightened specificity.

Had it confronted the question directly, the Panel should have reached the opposite result. Criminal law delegations require heightened specificity, which is plainly lacking here. Allowing democratically unaccountable agencies to create countless regulatory crimes, many of which require no "guilty mental state," is "absurd and unjust." *See* The White House, *Executive Order: Fighting Overcriminalization in Federal Regulations* (May 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/05/fighting-overcriminalization-in-federal-regulations/.

### A.  Writing criminal law is an exclusive legislative function.

"[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). Those limits flow from the nondelegation doctrine. The Panel claimed that this doctrine is not offended by giving executive-branch actors the power to "issue rules backed by criminal penalties," because that power is not inherently

7

legislative. Op. 13. But the problem is not presence of criminal penalties in the statute—it is the absence of any prohibited conduct there.

Congress cannot transfer to another branch "powers which are strictly and exclusively legislative." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). Thus, "Congress generally cannot delegate away the *inherently legislative task* of determining what conduct should be punished as a crime." *United States v. Nunez-Soberanis*, 406 F. Supp. 3d 835, 839 (S.D. Cal. 2019) (citing *United States v. Kozminski*, 487 U.S. 931, 949 (1988)) (emphasis added). Congress alone must create new federal crimes: "The Constitution promises that *only* the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 588 U.S. 445, 448 (2019) (emphasis added). This understanding has persisted since the early republic. *See Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820); *United States v. Gradwell*, 243 U.S. 476, 485 (1917); *United States v. Bass*, 404 U.S. 336, 348 (1971).

If Congress delegates authority to the executive branch to "write federal criminal law[]," it is delegating a power that is "exclusively

legislative." *Davis*, 588 U.S. at 448; *Wayman*, 23 U.S. at 42–43. The Framers recognized this risk. As James Madison emphasized, "the whole power of legislation might be transferred by the legislature" when a statute does not have "such details, definitions, and rules, as appertain to the true character of a law; *especially a law by which personal liberty is invaded*." 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 479 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) (James Madison) (emphasis added).

Section 1733(a) violates this principle. First, it is "a law by which personal liberty is invaded" because it authorizes BLM to create administrative crimes punishable by imprisonment. 43 U.S.C. § 1733(a). This law thus implicates "interest[s] of immense importance," given the loss of liberty and stigma associated with criminal punishment. *In re Winship*, 397 U.S. 358, 363 (1970). Yet BLM decides what conduct violates the statute *and* whether to prosecute particular people. Section 1733(a) thus unites "the legislative and executive powers . . . in the same . . . body"—precisely the situation where, Madison warned, "[t]here can be no liberty." The Federalist No. 47 (Madison).

9

Second, by providing no specifics whatsoever, Section 1733(a) delegates legislative authority to BLM to criminalize conduct. At the bare minimum, including an actus reus is a "detail" essential to the "true character of [criminal] law." The Debates in the Several State Conventions, *supra*; *see also City of Grants Pass v. Johnson*, 603 U.S. 520, 545 (2024) ("[H]istorically, crimes in England and this country have usually required proof of some act (or *actus reus*) undertaken with some measure of volition (*mens rea*)."). And the Framers recognized that criminal law delegations are unique and require greater specificity. James Madison emphasized that with "criminal subjects, it is proper that [statutory] details should leave as little as possible to the discretion of those who are to apply and execute the law." 17 Univ. of Va. Press, *The Papers of James Madison* 303–51 (David B. Mattern et al. eds., 1991).

Section 1733(a) turns this principle on its head. It leaves absolute discretion with the executive branch. BLM has free reign to create—and then enforce—its own administrative crimes that directly regulate liberty. But only Congress can "write criminal laws" restricting liberty. *Davis*, 588 U.S. at 448. If Congress delegates authority to "write criminal laws" then it is delegating an authority which is "strictly and exclusively"

10

legislative. *Id.*; *Gundy*, 588 U.S. at 135 (quoting *Wayman*, 23 U.S. at 42–43).

### B. Congress did not criminalize Mr. Pheasant's actions.

The Panel circumvented the nondelegation doctrine by concluding that "[i]t was Congress, not BLM, that created a criminal offense." Op. 13. This assertion contradicts basic logic and precedent.

Congress did not criminalize Mr. Pheasant's actions. Reading Section 1733(a) provides no hint whether his conduct is lawful or not. Congress simply set a penalty and let BLM decide what actions trigger it. That is not "creat[ing] a criminal offense" in any sense that matters—as the Supreme Court has recognized since the early republic.

Chief Justice Marshall long ago explained that "[t]he legislative authority of the Union must first make an act a crime," and "affix a punishment to it . . ." *Hudson & Goodwin*, 11 U.S. at 34. He emphasized that Congress must "define a crime, *and* ordain its punishment." *Wiltberger*, 18 U.S. at 95 (emphasis added). "It would be dangerous, indeed," he warned, "to punish a crime not enumerated in the statute" by the legislature. *Id.* Setting a penalty is therefore insufficient. This constitutional requirement is rooted in democratic accountability. If Congress did not

"fully and completely" define the offense, no one could be held accountable for what was actually punished. *In re Kollock*, 165 U.S. 526, 533 (1897); *United States v. Eaton*, 144 U.S. 677, 688 (1892) ("[S]ufficient statutory authority should exist for declaring any act or omission a criminal offense.").

The Panel's decision reads these precedents out of existence. *Hudson* and *Wiltberger* are unambiguous: Congress "creates" criminal law only if it *both* makes an act a crime and sets a punishment. *Hudson & Goodwin,* 11 U.S. at 34; *Wiltberger*, 18 U.S. at 95. Congress cannot "create" a federal crime just by setting a maximum punishment because criminalizing *conduct* is—and always has been—an "exclusive" legislative function. Although defining a crime certainly requires setting a penalty, the Panel confused a necessary condition for a sufficient one. Op. 13. Because BLM decided whether Pheasant's conduct is a crime, Congress has unconstitutionally delegated its exclusive criminal lawmaking authority.

### C.   Whether BLM can decide what conduct is criminal warrants en banc review.

Whether criminal delegations require more specificity is an immensely important question worthy of en banc consideration. That would be true in any circuit, but is doubly true here. BLM has authority over roughly 10% of the United States' entire land mass. That authority disproportionately impacts the states in this circuit. Most BLM land is in 12 western states: Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.[1] Every state in this circuit excluding Hawaii falls within this list. And in Nevada, BLM govern nearly two-thirds of the state. The question presented here thus dictates whether BLM has essentially unfettered authority to criminalize conduct across huge swathes of this Court's jurisdiction. And that is to say nothing of other federal agencies that, under the Panel's view, could enjoy similarly unchecked criminal lawmaking power.

Beyond that, the nondelegation doctrine is controversial in any context. *See Consumers' Research v. FCC*, 109 F.4th 743, 743 (5th Cir. 2024)*,*

---

[1] *See* Bureau of Land Management, *Federal Public Land Sales FAQs*, https://www.blm.gov/programs/lands-and-realty/sales-and-exchanges/federal-public-land-sales-faqs (last visited May 30, 2025).

*cert. granted*, No. 24-354, 2024 WL 4864036 (U.S. Nov. 22, 2024); *see also Gundy*, 588 U.S. at 149 (2019) (Alito, J., concurring); *id.* at 179 (Gorsuch, J., with whom Roberts, C.J. and Thomas, J. join, dissenting). But whatever standards will ultimately govern *non*-criminal delegations, the en banc Court should decide whether more is required when the executive branch prosecutes a crime that it also created.

## III. Section 1733(a) lacks an intelligible principle—especially under the heightened standard for criminal offenses.

The Panel concluded that Congress "set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way." Op. 9. That principle is far from intelligible—both under the traditional framework and especially when it dictates when people can be jailed.

The Panel relied on vague (and often contradictory) statutory directives that authorize BLM to serve as the legislature, governor, and state police for the majority of Nevada's landmass and hundreds of millions of acres across the United States. Section 1733(a) merely directs the Secretary to "issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public

14

lands, including the property located thereon." 43 U.S.C. § 1733(a). Else-where, the statute provides that the "Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a). "Multiple use" requires that land be used in different ways to "best meet the present and future needs of the American people." *Id.* § 1702(c). "Sustained yield," on the other hand, requires "the achieve-ment and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use*." Id.* § 1702(h). "Realiz[ing] the land's value" includes both resource extraction and the "protection of the public lands." *Id.* §§ 1702(h), 1733(a). In at least some cases, however, resource extrac-tion to "meet the needs of the American people" will conflict with "protec-tion of the public lands."

Congress provided no guidance on how to weigh these opposing principles. And they are simply too abstract—and unrelated to public safety—to provide meaningful guidance on what should be a *crime*. Even so, these contradictory provisions grant BLM plenary authority to create regulations to advance whichever goal it may want to promote. And these

goals can and do shift regularly, representing a moving target that is far from intelligible. *See, e.g.*, Exec. Order No. 14241, 90 Fed. Reg. 56, 13673 (2025) (prioritizing mineral production and ordering Executive Branch officials to take certain actions in furtherance thereof).

To be sure, the Supreme Court has upheld broad intelligible principles. *See generally Yakus v. United States*, 321 U.S. 414 (1944) (listing previously upheld standards such as "public interest, convenience, or necessity"). But it has done so only when other portions of the statutory scheme limited agency discretion. *See id.* at 420. Indeed, *Yakus* repeated that "[t]he essentials of the legislative function" include "the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Id.* at 424. And there, the delegating statute was internally consistent, reflecting a single, coherent legislative policy. *Id.* The governing language here, meanwhile, is internally inconsistent and provides no meaningful guidance on what constitutes a crime and what does not. It thus fails to provide an intelligible principle to govern the Secretary's discretion.

Moreover, the Supreme Court's two landmark decisions sustaining nondelegation challenges—*Panama Refining* and *Schechter Poultry*—

16

turn on criminal lawmaking power of the sort at issue here. In both, the Court "emphasized" the presence of "delegation of a power to make federal crimes of acts that had never been such before." *Fahey v. Mallonee*, 32 U.S. 245, 249 (1947). Since then, no nondelegation case has involved an unchecked delegation to the executive branch to write criminal law.

Nor can *United States v. Grimaud*, 220 U.S. 506 (1911), resolve whether the "intelligible principle" standard applies in the context of criminal law. *Contra* Op. 9. *Grimaud* predated the advent of the "intelligible principle" standard by over sixteen years. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) (mem.). And again, the Supreme Court noted eight decades after *Grimaud* that "whether more specific guidance is required" when Congress "authorizes another Branch to promulgate regulations that contemplate criminal sanctions" is an open question. *Touby*, 500 U.S. at 165–66. That being so, *Grimaud* can hardly control here.

The Court should thus grant en banc review to decide whether— under either the civil nondelegation standard or the heightened standard for criminal delegations—Section 1733(a) goes too far.

# Conclusion

This Court should vacate the Panel opinion and grant rehearing en banc.

June 3, 2025                              Respectfully submitted,

                                         /s/ *Ellesse Henderson*

Tobias S. Loss-Eaton                     Rene L. Valladares
Vishnu Tirumala                          Federal Public Defender
Bridget Pranzatelli                      Rohit Rajan
Sidley Austin LLP                        Ellesse Henderson
1501 K Street NW                         Sean McClelland
Washington, D.C. 20005                   Assistant Federal Public Defenders
                                         411 E. Bonneville Ave., Ste. 250
Jeffrey T. Green                         Las Vegas, NV 89101
The Carter G. Phillips                   (702) 388-6577
  Supreme Court Clinic                   Rohit_Rajan@fd.org
Northwestern Pritzker                    Ellesse_Henderson@fd.org
  School of Law                          Sean_McClelland@fd.org
375 East Chicago Avenue
Chicago, IL 60611

*Counsel for Appellee Gregory Pheasant*

18

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)**  | 23-991

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉    Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words:** | 3,231 |.
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○    In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Ellesse Henderson |   **Date** | June 3, 2025 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                                          *Rev. 12/01/24*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-991

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Gregory W. Pheasant
3405 Brave Lane
Reno, NV 89506

**Description of Document(s)** *(required for all documents)*:

Appellant Gregory W. Pheasant's
Petition for Panel and En Banc Rehearing

**Signature** | s/ Ellesse Henderson          **Date** | Jun 3, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 15                                                              *Rev. 12/01/2018*

# APPENDIX

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-991 |
| *Plaintiff - Appellant*, | D.C. No. 3:21-cr-00024-RCJ-CLB-1 |
| v. | |
| GREGORY W. PHEASANT, | |
| *Defendant - Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Senior District Judge, Presiding

Argued and Submitted October 10, 2024
Las Vegas, Nevada

Filed February 19, 2025

Before: Carlos T. Bea, Mark J. Bennett, and Eric D. Miller,
Circuit Judges.

Opinion by Judge Miller

# SUMMARY*

---

## Criminal Law

The panel reversed the district court's dismissal of a count charging Gregory W. Pheasant with driving an off-road vehicle on public lands at night without a taillight, in violation of 43 C.F.R. § 8341.1(f)(5), and remanded.

Section 8341.1(f)(5) was adopted by the Secretary of the Interior under authority vested in him by section 303(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), which directs the Secretary to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands, including the property located thereon." The statute provides that "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both."

The district court held that section 303(a) is an unconstitutional delegation of legislative power because it gives the Secretary "unfettered legislative authority" to make rules that "cover almost all conduct on public lands" without "any guidance or restraint as to when the Secretary . . . shall promulgate rules."

Article I of the Constitution vests all legislative powers in Congress. Accompanying that assignment of power to Congress is a bar on its further delegation—Congress may

---

*This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not transfer to another branch powers which are strictly and exclusively legislative. But Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. Under the Supreme Court's "intelligible principle" test, a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.

The panel held that section 303(a) easily satisfies the "intelligible principle" test because, taken together, the FLPMA's provisions set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way. Such constraints are enough to satisfy Article I.

---

## COUNSEL

Adam M. Flake (argued), Appellate Chief and Assistant United States Attorney; Jason M. Frierson, United States Attorney; Office of the United States Attorney, Las Vegas, Nevada; Robert L. Ellman, Appellate Chief, Office of the United States Attorney, Reno, Nevada; for Plaintiff-Appellant.

Ellesse Henderson (argued) and Rohit Rajan, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender's Office for the District of Nevada, Las Vegas, Nevada; Christopher P. Frey, Assistant Federal Public Defender; Federal Public Defender's Office for the District of Nevada, Reno, Nevada; for Defendant-Appellee.

Thomas A. Berry and Alexander R. Khoury, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Michael D. Pepson, Americans for Prosperity Foundation, Arlington, Virginia, for Amicus Curiae Americans for Prosperity Foundation.

Kara M. Rollins and John J. Vecchione, New Civil Liberties Alliance, Washington, D.C., for Amicus Curiae New Civil Liberties Alliance.

Molly E. Nixon, Pacific Legal Foundation, Arlington, Virginia; Luke A. Wake, Pacific Legal Foundation, Sacramento, California; for Amicus Curiae Pacific Legal Foundation.

Sean M. Corkery, Assistant Solicitor General; Alan Hurst, Solicitor General; Raúl R. Labrador, Idaho Attorney General; Office of the Idaho Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Alan Wilson, South Carolina Attorney, Office of the South Carolina Attorney General, Columbia, South Carolina; Jonathan Skrmetti, Tennessee

Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae the State(s) of Idaho, Alabama, Alaska, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, Tennessee, Utah, and West Virginia.

## OPINION

MILLER, Circuit Judge:

Late at night on the Friday of Memorial Day weekend in 2021, Bureau of Land Management rangers were patrolling Moon Rocks, an area of BLM-administered land north of Reno, Nevada. When the rangers saw a group of motorcyclists riding without lights, they turned on their emergency lights to direct them to stop. According to the rangers, one of the motorcyclists, Gregory Pheasant, refused to stop. After the rangers chased him down, he allegedly came to a stop only to spin his rear wheel—thereby throwing rocks and dirt at the rangers—while making obscene gestures and abusive comments. He then sped away again.

Pheasant was eventually apprehended, and a grand jury in the District of Nevada returned a three-count indictment charging him with assault on a federal officer, resisting the issuance of a citation or arrest, and—in the only count at issue in this appeal—driving an off-road vehicle on public lands at night without a taillight, in violation of 43 C.F.R.

§ 8341.1(f)(5). That regulation was adopted by the Secretary of the Interior under authority vested in him by section 303(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1733(a), which directs the Secretary to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands, including the property located thereon." The statute provides that "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both." *Id.*

Pheasant moved to dismiss the indictment, and the district court granted the motion. As to the taillight count, the court held that section 303(a) is an unconstitutional delegation of legislative power because it gives the Secretary "unfettered legislative authority" to make rules that "cover almost all conduct on public lands" without "any guidance or restraint as to when the Secretary . . . shall promulgate rules." The government appeals the dismissal of that count, and we review the district court's decision de novo. *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266 (9th Cir. 2021).

Article I of the Constitution vests "[a]ll legislative Powers . . . in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation"—Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). But "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of

discretion to executive or judicial actors." *Touby v. United States*, 500 U.S. 160, 165 (1991).

The Supreme Court has defined the point beyond which a grant of discretion is too broad—and is thus a delegation of legislative power—through the "intelligible principle" test. *See Gundy*¸ 588 U.S. at 135 (plurality opinion). Under that test, "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

The requirement that Congress set out an "intelligible principle" to constrain executive discretion "is an exceedingly modest limitation." *Melgar-Diaz*, 2 F.4th at 1266. That is because "the extent and character" of the assistance that Congress may seek from the coordinate branches "must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). And "[s]ince Congress is no less endowed with common sense than [courts] are, and better equipped to inform itself of the 'necessities' of government," courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting). As courts confronted with non-delegation challenges regularly point out, the Supreme Court has only twice invalidated a statute as an impermissible delegation—both times in 1935, and "in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy*, 588 U.S. at 146 (plurality opinion) (quoting *Mistretta*, 488 U.S. at 373 n.7);

*see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

As long as Congress has provided *some* standard constraining discretion—even one phrased in broad terms—the Supreme Court has upheld statutes against constitutional scrutiny. *See, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398–99 (1940) ("just and reasonable" rates); *National Broadcasting Co. v. United States*, 319 U.S. 190, 216–17 (1943) ("public interest, convenience, or necessity"); *Yakus v. United States*, 321 U.S. 414, 423–26 (1944) ("fair and equitable" prices); *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472–74 (2001) ("requisite to protect the public health"). As Justice Scalia asked, "What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a 'public interest' standard?" *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting).

Section 303(a) easily satisfies the "intelligible principle" test. The statute directs the Secretary to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733(a). The FLPMA instructs the Secretary to "manage the public lands under principles of multiple use and sustained yield." *Id.* § 1732(a). The "multiple use" mandate requires ensuring the utilization of "public lands and their various resource values"—including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values"—in a manner that takes into account "the relative values of the resources" and avoids "permanent impairment of the productivity of the land and the quality of the environment." *Id.* § 1702(c); *see Public Lands Council v. Babbitt*, 529 U.S.

728, 737–38 (2000). The "sustained yield" mandate requires controlling depleting land uses to ensure "maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources." 43 U.S.C. § 1702(h). To that end, the statute also requires the Secretary to exercise his authority "to prevent unnecessary or undue degradations of the lands." *Id.* § 1732(b). Taken together, those provisions set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way.

The Supreme Court's decision in *United States v. Grimaud* makes clear why that principle is sufficiently intelligible. 220 U.S. 506 (1911). In that case, the Court considered a statute authorizing the Secretary of Agriculture to issue rules "regulating the use and occupancy of the public forest reservations and preserving the forests thereon from destruction." *Id.* at 509. Acting under that authority, the Secretary issued a regulation—backed by criminal penalties—prohibiting grazing in a forest reserve without a permit. *Id.* at 514. The Court held that the statute sufficiently constrained the Secretary's authority because it "clearly indicated" that he was "to make provision to protect [the lands] from depredations and from harmful uses." *Id.* at 522. Section 303(a) and its complementary provisions provide similar guidance to the Secretary of the Interior. As in *Grimaud*, the constraints imposed by the FLPMA are enough to satisfy Article I.

Pheasant objects to this conclusion on three grounds. First, he argues that the adjacent statutory provisions in the FLPMA do not prescribe a relevant intelligible principle because they do not affect how the Secretary must execute his responsibilities under section 303(a). That argument runs headlong into the Supreme Court's instruction that, in non-

delegation cases as elsewhere, statutory provisions "need not be tested in isolation" because "[t]hey derive much meaningful content from the purpose of the [relevant] Act, its factual background and the statutory context in which they appear." *American Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946); *accord Gundy*, 588 U.S. at 141 (plurality opinion) ("To define the scope of delegated authority, we have looked to the text in 'context' and in light of the statutory 'purpose.'" (quoting *National Broadcasting Co.*, 319 U.S. at 214, 216)). Section 303(a) directs the Secretary to issue regulations "necessary to implement the provisions of [the FLPMA] with respect to the *management*, use, and protection of the public lands." 43 U.S.C. § 1733(a) (emphasis added). Other provisions of the FLPMA define how the Secretary is to conduct the "[m]anagement of use, occupancy, and development of public lands," *id.* § 1732(a), and constrain the Secretary's "management of the public lands," *id.* § 1702(c); *see id.* § 1702(h). Those provisions are even more directly relevant than the "general policy declarations" that the Court considered in *American Power & Light Co.*; they expressly define the terms that limit the scope of the Secretary's authority. 329 U.S. at 105. The FLPMA thus makes clear that section 303(a) does not, as Pheasant suggests, permit the Secretary to issue any regulation he wishes with a colorable connection to the use of public lands. Instead, the remainder of the statute specifies the policy goals that the Secretary must advance.

Second, Pheasant argues that Congress had to provide the Secretary with more detailed guidance because the FLPMA authorizes the Secretary to promulgate regulations that apply on large areas of land in the American West. *See Whitman*, 531 U.S. at 475 (explaining that "the degree of agency discretion that is acceptable varies according to the

scope of the power congressionally conferred"). But the Supreme Court has never required Congress to provide something more specific than an "intelligible principle" simply because a statute authorizes economically or socially significant regulations. In *Yakus*, for instance, the Court considered a statute that authorized an executive official to promulgate regulations "fixing . . . maximum prices of commodities and rents." 321 U.S. at 419. That delegation undoubtedly had sweeping economic consequences, but the Court upheld it because it determined that the statute's directive to set prices in a manner that was "fair and equitable" and to "give due consideration, so far as practicable, to prevailing prices during the designated base period" sufficiently constrained the executive's discretion. *Id.* at 423. Likewise, in *Whitman*, the Court considered a statute that authorized the EPA to set air quality standards for certain pollutants. 531 U.S. at 472. Even though the Court conceded that this "sweeping regulatory scheme[]" allowed the EPA to "set[] air standards that affect the entire national economy," it held that the guidance in the statute— which called for standards to be set "at a level that is requisite to protect public health from the adverse effects of the pollutant in the ambient air"—constituted an "intelligible principle" and thus "fit[] comfortably within the scope of discretion permitted by [the Court's] precedent." *Id.* at 473– 76. That the delegation here authorizes regulations that may affect a large area of land does not compel heightened constitutional scrutiny.

Pheasant's related argument—that something more than an intelligible principle is required because BLM's mission provides no inherent limitation on the scope of its regulations—is similarly unavailing. BLM does not have plenary regulatory authority; it has defined responsibilities

related to the "management of lands and resources." 43 U.S.C. § 1731(a). The regulations that Pheasant cites to demonstrate the breadth of BLM's authority prove just the opposite. BLM surely regulates a wide range of conduct. *See, e.g.*, 43 C.F.R. § 8365.1-4(a)(1) (noise disturbances); *id.* § 8365.1-2(a) (camping); *id.* § 4140.1 (grazing). But all of its regulations cover conduct with a strong connection to the management, use, and protection of public lands. *See id.* §§ 8365.1-4, 8365.1-2(a), 4140.1 (confining the regulations to public lands). Pheasant points to no examples of BLM regulations of private conduct that does not affect public lands; BLM has no authority to promulgate such regulations.

If anything, section 303(a)'s relationship to public lands counsels in favor of more, rather than less, deference to Congress's choice about the degree of responsibility to assign to the Executive Branch. The Constitution expressly vests in Congress the authority to manage "Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. That authority is plenary—the Supreme Court has described it as "without limitations," *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940), and analogous "to the police power of the several states," *Camfield v. United States*, 167 U.S. 518, 525 (1897). The Court has therefore recognized that Congress can, without creating a delegation problem, circumscribe the "implied license under which the United States [allows] its public domain to be used" by authorizing an agency to make "rules and regulations" that define "an unlawful use of the government's property." *Grimaud*, 220 U.S. at 521. That is precisely what Congress has done here.

Third, Pheasant and his *amici* urge us to apply greater scrutiny to section 303(a) because it empowers the Secretary to promulgate regulations whose violation may be punished

by criminal sanctions. Although Pheasant refers to a "delegation of criminal lawmaking power," that description is somewhat imprecise: It is Congress, not BLM, that created a criminal offense by providing that "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both." 43 U.S.C. § 1733(a); *see Melgar-Diaz*, 2 F.4th at 1267. And Pheasant does not contend that Congress is prohibited from leaving to the agency the authority to fill in the details of a regulatory scheme simply because the scheme is enforced through criminal penalties. So the question is, as it always is in non-delegation cases, how much discretion can the agency exercise before it is legislating? That is precisely the question that the "intelligible principle" test answers. *See Loving v. United States*, 517 U.S. 748, 771 (1996).

Pheasant emphasizes that liberty concerns are especially salient in criminal law, but those concerns have only an attenuated relationship to the constitutional principles he invokes. The non-delegation doctrine guarantees that Congress does not give away the legislative power that Article I has vested in it. That guarantee protects individual liberty by preserving the separation of powers. But a power does not become more legislative simply because its exerciser can issue rules backed by criminal penalties. Thus, although the Supreme Court has not expressly resolved whether "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions," *Touby*, 500 U.S. at 165–66, it has routinely applied the "intelligible principle" test even when the challenged statute authorized regulations backed by criminal

penalties. In *Grimaud*, for example, the Court explained that "the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense." 220 U.S. at 521; *see Yakus*, 321 U.S. at 418, 427 (upholding grant of authority to executive to set price regulations backed by criminal penalties); *Loving*, 517 U.S. at 771–72 (upholding grant of authority to President to define aggravating factors applicable in military capital cases).

Pheasant's view finds no support in circuit precedent, either. To the contrary, in *Melgar-Diaz*, we rejected a non-delegation challenge to a statute that criminalized crossing the border at a time or place other than as designated by an immigration official. 2 F.4th at 1265. The criminal character of the statute was irrelevant to our conclusion that Congress provided a sufficiently intelligible principle. It mattered only that the statute "does not cast immigration officials completely adrift when they designate times and places of entry," which meant that Congress had not delegated legislative power. *Id.* at 1268. Other circuits have also "decline[d] to abandon the well-settled 'intelligible principle' standard" when reviewing "a statute with criminal consequences." *United States v. Nichols*, 775 F.3d 1225, 1232 (10th Cir. 2014), *rev'd on other grounds*, 578 U.S. 104 (2016); *accord United States v. Cooper*, 750 F.3d 263, 270–71 (3d Cir. 2014).

Even in the criminal context, the "intelligible principle" test provides the controlling legal standard for evaluating non-delegation challenges. And under that test, the district court erred in invalidating section 303(a).

**REVERSED and REMANDED.**