**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-991 |
| *Plaintiff - Appellant*, | D.C. No. 3:21-cr-00024-RCJ-CLB-1 |
| v. | |
| GREGORY W. PHEASANT, | ORDER |
| *Defendant - Appellee*. | |

Filed October 31, 2025

Before: Carlos T. Bea, Mark J. Bennett, and Eric D. Miller, Circuit Judges.

Order;
Dissent by Judge Bumatay;
Dissent by Judge VanDyke

# SUMMARY[*]

## Criminal Law

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel reversed the district court's dismissal of a count charging the defendant with driving an off-road vehicle on public lands at night without a taillight, in violation of 43 C.F.R. § 8341.1(f)(5), which was adopted by the Secretary of the Interior under authority vested in him by section 303(a) of the Federal Land Policy and Management Act of 1976.

Dissenting from the denial of rehearing en banc, Judge Bumatay wrote that the Ninth Circuit should have demanded more before letting the Executive branch—rather than Congress—define the conduct made criminal under the Federal Land Policy and Management Act. Given the text and history of the Constitution's Article I Vesting Clause, Congress cannot delegate authority to define the actus reus of a crime to the Executive branch. While some discretion may be left in the hands of executive officials, Congress must establish the conduct that subjects the people to a core deprivation of personal liberty—imprisonment.

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined in part by Judge Bumatay, wrote that the court should have reheard this case en banc to resolve the question whether criminal delegations are held to the same exceedingly low standard that applies to civil delegations

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and to correct the panel's erroneous conclusion that criminal delegations are not held to a higher standard.

---

## ORDER

The panel has voted to deny the petition for panel rehearing. Judge Bennett and Judge Miller have voted to deny the petition for rehearing en banc, and Judge Bea has so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

The petition for panel rehearing and rehearing en banc is **DENIED**. Dkt. No. 75.

---

BUMATAY, Circuit Judge, dissenting from the denial of rehearing en banc:

As Judge VanDyke thoughtfully explains, we should have heard this case en banc. The Ninth Circuit should have demanded more before letting the Executive branch—rather than Congress—define the conduct made criminal under the Federal Land Policy and Management Act. *See* 43 U.S.C. § 1733(a).

Of course, the Supreme Court has endorsed some level of congressional delegation to the Executive branch. *See FCC v. Consumers' Rsch.*, 145 S.Ct. 2482, 2491 (2025). But

4 USA v. PHEASANT

history—and precedent for that matter—make clear that the non-delegation doctrine is context specific. *See id.* at 2503 (looking to "broader statutory contexts" to identify intelligible principles). And what's permissible "varies according to the scope of the power congressionally conferred." *Id.* at 2397 (simplified). So it's "not [a] one size fits all" test. *Id.* at 2525 (Gorsuch, J., dissenting). While a more lenient non-delegation doctrine may suffice in some areas of the law, other areas require a more demanding approach.

Criminal law is in the *more demanding* bucket. Given the deprivation of liberty at stake, Congress cannot simply leave it to the Executive branch to unilaterally declare what acts can subject the people to criminal confinement. In this context, the Constitution requires more than the standard, opaque version of an "intelligible principle." Instead, to satisfy the non-delegation doctrine that our separation of powers demands, Congress must—at a minimum—define both the actus reus and the penalty for any criminal offense. Our court was thus wrong to simply gesture at a toothless "intelligible principle" and call it a day. *See United States v. Pheasant*, 129 F.4th 576, 583 (9th Cir. 2025).

Because the separation-of-powers demands more before throwing people in prison, I respectfully dissent from the denial of rehearing en banc.

## I.

## The Non-Delegation Doctrine

### A.

The non-delegation doctrine "bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 588 U.S. 128, 132

(2019) (plurality). It's a function of the Constitution's Article I Vesting Clause, which requires that "[a]ll Legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. And it is "rooted in the principle of separation of powers." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). It preserves the tripartite system of government established by the Constitution's first three articles: three branches—each with distinct and "exclusive" authority. *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 67 (2015) (Thomas, J., concurring in the judgment).

The Legislative Power is the exclusive power to make laws that are binding on citizens. *See* The Federalist No. 78 (Alexander Hamilton) (George W. Cary & James McClellan ed., 2001) ("[T]he legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated."). As one early English treatise put it, "[b]y the Legislative Power, we understand the Power of making, altering, or repealing Laws, which in all well-ordered Governments, hath ever been lodged in a succession of the supreme Councels of Assemblies of a Nation." Marchamont Nedham, *The Excellencie of a Free-State* (1656), in 1 The Founders' Constitution 314 (1986). Another publication closer to the Founding Era said the power included "consulting, debating, enacting laws, and forming regulations, according to which all are to conduct themselves." 1 James Burgh, Political Disquisitions 5 (London 1774).

6            USA v. PHEASANT

A key limit on the legislative power is that it cannot be delegated. As John Locke said, the legislature could only make new laws—not new legislators:

> The power of the legislative being derived from the people by a positive voluntary grant and institution, can be no other, than what that positive grant conveyed, which being only to make laws, and not to make legislators, the legislative can have no power to transfer their authority of making laws, and place it in other hands.

John Locke, *Second Treatise of Government: An Essay Concerning the True Original, Extent and End of Civil Government* § 141 (1764 ed.); *see also* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1518 n.146 (2021) (collecting sources showing Locke's influence on the Founding generation).

Founding-era debates over the Constitution reflected Locke's ideas. At the Pennsylvania Ratifying Convention, James Wilson—the only Founder to have signed the Declaration of Independence and the Constitution— favorably contrasted the limits on delegation imposed by the Constitution with the lack of limits on Parliament to do the same. James Wilson, *Speech at the Pennsylvania Ratifying Convention* (Nov. 24, 1787). While the British constitution allowed "the Parliament [to] transfer[] legislative authority to Henry VIII," Wilson observed that the "control [over] the power and conduct of the legislature by an overruling constitution was an improvement in the science and practice of government reserved to the American states." *Id.*; *see also* The Federalist No. 53, at 277–78 (James Madison)

(George W. Cary & James McClellan ed., 2001) (comparing "the transcendent and uncontrollable" authority of Parliament with the "constitutional security . . . established in the United States" because of its "constitution paramount to the government"). Or as an anonymous Virginia essayist put it, legislative power could not be "transferred," because it would "surpass the power of legislation and require the assent of the people at large." Philip Hamburger, Is Administrative Law Unlawful? 599 n.16 (2014) (citing *Observations upon the Seven Articles, Reported by the Grand Committee . . . and Now Lying on the Table of Congress*, Virginia Independent Chronicle (Feb. 21, 1787)).

The Founding generation understood that one way to violate the prohibition on legislative delegation was if Congress authorized another branch of government to address too many details left unresolved by statute. This is because, at the time of the Founding, providing sufficient statutory detail was inherent in the nature of the Legislative power. If Congress promulgated a statute that delegated to the Executive branch the ability to provide necessary legislative details, it would exceed the legislative authority. As James Madison wrote in a widely read post-Ratification circular:

> Details to a certain degree, are essential to the nature and character of a law . . . . If nothing more were required . . . than a general conveyance of authority—without laying down any precise rules by which the authority conveyed should be carried into effect—it would follow that the whole power of legislation might be transferred by the

> legislature from itself, and proclamations
> might become substitutes for law.

James Madison, The Report of 1800 (Jan. 7, 1800).[1] Chief
Justice Marshall echoed these views: "[i]t will not be
contended that Congress can delegate to the Courts, or to any
other tribunals, powers which are strictly and exclusively
legislative." *Wayman v. Southard*, 23 U.S. 1, 42 (1825).

The non-delegation doctrine addressed two Founding-
era concerns—preventing tyranny and maintaining
accountability. Centuries of English common law taught
that maintaining a strict separation of powers was crucial to
preserving liberty. Blackstone, for example, "defined a
tyrannical government as one in which 'the right both of
*making* and of *enforcing* the laws, is vested in one and the
same man, and the same body of men,' for 'whenever these
two powers are united together, there can be no public
liberty.'" *Ass'n of Am. Railroads*, 575 U.S. at 73 (Thomas,
J., concurring in the judgment) (quoting Blackstone, 1
Commentaries *142). Countless other writings from the
common law accord with his view. *See id. at* 70–74 (citing
writings of de Bracton, Coke, Hale, Locke, Hume, and
Blackstone). And the English experience in resisting
delegations to the Crown made this principle concrete. *Id.*
at 71–72 (citing the *Case of Proclamations,* 12 Co. Rep. 74,
75, 77 Eng. Rep. 1352, 1353 (K.B. 1611) (Coke, C.J.)
(holding the King could not "change any part of the common
law, nor create any offence by his proclamation, which was
not an offence before, without Parliament.")).

So the idea that the "separate and distinct exercise of the
different powers of government [was] essential to the

---

[1] https://founders.archives.gov/documents/Madison/01-17-02-0202.

preservation of liberty" was embraced at the time of the Founding.  The Federalist No. 51, at 268 (James Madison) (George W. Cary & James McClellan ed., 2001).  As said by Montesquieu, "[t]here can be no liberty where the legislative and executive powers are united in the same person . . . lest the same monarch . . . should enact tyrannical laws to execute them in a tyrannical manner."    Baron de Montesquieu, The Spirit of the Laws 151 (Thomas Nugent, trans., Hafner Pub. Co. 1949) (1748).  And Madison wrote that it would be "absurd" for the Executive's orders to have the force of law "like all *other laws*," because that would presuppose that the "executive department naturally includes a legislative power."  Helvidius No. 1 (James Madison), Aug. 24, 1793. [2]  In fact, to Madison, it was more than "an absurdity"—it was "tyranny." *Id.*

The Founders also understood that the non-delegation principle secured democratic accountability.    Simply, permitting delegation of legislative powers to unelected Executive branch officials undermines representative democracy—the bedrock of legitimacy for creating binding laws. *Cf. Resolutions of the Boston Town Meeting on Sept. 13, 1768*, *in* A Report of the Record Commissioners of the City of Boston, Containing the Boston Town Records, 1758–1769, at 261, 262–63 (Boston, Rockwell & Churchill 1886) (protesting efforts to levy taxes or maintain a standing army in the colonies as "illegal" unless prescribed by "Representatives of [citizens'] own free Election").    The Founders knew that "[r]estricting the task of legislating to one branch characterized by difficult and deliberative processes . . . promote[d] fair notice and the rule of law, ensuring the people would be subject to a relatively stable

---

[2] https://founders.archives.gov/documents/Madison/01-15-02-0056.

and predictable set of rules," and guaranteed "that the lines of accountability would be clear." *Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting) (citing The Federalist No. 50 (James Madison)). And that way, "the adoption of new laws restricting liberty" would remain "a hard business, the product of an open and public debate among a large and diverse number of elected representatives"—rather than "hand[ed] off" to another branch where "unelected judges and prosecutors [are] free to 'condemn all that they personally disapprove and for no better reason than they disapprove it." *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J., concurring) (simplified).

## B.

To be sure, Congress was not categorically precluded from leaving some discretion in the hands of the Executive in implementing laws. But early examples of what some have labeled "delegations" were nothing like today's grants of nearly unlimited administrative rulemaking authority to executive officers. And importantly, as a historical matter, any delegations took place in specific, limited contexts. Simply, some—but only some—legislative matters allowed greater discretion to the Executive.

Understanding why the Founders delegated some details helps explain why today's broadest criminal delegations are impermissible. Experience had shown that a deliberative legislative body was ill-suited to exhausting future contingencies in legislation, quickly responding to emergencies, or nimbly dealing with sensitive matters of foreign affairs. *See* Akhil Reed Amar, America's Constitution: A Biography 132–33 (2005) ("Under the old Articles, various recesses and quorum failures of the Confederation Congress had compromised America's ability

to conduct foreign affairs.").  As then-Ambassador Thomas Jefferson complained in a letter to a fellow Virginian, the Articles of Confederation Congress obsessed over the "smallest trifle" rather than the "most important act[s] of legislation," because it had to exercise both executive and legislative power.  Thomas Jefferson to Edward Carrington (Aug. 4, 1787).**[3]**  According to Jefferson, this was "the source of more evil than we have ever experienced from any other cause." *Id.*  Jefferson's solution was "to separate in the hands of Congress[,] the Executive and Legislative powers." *Id.*  Similarly, Jefferson wrote to Madison that an executive committee be appointed to "receive and dispatch all executive business, so that Congress itself should meddle only with what should be legislative."  Thomas Jefferson to James Madison (Dec. 16, 1786).**[4]**

So Founding-era laws didn't always specify every detail in their legislative acts.  *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 302–05 (2021) (giving examples of grants of legislative authority in Founding-era statutes); Wurman, 130 Yale L.J. at 1540–53 (same).  Nor could they—almost every statute requires at least *some* discretion in execution.

Instead, it was understood that some legislative areas— to respect the separation of powers and to adhere to democratic accountability—required Congress to make all the essential decisions.  In the words of Chief Justice Marshall, "important subjects . . . must be entirely regulated by the legislature itself." *Wayman v. Southard*, 23 U.S. 1, 43 (1825).  Otherwise, in areas of "less interest," Congress

---

[3] https://founders.archives.gov/documents/Jefferson/01-11-02-0588.

[4] https://founders.archives.gov/documents/Jefferson/01-10-02-0461.

may identify the "general provision" and give power "to those who are to act under such general provisions to fill up the details." *Id.*

As a historical matter, Congress granted the Executive greater discretion in implementing laws requiring ministerial administration or in areas involving executive prerogatives. Take the Founding-era example of veteran pensions. The law allowed the President to regulate the distribution of pension payments to veterans—a mere act of bureaucratic process. Act of Sept. 29, 1789, ch. 24, 1 Stat. 95. Another allowed the Secretary of State, the Secretary of War, and the Attorney General to issue exclusive patents if they determined an invention or discovery was "sufficiently useful and important"—a highly individualized, fact-specific inquiry difficult to treat broadly via legislation alone. Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 109–110. And another authorized the President to determine whether a foreign nation sufficiently interfered with American trade to trigger a preexisting embargo statute—a decision already within the Executive's foreign-policy wheelhouse. Act of Mar. 1, 1809, ch. 24, § 11, 528, 530; Act of May 1, 1810, ch. 39, § 4, 2 Stat. 605, 606; *see also Cargo of the Brig Aurora v. United State*s, 11 U.S. (7 Cranch) 382, 382 (1813).

Likewise, whether the delegation implicated public or private rights served as a fault line for permissible delegation. "The idea that the Executive may not formulate generally applicable rules of private conduct" has "ancient roots." *Ass'n of Am. Railroads*, 575 U.S. at 70 (Thomas, J., concurring in the judgment). Indeed, according to some scholars, while delegations in the areas of public rights, such as foreign and military affairs, spending, and management of government property, were permissible, for other areas, such as "rules that regulate citizens as to their private rights in the

domestic sphere," "the Constitution imposes a strict prohibition on such delegation." Michael Rappaport, *A Two Tiered and Categorical Approach to the Nondelegation Doctrine*, 2 San Diego Legal Stud. Paper No. 20-471 (2020); [5] *see also* Hamburger, Is Administrative Law Unlawful? 388–95 (noting delegations with a historical pedigree from states to municipalities, the federal government to territories, municipalities to local administrative bodies, to courts for matters of procedure, and to the military for martial orders).

Non-delegation was thus understood at the Founding to be a real limitation on Congress's "Legislative powers." History shows that non-delegation's mandate varied based on subject matter, allowing significant discretion to the Executive in foreign, territorial, and military affairs. But outside these historical exceptions, and especially in subjects of great "importan[ce]," the non-delegation doctrine is violated when a statute is insufficiently detailed and vests authority in an agency to write the rules necessary to make the law enforceable.

## II.

### Non-Delegation and Criminal Law

If the non-delegation doctrine has teeth in any area, it must in the criminal law context. The power to make criminal law raises heightened concerns for liberty and arbitrary government power. After all, what else could encroach more on personal liberty than the threat of imprisonment? The drafting of criminal law thus requires a more stringent non-delegation doctrine because it "implicate[s] potentially two core private rights: the right to

---

[5] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3710048.

life and personal liberty." Nicolas Elliott-Smith, *Crimes Without Law: Administrative Crimes and the Nondelegation Doctrine*, 115 J. Crim. L. & Criminology 429, 450 (2025). So when enacting criminal statutes, the Constitution requires far more legislative detail and prohibits broad delegations.

Founding-era criminal statutes reflected these concerns by specifying an actus reus and punishment. Indeed, it was recognized long ago that "[t]he legislative authority of the Union must first make an *act* a crime" and "affix a punishment to it." *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812) (emphasis added). Thus, the textual and historical evidence shows that, to comply with Article I's exclusive grant of "Legislative powers," Congress must at a minimum define the actus reus within the four corners of the statute.

## A.

So great was the concern for the deprivation of liberty in the criminal context that our Founding generation understood that Congress needed to provide more specificity in enacting criminal statutes. In 1800, Madison warned of this need when "personal liberty" was invaded:

> [O]n criminal subjects, it is proper, that details should leave as little as possible to the discretion of those who are to apply and to execute the law. . . . To determine then, whether the appropriate powers of the distinct departments are united by [the act], it must be enquired whether it contains such details, definitions, and rules, as appertain to the true character of a law; especially, a law by which personal liberty is invaded,

USA v. PHEASANT                                        15

> property deprived of its value to the owner,
> and life itself indirectly exposed to danger.

James Madison, The Report of 1800 (Jan. 7, 1800).[6] Thus, shortly after ratification, it was acknowledged that only Congress could set the "details, definitions, and rules" of criminal violations. *Id. See also* Wurman, 130 Yale L.J. at 1555 (arguing that only permissible delegations at the Founding were those involving a "narrow" "category of conduct").

At a minimum, this means that Congress must define the actus reus by statute. After all, the criminal *act* is at the heart of criminal offense. *See* 4 Blackstone Commentaries \*5 (defining a "crime or misdemeanor" as "an act committed or omitted, in violation of a public law either forbidding or commanding it"); Samuel Johnson, A Dictionary of the English Language (4th folio ed.,1773) (defining "crime" as "[a]n act contrary to right; an offence; a great fault; an act of wickedness"); *see also City of Grants Pass v. Johnson*, 603 U.S. 520, 545 (2024) ("[H]istorically, crimes in England and this country have usually required proof of some act (or *actus reus*) undertaken with some measure of volition (*mens rea*)."). Indeed, one would search in vain through the Founding-era criminal law treatises of Hawkins and Hale for mention of a penal statute that did *not* include an actus reus. *See generally* William Hawkins, 1 A Treatise of the Pleas of the Crown (1716); Matthew Hale, 1 Historia Placitorum Coronæ: The History of the Pleas of the Crown (1736); *see also* 4 Blackstone Commentaries (Of Public Wrongs).

The Marshall Court also twice held the power to define and enact criminal statutes, including the actus reus, belongs

---

[6] https://founders.archives.gov/documents/Madison/01-17-02-0202.

to Congress alone.  In deciding whether federal courts could exercise common-law jurisdiction in criminal cases, the Court emphatically said no.  *See Hudson & Goodwin*, 11 U.S. at 34.  While the Court recognized some "implied powers" for the courts, the "jurisdiction of crimes against the state is not among those powers." *Id.*  Instead, the Court understood that criminal rulemaking was part of the "legislative authority." *Id.*  And chief among Congress's responsibilities was to "first make an *act* a crime." *Id.* (emphasis added).  Thus, the Court required Congress to set the actus reus for any criminal statute.

This was no anomaly.  A few years later, Chief Justice Marshall reiterated that "[i]t is the legislature . . . which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).  Simply, to the Chief, it was "a plain principle that the power of punishment is vested in the legislative . . . department." *Id.*; *see also United States v. Bailey*, 34 U.S. 238, 257 (1835) (McLean, J., dissenting) (objecting to a perjury statute's potential delegation to the Treasury Department to prescribe who could administer oaths, because it involved "the construction of a highly penal law of the union" and was thus an "important" matter). *But see id.* at 253–54 (maj. op. of Story, J.) (upholding the conviction without relying on a delegation because the statute's plain language empowered a state justice of the peace to administer oaths).

Several reasons support this differential treatment of criminal law for purposes of the non-delegation doctrine.

First, the Constitution's text supports treating criminal law differently.  Indeed, the Constitution reflects unique "concern with the danger to liberty associated with the criminal process."  Rachel E. Barkow, *Separation of Powers*

*and the Criminal Law*, 58 Stan. L. Rev. 989, 1015 (2006). Consider a few of the Constitution's criminal safeguards. It prohibits the passage of ex post facto laws and bills of attainder, but only as to criminal law. U.S. Const., Art. I, § 9. It requires that all criminal trials be conducted by a jury of peers and held within the State where the offense was committed. *Id.* Art. III § 2. And a conviction for treason requires two independent witnesses. *Id.* § 3. The Fifth Amendment's due process guarantee requires a higher standard of proof in criminal cases. *In re Winship*, 397 U.S. 358, 364 (1970). And the Sixth Amendment guarantees a speedy and public trial, notice of charges, confrontation, assistance of counsel, and juries in criminal proceedings. U.S. Const. Amend. VI. Thus, the Constitution's overriding concern for limiting government power in the criminal sphere should be reflected in the non-delegation doctrine.

Second, some of the Founding Era's most influential legal philosophers wrote on the need for more specificity in criminal law. Discussing the nature of criminal laws, Blackstone wrote that "[in] proportion to the importance of the criminal law, ought also to be the care of the legislature in properly forming and enforcing it." 4 Blackstone Commentaries \*\*2–3. This, he explained, was because "to know with precision what the laws of our country have forbidden, and the deplorable consequences to which a willful disobedience may expose us, is a matter of universal concern." *Id*. Illustrating his point, Blackstone discussed an old English statute that had made stealing sheep "or other cattle" a felony. 1 Blackstone Commentaries \*88. According to Blackstone, these "general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence," leading a court to strike the general phrase. *Id.* In response, Parliament passed another theft statute

specifically listing "bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." *Id.*

Blackstone's views accorded with those of the criminal-law reformist Cesare Beccaria, one of the most influential writers of the era. Beccaria's treatise *On Crimes and Punishments* advocated for codifying the criminal law rather than maintaining judge-made crimes. Cesare Beccaria, On Crimes and Punishments 13 (David Young, trans., Hackett Publ. Co. 1986) (1764). He argued that "without written texts, society will never assume a fixed form of government in which power derives from the whole rather than the parts and in which the laws, which cannot be altered save by the general will, are not corrupted as they move through the crush of private interests." *Id.*; *see generally* John Bessler, *The Italian Enlightenment and the American Revolution: Cesare Beccaria's Forgotten Influence on American Law*, 37 Mitchell Hamline L.J. Pol'y & Prac. 1 (2017) (demonstrating Beccaria's literary popularity in the United States during the Founding). The writings of Blackstone, Beccaria, and others make clear that the principle that the legislature must define the act forbidden and its penalty was within the Framers' consciousness.

Third, age-old criminal-law doctrines support greater specificity in criminal legislation. Take the rule of lenity. It teaches "that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *United States v. Davis*, 588 U.S. 445, 464 (2019). Lenity reinforces the separation of powers by "strik[ing] the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

Or take the void-for-vagueness doctrine.  It applies with greatest force to "criminal penalties because the consequences of imprecision are qualitatively less severe [in the civil context]."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).  Many of the concerns that drive vagueness doctrine may apply equally to non-delegation doctrine.  *See Sessions*, 584 U.S. at 216 (Thomas, J., dissenting) (suggesting that "the vagueness doctrine is really a way to enforce the separation of powers—specifically, the doctrine of nondelegation"). Indeed, "[v]ague statutes have the effect of delegating lawmaking authority to the executive."  Nathan S. Chapman & Michael W. McConnell, *Due Process As Separation of Powers*, 121 Yale L.J. 1672, 1806 (2012).  Vague statutes simply make it "more likely that any individual enforcement decision will be based on a construction of the statute that accords with the executive's unstated policy goals, filling the gaps of the legislature's policy goals."  *Id.*

Thus, as an original matter, for federal "crimes" to be consistent with the "Legislative power," Congress—and no other branch—must specify the actus reus of the criminal offense.  *See* Elliott-Smith, 115 J. Crim. L. & Criminology at 483–84 ("When Congress delegates rulemaking authority to an agency to unilaterally determine the actus reus of a criminal offense, it has impermissibly delegated the authority to regulate a citizen's core [personal] right to liberty.").

## B.

### Founding-Era Criminal Statutes

The need for specificity in criminal enactments was reflected in early congressional practice.  Although the "number of federal crimes at the Founding was low," an

examination of those laws suggests that "the blanket authorization for an executive body to create regulations punishable by criminal penalties directly contravenes the Founding-era conceptualization of the separation of powers."     Michael C. McCue, *Modern Times, Hidden Crimes: Criminal Lawmaking Delegations from the Founding to Today*, 20 Dartmouth L.J. 12, 13, 28 (2022) (simplified).   One lone exception exists—the Northwest Ordinance—but that law dealt with the unique enclave of federal territories.   Criminal statutes approaching the criminal administrative laws we see today—statutes delegating to an executive official the power to define the actus reus—did not appear until the late 19th century.  This historical evidence supports that Article I's Vesting Clause, as originally understood, required that Congress define, at a minimum, a crime's actus reus and penalty.

## 1.

### Early Criminal Laws

With a single exception, federal criminal statutes at the Founding never delegated to other branches the authority to define an actus reus or affix a penalty.

Consider the first criminal law enacted by Congress. *See* An Act for the Punishment of Certain Crimes Against the United States, ch. 9, 1 Stat. 112 (1790).  It specified many crimes, including treason, piracy, murder and manslaughter within federal enclaves and at sea, and more. *Id.*  These were well known criminal offenses—even if they were defined with respect to the common law or the law of nations.  So in each case, Congress had specified an actus reus and a penalty.

Of course, sometimes discretion was involved. The Act, for example, provided that a person who "violate[s] any safe-conduct . . . under the authority of the United States, or shall . . . offer[] violence to the person of an ambassador or other public minister" would be imprisoned for up to three years and fined. 1 Stat. 112, 118 § 28. So the statute did not specify who counted as an "ambassador or other public minister" (a determination strictly within the President's foreign-policy authority). But Congress specified the actus reus—violating the official's safe-conduct. The Act thus only represents "an extraordinarily *narrow* amount of executive discretion." McCue, 20 Dartmouth L.J. at 14 (emphasis added).

Consider next a law enacted a few years later—one outlawing unregulated trade with Indians. *See* An Act to Regulate Trade and Intercourse with the Indian Tribes, ch. 19, 1 Stat. 329 (1793). While granting the Executive branch some discretion over licensing, the law sufficiently specified the conduct it made unlawful. *Id.* The law prohibited "any trade or intercourse" with Indian Tribes "without a license under the hand and seal of the superintendent of the department, or of such other person, as the President of the United States shall authorize to grant licenses for that purpose." *Id.* at 329 § 1. So unlike some modern delegations, the law didn't authorize an executive administrator to set a course of conduct for punishment. Rather, it let the Executive grant exceptions to a congressionally mandated, general prohibition, which fit within the Executive's traditional purview anyway. *See Reynolds v. United States*, 565 U.S. 432, 450 (2012) (Scalia, J., dissenting) ("[T]he power to *reduce* congressionally imposed requirements . . . is little more than a formalized

version of the time-honored practice of prosecutorial discretion.").

In the years following, Congress clearly specified in several early criminal laws the *conduct prohibited* even if it left to the Executive the discretion to determine the *precise objects* of the conduct made criminal. The Stamp Act, for example, prohibited "counterfeit[ing] or forg[ing] any stamp or mark, directed or allowed to be used by this act." *See* An Act Laying Duties on Stamped Vellum, Parchment, and Paper, ch. 11, § 13, 1 Stat. 527, 531 (1797). But that statute allowed "the Secretary of the Treasury . . . [to] provide[ the] many marks and stamps" subject to the criminal offense. *Id.* at 529. Likewise, another law punished those who "falsely make, alter, forge or counterfeit . . . any bill or note issued by order of the president, directors and company of the Bank of the United States" with a term of imprisonment. An Act to Punish Frauds Committed on the Bank of the United States, ch. 61, 1 Stat. 573, 573–74 (1798). Yet another law subjected persons who "cut any timber on the lands reserved" by the Navy Secretary to fine and imprisonment, with the Secretary authorized to select "such tracts or portions . . . as in his judgment may be necessary to furnish for the navy a sufficient supply" of wood. An Act Making Reservation of Certain Public Lands to Supply Timber for Naval Purposes, 3 Stat. 347 (1817). In all these statutes, Congress itself unambiguously specified the actus reus: counterfeiting, forging, or altering of governmental instruments or chopping down protected trees—even if Congress left to the Executive branch or others the task of specifying the precise *object* of the conduct proscribed.

Amid this backdrop, a constitutional controversy was sparked by an extraordinarily broad criminal statute, the Alien Friends Act of 1798. *See* An Act Concerning Aliens,

ch. 58, 1 Stat. 570 (1798). While the criminal portion of the Act provided a well-defined actus reus—illegal re-entry of previously deported aliens—it controversially gave unlimited discretion to the President to "order [the deportation of] all such aliens as he shall judge dangerous to the peace and safety of the United States." *Id.* at 571. The Act punished the return of "alien[s]" previously "ordered to depart" with imprisonment and disqualification from ever becoming a United States citizen. *Id.* Thus, the Act sparked concerns over too much delegation to the President to determine who could be subject to criminal punishment.

Debates over this delegation spurred Madison to passionately criticize the Act's blurring of legislative lawmaking and executive enforcement, particularly in the criminal context. *See* James Madison, The Report of 1800 (Jan. 7, 1800) ("[T]he alien act . . . unites legislative, judicial and executive powers in the hands of the President . . . . [A]ll will agree, that the powers referred to [the Executive and Judiciary] may be so general and undefined, as to be of a legislative, not of an executive or judicial nature; and may for that reason be unconstitutional.").[7] And Madison was not alone in his opposition. *See* Wurman, 130 Yale L.J. at 1514–15 (discussing the opposition to the bill by Representatives Gallatin, Williams, and Livingston). Agreeing with Madison, for instance, Rep. Gallatin said in the House of Representatives that unless crimes and punishments were "accurately defined," "States and the State Judiciary would, indeed they must, consider the law as a mere nullity, they must declare it to be unconstitutional." 8 Annals of Cong. 1982 (1798). Even Representative Otis, a supporter of the Bill, thought that such fundamental liberty

---

[7] https://founders.archives.gov/documents/Madison/01-17-02-0202.

could not "depend[] upon the will of *one man*." 8 Annals of Cong. 2021 (1798). In the shadow of this constitutional controversy, the Alien Friends Act was never enforced and not renewed upon its expiration in 1800. *See* McCue, 20 Dartmouth L.J. at 26. Thus, the Act's attempt at excessive delegation was thwarted before such delegation could become a trend.

Finally, Congress was often specific as to *all* aspects of the crime when it wrote a statute. For example, a statute regulating imports forbade "defac[ing], alter[ing] or forg[ing] any certificate, granted for the protection of merchandise transported as aforesaid[,]" subjecting violators to imprisonment and fines. An Act to Regulate the Collection of Duties on Imports and Tonnage, ch. 22, § 109, 1 Stat. 703, 703 (1799). This provision didn't just specify an actus reus and penalty. Congress set the *object* of the guilty act, too: it drafted and specified the text of the certificate one could be charged for forging. *Id.*; *see* McCue, 20 Dartmouth L.J. at 19. So while Congress *sometimes* gave the Executive the leeway to set the specific objects of an actus reus, it more commonly handled even those details itself.

## 2.

### The Northwest Ordinance

Of course, some countervailing history exists. The Northwest Ordinance is sometimes cited as proof that the Founders had no issue with broadly delegating the power to define criminal laws. *See* Mortenson & Bagley, 121 Colum. L. Rev. at 335. The Ordinance provided that territorial governors and judges could temporarily adopt criminal and civil laws of existing states until an assembly could be formed, at which point the "[territorial] Legislature shall

have authority to alter them as they shall think fit." *See* An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio §§ 5, 9 (1787) ("Northwest Ordinance");[8] Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 50–51 (1789) (expressly re-adopting the Northwest Ordinance as previously enacted by the Continental Congress). And similar laws were passed to regulate other pre-statehood territories.[9] Thus, Congress perhaps authorized criminal lawmaking in the Ordinance without specifying the actus reus of the offenses.

But the Ordinance is fundamentally different from general criminal delegations that would have been understood to exceed Congress's "Legislative powers." So the Ordinance is best viewed as the exception that proves the rule that criminal legislation required specificity, including establishing an actus reus. First, the Ordinance limited the forms of criminal conduct. The territorial governors and judges still couldn't define a criminal law's actus reus from scratch—rather, they could only temporarily adopt laws that had already been written and enacted by other states' legislatures. Northwest Ordinance § 5. And they could only do so until a territorial legislature was formed to enact laws blessed by local voters. *Id.*

Second, and more important, the Northwest Ordinance involved the administration of territorial lands—an area subject to a less stringent non-delegation doctrine. Hamburger, Is Administrative Law Unlawful? 389–90.

---

[8] https://www.archives.gov/milestone-documents/northwest-ordinance.

[9] Act of May 26, 1790, ch. 14, § 1, 1 Stat. 123, 123 (Southwest Territory); Act of Apr. 7, 1798, ch. 28, § 3, 1 Stat. 549, 550 (Mississippi Territory); Act of May 7, 1800, ch. 41, § 2, 2 Stat. 58, 59; Act of May 8, 1792 (Indiana Territory).

When debates about non-delegation regained prominence in the early twentieth century, the chief justice of the Florida Supreme Court wrote that history and necessity justified delegations to territories:

> *Immemorial usage* and the necessities of local government justify the delegation of some minor legislative power of a police nature within definite limitations to municipalities where express organic provisions do not forbid. Congress may [thus] confer limited and defined legislative powers upon the territories.

J.B. Whitfield, *Legislative Powers That May Not Be Delegated*, 20 Yale L.J. 87, 88 (1910) (emphasis added); *see also Territory ex rel. Cty. of Oahu v. William L. Whitney*, 17 Haw. 174, 180–81 (Haw. 1905) (upholding a criminal delegation to a territory's county government); *id.* at 188 (Hartwell, J., concurring) ("Delegating certain legislative powers to municipal organizations, such as towns and cities, has been found so essential to public welfare, and its delegation has been so often sustained by judicial decisions, as to be established beyond question.") (simplified). So congressional delegations to temporary territorial governments are a different playing field.

It's also worth noting that no local legislatures existed in the territories before the Ordinance. *See* Elliott-Smith, 115 J. Crim. L & Criminology at 462. So the Ordinance's protection of local inhabitants—then without a local representative government—justified expansive delegation. After all, whenever local government had been denied to colonial Americans, they experienced logistical nightmares

in petitioning Parliament and awaiting legislation from an ocean away. *See* Akhil Amar, The Words That Made Us: America's Constitutional Conversation 1760-1820, at 4–7 (2021). So the Northwest Ordinance (and later delegations to territorial governors) allowed for the quick adoption of laws most suitable for local conditions. Thus, Congress's broad delegations to temporary territorial governments fulfilled rather than undermined the fundamental principle of democratic accountability underlying the non-delegation doctrine.

### 3.

### Broad Delegations Long Postdated the Founding

The earliest federal statute to broadly delegate to an executive official the power to proscribe criminal conduct was enacted over a hundred years after the Founding. *See* McCue, 20 Dartmouth L.J. at 35–36 (explaining that the Organic Administration Act of 1897 marked the beginning of modern administrative crimes). The Organic Administration Act of 1897 granted the Secretary of the Interior authority to "make provisions for the protection" of "public forests" and "make such rules and regulations . . . to preserve the forests . . . from destruction." *See* Act of June 4th, 1897, ch. 2, 30 Stat. 11, 35 (1897). And "any violation" of these "rules and regulations" was punishable "by a fine of not more than $500 or imprisonment for not more than twelve months, or both." *Id.* (cross-referencing punishment provided by the Act of June 4th, 1888, ch. 340, 25 Stat. 166) So this was the start of broad delegations at the turn of the 20th century. Some—the Court blessed. *See, e.g.*, *United States v. Grimaud*, 220 U.S. 506, 515–23 (1911). Others— the Court struck down on non-delegation grounds. *See, e.g.*,

*A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 537–42 (1935).

That we don't see the first broad delegation of criminal lawmaking authority until the late 19th century suggests that our Founding generation would have considered such power contrary to the original meaning of "the Legislative power." *See Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020) (explaining that a tradition that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition"); *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) ("[T]o the extent later history contradicts what the text says, the text controls.").

\* \* \*

A pattern emerges from this history. For over a century, Congress understood that *it* must establish the conduct proscribed as criminal. Excluding the Northwest Ordinance (which is in a different context), no Founding-era federal law broadly delegated authority to the Executive to set the range of criminal conduct without significant constitutional controversy. That doesn't mean that Congress could not leave any discretion to the Executive. So long as Congress "identifie[d] an actus reus, the Executive Branch may retain broad discretion to prohibit particular types of conduct [within the actus reus] without running afoul of any originalist constraints on the delegation of criminal lawmaking authority." Elliott-Smith, 115 J. Crim. L. & Criminology at 483. So Congress could specify the range of conduct proscribed (the actus reus) and the Executive could determine which precise *objects* would be included within that narrow range of conduct—like choosing which lands were to be protected or what stamps and marks could not be

counterfeited.   Yet, at a minimum, the non-delegation principle has always required that Congress specify the actus reus and the penalty within the text of the statute to meet constitutional muster.

## III.

The Federal Land Policy and Management Act's criminal provision violates the non-delegation doctrine because it empowers an executive agency to define the actus reus of its criminal offense.  It provides that "[t]he Secretary [of Interior] shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property located thereon" and "[a]ny person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both." 43 U.S.C. § 1733(a).  The Act's text defines no prohibited activity and provides no notice of what conduct would constitute a criminal offense.

This statutory prohibition is as indefinite as it gets.  The Act says nothing about where or when motorists can drive off-road vehicles on public lands.  It doesn't specify what conduct could land you in jail.  Instead, the public would need to plumb the depths of the Federal Register to know what's off-limits.  *See* 43 C.F.R. § 8341.1(f)(5).  This is no simple task.  *See* Neil Gorsuch & Janie Nitze, Overruled: The Human Toll of Too Much Law 17 (2024) (explaining that the Federal Register has expanded from 16 pages in 1936 to over 188,000 pages as of 2021).  And it was likely unelected bureaucrats—and not politically accountable actors—who wrote those regulations.  *See id.* at 77 ("If laws governing major facets of our society were once largely the

work of elected representatives and the product of democratic compromises, nowadays they often represent only the current thinking of relatively insulated agency officials in a distant city."). So in effect, Congress has said, "do as the minions of the Secretary of the Interior tell you— or go to jail." Such a statute fails to provide the necessary legislative detail contemplated by the Constitution's "Legislative powers." Because Congress has not exercised its "strictly and exclusively legislative" authority to define the offense's criminal conduct, *see Gundy*, 588 U.S. at 135 (simplified), Gregory Pheasant's conviction under the Act is constitutionally invalid.

Our precedent shows why. Recently, we upheld a criminal delegation because the statute's four corners "penalized a particular type of conduct[.]" *United States v. Melgar-Diaz*, 2 F.4th 1263, 1267 (9th Cir. 2021). Congress made it a crime "to enter the United States unless an alien presents himself for inspection at an approved time and place." *Id.* Thus, the statute did "not give immigration officials the power to create crimes," but allowed discretion in determining the *object* of prohibited criminal activity (i.e., the location and time of entry). *Id.* This distinction between the criminal *act* (which cannot be delegated) and the criminal act's precise *object* (which can) is reflected in our Nation's history and criminal non-delegation precedents. *See, e.g.*, *Yakus v. United* States, 321 U.S. 414, 423 (1944) (upholding a statutory prohibition on selling commodities above maximum prices, when the type of commodity and maximum prices were set by wartime administrators).

The Court has expressly left open what "'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions." *See Touby v. United States*, 500 U.S. 160, 165–

66 (1991). Based on the text of the Constitution and its historical understanding, the answer is clear. We should read the "intelligible principle" requirement in the direction of our constitutional history and demand that Congress decide the actus reus before criminalizing conduct. The Constitution demands no less.

## IV.

Given the text and history of the Vesting Clause, Congress cannot delegate authority to define the actus reus of a crime to the Executive branch. While some discretion may be left in the hands of executive officials, Congress must establish the conduct that subjects the people to a core deprivation of personal liberty—imprisonment. Because today we bless a conviction where some unaccountable bureaucrat rather than the People's Congress established the conduct made criminal, I respectfully dissent.

VANDYKE, Circuit Judge, joined by BUMATAY, Circuit Judge, except as to Part II.C, dissenting from the denial of rehearing en banc:

Section 303 of the Federal Land Policy and Management Act ("FLPMA") grants to the Secretary of the Interior broad authority to issue regulations "with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733(a). The Secretary can back up those regulations with hefty criminal penalties—up to one year in prison and a $1,000 fine. The Secretary used this authority to create a broad array of regulatory crimes across the Bureau of Land Management. Gregory Pheasant violated one such regulation by driving his motorcycle with a broken

taillight on BLM land.  He was indicted for violating that taillight regulation, and then he successfully moved to dismiss that indictment.  The district court concluded that the regulations violated the nondelegation doctrine and dismissed them.  The panel reversed, holding that the BLM regulations did not violate the nondelegation doctrine.

The panel held that congressional delegations of criminal lawmaking power are to be reviewed under the same standard as civil delegations.  "Even in the criminal context," the panel held, "the 'intelligible principle' test provides the controlling legal standard for evaluating non-delegation challenges." *United States v. Pheasant*, 129 F.4th 576, 583 (9th Cir. 2025).  The panel was our court's first to reach that conclusion.  And although the Supreme Court has explicitly declined to conclude one way or the other whether the deferential intelligible-principle test applies in the criminal context, Supreme Court precedent and first principles suggest that it does not.  Given the heightened concerns that criminal delegations create with respect to the separation of powers and individual liberty, courts should scrutinize criminal delegations more closely than they review civil delegations.  By denying rehearing en banc, our court missed an auspicious opportunity to correct the panel's erroneous conclusion otherwise.  I respectfully dissent from the denial of rehearing en banc.

## I.

The Bureau of Land Management manages some 245 million acres of land—roughly 10% of all the land in the United States.  *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., *What We Manage*, https://www.blm.gov/about/what-we-manage (last visited Oct. 7, 2025).  Most of that land falls within this circuit. *Id.*

Roughly two-thirds of Nevada (where this case originated) falls under BLM's authority.  U.S. Dep't of the Interior, Bureau of Land Mgmt., *BLM Nevada*, https://www.blm.gov/nevada (last visited Oct. 7, 2025).

Across this wide swath, Congress has granted the Secretary of the Interior, acting through BLM, broad authority to issue any "regulations necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands."  43 U.S.C. § 1733(a).  The Secretary can back up those regulations with criminal penalties: "any person who knowingly and willfully violates any such regulation … shall be fined no more than $1,000 or imprisoned no more than twelve months, or both." *Id.*  Under this authority, the BLM has constructed a vast criminal code regulating the conduct of anyone present on BLM land with respect to, inter alia, housing policies, traffic laws, firearms regulations, mining rules, and agricultural policies.

Over the Memorial Day weekend of 2021, Pheasant rode his dirt bike on a portion of BLM land known as Moon Rocks, a few miles north of Reno, Nevada.  Because off-roaders use Moon Rocks frequently, it is regularly patrolled by BLM rangers.  Pheasant's dirt bike did not have an operating rear taillight.  By operating his dirt bike without the traffic light, Pheasant violated BLM's traffic regulation in 43 C.F.R. § 8341.1(f)(5), which bans the operation of an off-road vehicle on BLM land without a taillight.  Once apprehended he was cited (then indicted) for violating § 8341.1(f)(5)'s taillight regulation and indicted for assault on a federal officer and resisting issuance of citation or arrest.

Pheasant moved to dismiss the indictment, and the district court granted his motion. As relevant to this appeal and the panel's opinion, the district court found that the two counts premised on Pheasant's violation of BLM's regulatory crimes were invalid because they relied on an unconstitutional delegation of authority. The court determined that § 1733(a), which delegated the authority to create the regulations under which Pheasant was charged, lacked an intelligible principle, rendering it unconstitutional.

The government appealed, challenging the dismissal of the taillight count on nondelegation grounds. A panel of our court reversed in a published opinion, holding that § 1733(a) satisfies the "intelligible principle" test and is therefore a constitutional delegation of power. The panel noted that the intelligible-principle test is "an exceedingly modest limitation." *Pheasant*, 129 F.4th at 579 (quoting *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266 (9th Cir. 2021)). The panel therefore determined that it would uphold the statute so long as it contained "*some* standard constraining discretion." *Id.* at 580. The panel found such a standard in the statute's requirement that any regulations issued be "necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands." *Id.* (alteration in original) (quoting 43 U.S.C. § 1733(a)). Coupled with FLPMA's instruction to "manage the public lands under principles of multiple use and sustained yield," *id.* (quoting 43 U.S.C. § 1732(a)), the court found a "clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way," *id.*

The panel concluded its opinion by addressing Pheasant's argument that the statute requires greater scrutiny "because it empowers the Secretary to promulgate

regulations whose violation may be punished by criminal sanctions." *Id.* at 582. Citing various Supreme Court cases, the panel asserted that the Court has previously upheld such delegations under the "intelligible principle" test. *Id.* at 583. Though it acknowledged the Supreme Court's statement that perhaps "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions," *id.* (quoting *Touby v. United States*, 500 U.S. 160, 165–66 (1991)), the panel concluded that "[e]ven in the criminal context, the 'intelligible principle' test provides the controlling legal standard for evaluating non-delegation challenges," *id.*

## II.

The Constitution vests "[a]ll legislative Powers [t]herein granted … in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion). Moreover, "the principle of separation of powers that underlies our tripartite system of Government" independently compels the conclusion that Congress, not agencies, must make legislative decisions. *Mistretta v. United States*, 488 U.S. 361, 371 (1989); *see also Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) ("[I]t would frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." (internal quotation marks and footnote omitted)). So there is no doubt that "the lawmaking function belongs to Congress." *Loving v. United States*, 517 U.S. 748, 758 (1996). No matter the context, Congress "may not constitutionally delegate its legislative

power to another" constitutional actor. *Touby*, 500 U.S. at 165.

Still, "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). So the Supreme Court has made clear that delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta*, 488 U.S. at 372 (alteration marks omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Here, the panel misread Supreme Court and circuit precedent to support its conclusion that criminal delegations are subject only to the "intelligible principle" test for reviewing nondelegation challenges. Far from supporting the panel's conclusion, precedent in fact cuts the other way—confirming that courts must apply a stricter test when assessing criminal delegations. And FLPMA's criminal delegation to the Secretary runs afoul of this stricter test.

**A.**

The panel held, for the first time in this circuit, that the intelligible-principle test—and only that test—applies to congressional delegations of criminal lawmaking authority. *See Pheasant*, 129 F.4th at 583. The panel found support for this conclusion in both Supreme Court and circuit precedent. *See id.* Neither offers the support that the panel claimed to find. At best, precedent has simply left open the criminal-delegation question.

USA v. PHEASANT                                          37

Supreme Court precedent first. The panel described *United States v. Grimaud*, 220 U.S. 506 (1911), as an example of the Supreme Court's "routine[] appli[cation of] the 'intelligible principle' test even" to statutes that "authorize[] regulations backed by criminal penalties." *Pheasant*, 129 F.4th at 583. That can't be. *Grimaud* was decided in 1911, a decade and a half *before* the intelligible-principle test came to the fore in *J.W. Hampton*, 276 U.S. at 409. So that case is certainly not an example of the Supreme Court's applying the intelligible-principle test to a criminal delegation.

If anything, *Grimaud* is an example in which the Supreme Court applied a standard *higher* than the intelligible-principle test to evaluate the legality of a delegation enforced by a criminal penalty. There, the statute authorized the Secretary of Agriculture to "regulat[e] the use and occupancy of the public forest reservations and preserv[e] the forests thereon from destruction," and to enforce those regulations with criminal penalties. *Grimaud*, 220 U.S. at 509. The Court reasoned that this delegation was permissible because it only included the "power to fill up the details"—that is, the power to "administer the law and carry the statute into effect." *Id.* at 517–18.[1] Given this focus, the *Grimaud* Court effectively applied a higher standard for assessing congressional delegation. *See, e.g.*, *Gundy*, 588 U.S. at 157–58 & n.38 (Gorsuch, J., dissenting) (describing *Grimaud* as consistent with a higher nondelegation standard).

---

[1] The Court has similarly upheld criminal delegations in other instances providing adequate limitations on the executive's actions pursuant to the delegation. *See, e.g.*, *Loving*, 517 U.S. at 771–72; *Yakus v. United States*, 321 U.S. 414, 424–25 (1944).

But you needn't take my word for it that *Grimaud* doesn't settle the criminal-delegation question. Even when upholding delegations backed by criminal penalties after *Grimaud*, the Supreme Court itself has acknowledged that "whether more specific guidance is in fact required" when Congress "authorizes another Branch to promulgate regulations that contemplate criminal sanctions" remains an open question. *Touby*, 500 U.S. at 165–66.[2] Thus, the Supreme Court itself has said it hasn't provided any definitive conclusion as to whether criminal delegations require greater congressional guidance, but rather that it has explicitly left this question open for resolution in later cases. *Grimaud* neither compels nor supports the panel majority's conclusion in this case.

Nor have the circuit courts, including ours (until now), definitively decided this question. For a half century, when our court has been presented with the criminal-delegation question, we have declined to conclusively resolve it. *See United States v. Gurrola-Garcia*, 547 F.2d 1075, 1079 & n.6 (9th Cir. 1976) (concluding that "Congress may constitutionally provide a criminal sanction for the violation of regulations which it has empowered the President or an agency to promulgate," but also explaining that "if we were to apply Justice Brennan's [heightened standard] we would reach the same result" (citing *United States v. Robel*, 389 U.S. 258, 272 (1967) (Brennan, J., concurring in the result))); *United States v. Motamedi*, No. 20-10364, 2022

_____

[2] Contrast the Court's treatment of the criminal-delegation question (which it has explicitly avoided answering) with its treatment of delegations concerning the taxation power. In the context of tax delegations, the Court has made explicit that the intelligible-principle standard applies. *See Skinner v. Mid.-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989).

WL 101951, at *2 (9th Cir. Jan. 11, 2022).  Recently, in *Melgar-Diaz*, our court considered a nondelegation challenge to a statute that made it a crime to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers."  2 F.4th at 1266 (quoting 8 U.S.C. § 1325(a)(1)).  That statute passed muster because it did "not give immigration officials the power to create crimes."  *Id.* at 1267.  Rather, *Congress* "penalized a particular type of conduct"—unlawfully entering the United States—and provided the executive no more than a "ministerial authority" of "determining [approved] times and places."  *Id.*  So our court concluded that the delegation at issue did "provide[] an intelligible principle."  *Id.* at 1269.  And we further reasoned that the criminal delegation in *Melgar-Diaz* "present[ed] even fewer nondelegation concerns than [the criminal delegation in] *Touby*."  *Id.* at 1268.  Thus, like *Touby*, *Melgar-Diaz* simply assumed that a higher standard may apply to criminal delegations and declined to resolve that question.  *Id.*  So until the panel's opinion in this case, our court has consistently applied both the "intelligible principle" test *and* a heightened standard to nondelegation challenges to criminal delegations.

Other circuits have taken a similar approach.  They have frequently evaluated delegations of criminal lawmaking power under both the intelligible-principle test and a stricter test without endorsing one or the other.  *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion), *aff'd*, 602 U.S. 406 (2024); *United States v. Cooper*, 750 F.3d 263, 271 (3d Cir. 2014); *United States v. Amirnazmi*, 645 F.3d 564, 576–77 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 216–17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093–94 (4th Cir. 1993).  In rare cases, circuit courts have applied

only the intelligible-principle test—but even then, they have declined to conclusively state that it is the controlling legal standard, recognizing that the Supreme Court has suggested that a higher standard may be appropriate. *See Cooper*, 750 F.3d at 271 ("In *Amirnazmi*, we did not resolve 'the unsettled question of whether something more demanding than an "intelligible principle" is necessitated within the context of delegating authority to define criminal conduct.' We likewise decline to do so here." (citation omitted)); *United States v. Nichols*, 775 F.3d 1225, 1232 (10th Cir. 2014) ("[T]he Supreme Court left open the question whether a heightened 'meaningfully constrains' standard applies to Congress's delegation of authority involving statutes with criminal implications."), *rev'd on other grounds*, 578 U.S. 104 (2016).

Whether congressional delegations backed by criminal penalties are reviewed under the same standard as those backed by civil enforcement is an important question. And I concede that it is not an easy question. As scholars have noted, "the Court's decisions on criminal delegations are confused and conflicting." F. Andrew Hessick & Carissa Byrne Hessick, *Nondelegation and Criminal Law*, 107 Va. L. Rev. 281, 295 (2021). Yet even while the courts have refrained from answering this question conclusively, there is no shortage of judges who have described the serious constitutional concerns that arise from Congress's delegations to the executive in the context of criminal statutes. *See, e.g.*, *Cargill*, 57 F.4th at 472; *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (Tymkovich, C.J., dissenting); *United States v. Nichols*, 784 F.3d 666, 672–73 (10th Cir. 2015) (Gorsuch, J., dissenting from the denial of rehearing en banc); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 734 (6th Cir. 2013) (Sutton, J.,

concurring).  Nor have individual Justices been silent on this issue.  *See Robel*, 389 U.S. at 272–73 (Brennan, J., concurring in the result); *Barenblatt v. United States*, 360 U.S. 109, 140 n.7 (1959) (Black, J., dissenting).

The Supreme Court has found occasion to avoid answering this question, as have the other circuit courts.  But this case makes the question unavoidable because the criminal delegation at issue here does not survive the more exacting scrutiny due criminal delegations.  And given the important separation-of-powers and individual-liberty interests at stake, our court should have taken the opportunity to correct the panel's decision en banc.  Criminal delegations require a heightened standard.

**B.**

Our en banc court should have considered the question left open by longstanding Supreme Court precedent.  The panel's conclusion that criminal delegations are not held to a higher standard undermines the principles underlying the nondelegation doctrine—separation of powers and protection of individual liberty.  Moreover, it contradicts the Supreme Court's commonsense idea that the degree of congressional guidance must be commensurate with the scope of the delegation.  Holding criminal delegations to a higher standard than civil delegations is also consistent with the way courts treat other constitutional and quasi-constitutional doctrines regarding criminal-law impositions upon individual freedom.  So courts should scrutinize criminal delegations to a greater degree than civil delegations.

The basis for scrutinizing criminal delegations more rigorously than civil delegations is simple: laws defining criminal conduct "represent the ultimate intrusions on

personal liberty and carry with them the stigma of the community's collective condemnation." *Nichols*, 784 F.3d at 672–73 (Gorsuch, J., dissenting from the denial of rehearing en banc). It was for that reason that the Founders exercised caution to separate the criminal enforcement power from the lawmaking power. *See* Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1017, 1031 (2006); *see also* The Federalist No. 47 (Madison) ("The accumulation of all powers … in the same hands … may justly be pronounced the very definition of tyranny."). Thus, as the Supreme Court has explained since its earliest days, "[t]he legislative authority of the Union must first make an act a crime," and "affix a punishment to it." *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812). Congress must "define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). When Congress simply sets a punishment, as it did in 43 U.S.C. § 1733(a), without defining the specific conduct that warrants that punishment, Congress fails to comply with that central ideal of the separation of powers. *See* James Madison, *Report on the Virginia Resolution*, *in* 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 546, 560 (Jonathan Elliot ed., 2d ed. 1836) ("Details, to a certain degree, are essential to the nature and character of a law; and on criminal subjects, it is proper that details should leave as little as possible to the discretion of those who are to apply and execute the law.").

Congress may not transfer to others "powers which are strictly and exclusively legislative"—such as the power to write criminal laws. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress

is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."). "[E]nacting criminal statutes is a core congressional function, because the alternative (delegating legislative power to the executive branch) has an untenable result—placing the lawmaking and the law-enforcing in a single branch of government." Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power, in The Administrative State Before the Supreme Court* 97 (Peter J. Wallison & John Yoo eds., 2022).

The panel incorrectly concluded otherwise. It reasoned that "a power does not become more legislative simply because its exerciser can issue rules backed by criminal penalties." *Pheasant*, 129 F.4th at 583. Not true. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures … should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see also Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting); Hessick & Hessick, *supra* at 300. That is why "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985). Contrary to the panel's conclusion otherwise, criminal lawmaking is an *especially* legislative matter.

Requiring a higher standard for delegations in the criminal context is also not a novel idea. Rather, it is the logical extension of the general idea that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Melgar-Diaz*, 2 F.4th at 1267 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001)). That is, "[l]aws

that vest more power require more constraints." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 776 (6th Cir. 2023) (Nalbandian, J., dissenting). There is no greater power than the power to punish criminally. *See* Brenner M. Fissell, *When Agencies Make Criminal Law*, 10 U.C. Irvine L. Rev. 855, 880 (2020) ("[T]he uniquely harsh sanctions that result from criminal law violations makes delegation of criminalization a matter of special concern …."); Chenoweth & Samp, *supra* at 102. Because the power to impose harsh criminal sanctions is so great, Congress must provide a comparably greater degree of guidance.

It is particularly noteworthy that the only two cases in which the Supreme Court has ever found an impermissible delegation were in cases that presented criminal delegations. In *Fahey v. Mallonee*, the Court reasoned that the statutes at issue in *Schechter Poultry* and *Panama Refining* were found to have violated the nondelegation doctrine because each "dealt with delegation of a power to make federal crimes of acts that never had been such before." 332 U.S. 245, 249 (1947). And even when the Court has upheld other criminal delegations it has nonetheless "suggested that 'greater congressional specificity [may be] required in the criminal context.'" *Carter*, 736 F.3d at 734 (Sutton, J., concurring) (quoting *Touby*, 500 U.S. at 166); *see also Nichols*, 784 F.3d at 672 (Gorsuch, J., dissenting from the denial of rehearing en banc) (collecting cases). The Court has suggested that these delegations might require more "meaningful[]" guidance than a mere "intelligible principle." *Touby*, 500 U.S. at 166; *Fahey*, 332 U.S. at 249–50; *see also, e.g.*, *Robel*, 389 U.S. at 272–73 (Brennan, J., concurring); *Barenblatt*, 360 U.S. at 140 n.7 (Black, J., dissenting). Thus, while the nondelegation doctrine has only ever had "one good year" at the Supreme Court, Cass R. Sunstein, *Nondelegation*

*Canons*, 67 U. Chi. L. Rev. 315, 322 (2000), that was the year in which the Court was presented with rampant delegations backed by criminal penalties.

Requiring greater specificity with respect to criminal delegations is also consistent with other doctrines that require greater clarity in the criminal context. *See* Hessick & Hessick, *supra* at 301–05. For example, the void-for-vagueness doctrine demands greater specificity in criminal laws. *See Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). The Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). So too with the centuries-old prohibition on federal common-law crimes, even while federal common law remains commonplace in the civil context. *See Hudson & Goodwin*, 11 U.S. (7 Cranch) at 34. The quasi-constitutional doctrine of lenity also lends support with its standard conception that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 410 (2010) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). Criminal delegations should not be the glaring exception amidst these constitutional and quasi-constitutional doctrines properly limiting Congress's ability to impose criminal penalties based upon open-ended statutes.

In sum, Supreme Court precedent, the principles underlying the nondelegation doctrine, and the Supreme Court's treatment of corollary criminal-law doctrines all suggest a higher standard when reviewing criminal delegations.

## C.

So criminal delegations should be subject to a stricter test than non-criminal delegations. But what might this stricter test require? *Touby* lays out one option. *See* 500 U.S. at 166. There, the Court noted three factors that justified the Controlled Substances Act's delegation of the power to schedule a drug as a controlled substance. *Id.* at 166–67. First, Congress required that before scheduling a drug as a controlled substance, the executive must first determine it to be an "imminent hazard" to public safety. *Id.* at 166. Second, the executive was required to weigh the history, current state, scope, duration, and significance of the drug's abuse to determine what risk it presents to the public health. *Id.* And finally, the executive, after making a factual finding that the drug "has a high potential for abuse," has no medical use, and is not safe under medical supervision, could list the drug as a controlled substance. *Id.* at 167.

From the Court's analysis flows a three-pronged "meaningful constraint" test. *See Nichols*, 784 F.3d at 673–74 (Gorsuch, J., dissenting from the denial of rehearing en banc). First, Congress must draw a clear and generally applicable rule—in the case of the Controlled Substances Act, the statutory requirement that no unauthorized person may possess a controlled substance. *Touby*, 500 U.S. at 166–67. Second, that rule must hinge on a factual determination by the executive. *Id.* at 167. And third, the statute must provide criteria constraining the executive as it makes its finding. *Id.*; *see also Mistretta*, 488 U.S. at 372–73 (Congress must "clearly delineate[] the general policy … and the boundaries of this delegated authority." (citation omitted)). Circuit courts, including ours, have used essentially this analysis drawn from *Touby* when evaluating criminal delegations in other statutes. *See United States v.*

*Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023); *Amirnazmi*, 645 F.3d at 576–77; *Dhafir*, 461 F.3d at 216–17; *United States v. Garfinkel*, 29 F.3d 451, 457–59 (8th Cir. 1994); *Arch Trading Co.*, 987 F.2d at 1093–94.

Applying the appropriate standard for criminal delegations—a test akin to *Touby*'s meaningful-constraint test—FLPMA's unbounded delegation to determine, by regulatory fiat, the actions to which criminal penalties attach fails to pass constitutional muster. Even if § 1733(a) draws a clear and generally applicable rule, it does not require the Secretary to make a specific factual finding (with or without any criteria) when determining what actions to criminalize.

And Congress did not provide any criteria to constrain the Secretary's exercise of policy judgment in determining what actions to criminalize. When issuing regulations necessary for "the management, use, and protection of the public lands," § 1733(a), the Secretary must consider the "principles of multiple use and sustained yield," § 1732(a). "Multiple use" means treating the competing uses for BLM land to "best meet the present and future needs of the American people." § 1702(c). "Sustained yield" entails "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." § 1702(h). These principles—though they purport to live in harmony—can be used to justify almost any of the potential uses of land that a Secretary might pursue. Decisions about land use always involve tradeoffs, and uses of land are often mutually exclusive. For just one example, devoting land to recreational use will inevitably inhibit resource extraction and commercial use. But does that recreational use (which may yield a sizable *intangible* benefit) "best meet the present and future needs of the American people," considering the

*tangible* economic opportunity cost? And if so, would commercial use not be "consistent with multiple use"? Reasonable minds may differ. The Supreme Court has explained, "'[m]ultiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

From this inherently contradictory statutory guidance, the panel concluded that Congress "set out a clear principle: The Secretary must develop a long-term management strategy to realize the land's value in a sustainable way." *Pheasant*, 129 F.4th at 580. But that principle does nothing to meaningfully limit the Secretary's ability to decide what conduct can, or should, be criminalized.

Sometimes, less is more. This is one such time. In FLPMA, the Secretary must balance many contradictory objectives—present and future uses, recreational and commercial uses, and short-term and long-term extraction—to name just a few. And because of these inherently contradictory objectives, the statute "does nothing to cabin the Secretary of the Interior's ability to choose what is a crime." This arrangement gives the Secretary effectively carte blanche "power to write a criminal code rife with his own policy choices." *Gundy*, 588 U.S. at 171 (Gorsuch, J., dissenting).

Because there is no Congressional guidance for balancing these competing objectives, and unfettered discretion when balancing them, other cases where the Supreme Court upheld exceedingly broad civil or criminal delegations are inapposite here. For example, in *Yakus*, the Court upheld a statute that allowed an administrator "to

stabilize commodity prices so as to prevent war-time inflation" and stymie "enumerated disruptive causes and effects" of inflation. 321 U.S. at 423. But unlike the statute here, the delegating statute in *Yakus* represented a congressional policy judgment that came with a "stated … legislative objective," a "prescribed … method of achieving that objective," and "standards to guide the administrative determination." *Id.* So too in *Grimaud*, where the Court rejected a nondelegation challenge to a statute that delegated authority to the Secretary of Agriculture to regulate the occupancy and use of public forest reservations to preserve them from destruction. 220 U.S. at 515, 522. But the *Grimaud* Court understood that this rulemaking authority was limited to "regulating the use and occupancy of the public forest reservations" so as to "preserv[e]" them and keep them from "destruction." *Id.* at 509; *see also Gundy*, 588 U.S. at 158 & n.37 (Gorsuch, J., dissenting). Here, in contrast, the Secretary can freely exercise his own policy judgment when picking among the *competing* objectives—without any guidance from Congress on how he must weigh each particular objective of BLM's "multiple use and sustained yield" mandate. And unlike the limitation in *Touby*, which required the agency to conclude that a drug posed "an imminent hazard to the public safety," 500 U.S. at 166 (citation omitted), here the Secretary is not bound to achieve a direct policy objective that Congress has first set in the statute. Instead, the Secretary has unfettered discretion to balance a host of competing directives as the Secretary sees fit.

Further, when looking at the delegation here we should also consider the extent and scope of the delegation's impact. BLM manages not only 10% of the United States's landmass but is also the largest landholder in

50                         USA v. PHEASANT

the United States and manages roughly 30 percent of the
Nation's mineral resources.    *See* U.S. Dep't of the
Interior, Bureau of Land Mgmt., *What We Manage*,
https://www.blm.gov/about/what-we-manage (last visited
Oct. 7, 2025).   Practically, this delegation lets the agency
"promulgate a plethora of rules from housing policies, to
traffic laws, to firearms regulations, to mining rules, to
agriculture certifications," thereby granting it "unfettered
legislative authority to promulgate rules for over 48 million
acres of land [in Nevada], which is 68% of the state." *See
Norton*, 542 U.S. at 58.

    The geographic size and substantive scope of BLM's
criminal lawmaking authority is already astounding.  But it
gets even more monstrous given the plenary authority that
the federal government has over its land.  As the panel
acknowledged, "[t]he Constitution expressly vests in
*Congress*, the authority to manage 'Property belonging to
the United States.'" *Pheasant*, 129 F.4th at 582 (emphasis
added) (quoting U.S. Const. art. IV, § 3, cl. 2).   "That
authority is plenary—the Supreme Court has described it as
'without limitations,' and analogous 'to the police power of
the several states.'"  *Id.* (citation omitted) (first quoting
*United States v. City & Cnty. of San Francisco*, 310 U.S. 16,
29 (1940); and then quoting *Camfield v. United States*, 167
U.S. 518, 525 (1897)); *see also Kleppe v. New Mexico*, 426
U.S. 529, 540 (1976).   Far from lessening the dangers of
delegations, complete delegations of a plenary power
necessitate greater scrutiny. *See Pheasant*, 129 F.4th at 582.
The settled principle that the scope of Congressional
guidance must be commensurate with the scope of the
delegated authority demands as much. *See Melgar-Diaz*, 2
F.4th at 1267; *Whitman*, 531 U.S. at 475.  And here, where
Congress has provided no limiting principles on what crimes

the Secretary may fashion pursuant to Congress's plenary power, the effectively unbounded delegation runs afoul of the Constitution's demands.

### III.

This case squarely presents an issue at the core of separation of powers and individual liberty. The panel opinion in this case broke new ground as the first circuit court to conclusively resolve that criminal delegations are held to the same exceedingly low standard that applies to civil delegations. That conclusion does not follow from Supreme Court precedent, prior Ninth Circuit precedent, or out-of-circuit precedent, which have all declined to resolve this question. Our court should have reheard this case en banc to resolve that question and to correct the panel's erroneous conclusion that criminal delegations are not held to a higher standard. I respectfully dissent from the denial of rehearing en banc.